UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JEREMY G.,

                         Plaintiff,

v.                                           1:24-CV-00506
                                             (AJB/ML)

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
_____

APPEARANCES:                      OF COUNSEL:

JEREMY G.
 *Plaintiff, Pro Se*

U.S. SOCIAL SECURITY ADMIN.      HUGH DUN RAPPAPORT, ESQ.
 *Counsel for Defendant*
6401 Security Boulevard
Baltimore, Maryland 21235

**MIROSLAV LOVRIC**, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

Plaintiff Jeremy G. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (Dkt. No. 1.)  Plaintiff is appearing *pro se*, and the Clerk provided him a copy of the Local Rules of Practice and the Pro Se Handbook for the Northern District of New York. (Dkt. Nos. 6, 11.) Plaintiff did not consent to the disposition of this case by a Magistrate Judge. (Dkt. No. 5.)

This matter has been referred to me for preparation of a Report and Recommendation to the Honorable Anthony J. Brindisi, United States District Court Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  It has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when appealing a denial of Social Security benefits.

Currently before this Court are Plaintiff's motion for judgment on the pleadings and Defendant's motion for judgment on the pleadings. (Dkt. Nos. 17, 22.)  For the reasons set forth below, this Court recommends the District Court grant Plaintiff's motion for judgment on the pleadings, deny Defendant's motion for judgment on the pleadings, and remand the Commissioner's decision for further administrative proceedings.

## I.    PROCEDURAL HISTORY

On November 30, 2021, Plaintiff filed an application for DIB alleging disability dating from November 10, 2015. (Administrative Transcript ("T.") 129-130.)  His application was denied initially on February 22, 2022, and his request for administrative reconsideration was denied on June 10, 2022. (T. 117-128, 132-143.)  Plaintiff's subsequent request for a hearing was granted. (T. 191-198.)  On February 21, 2023, Plaintiff testified before Administrative Law Judge ("ALJ") Dale Black-Pennington. (T. 31-42.)  The ALJ held a supplemental hearing on July 6, 2023 to hear the testimony of vocational expert ("VE") Patricia Highcove. (T. 73-86.)  The ALJ issued an unfavorable decision on July 27, 2023. (T. 42-72.)  The Appeals Council denied Plaintiff's request for review on February 28, 2024. (T. 1-7.)

Plaintiff, who was represented by counsel during the administrative process, commenced this judicial proceeding *pro se* on April 11, 2024 to challenge the Commissioner's denial of disability benefits. (Dkt. No. 1.)

## II.    GENERALLY APPLICABLE LAW

### A.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2015); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  To facilitate the court's review, an ALJ must set forth the crucial factors justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted).  Where substantial evidence supports the ALJ's findings they must be sustained "even where substantial evidence may

3

support the plaintiff's positions and despite that the court's independent analysis of the evidence may differ from the [ALJ's]." *Rosado*, 805 F. Supp. at 153. In other words, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

**B.    Standard for Benefits[1]**

To be considered disabled, a plaintiff-claimant seeking benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff-claimant's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

*Id*. § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2015). Under that five-

---

[1]  The requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments;  (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments;  (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

## III.    FACTS

As of the date of the ALJ's decision, Plaintiff was 41 years old and resided with his wife and four children. (T. 50, 129.)  He is a high school graduate who attended special education classes due to learning difficulties attributed to attention deficit disorder ("ADD") or attention deficit hyperactivity disorder ("ADHD"). (T. 52, 314.)  His past relevant work is primarily in the construction field, including demolition, concrete work, roofing, and general carpentry. (T. 805, 1114, 1404.)  Plaintiff stopped working full-time when he developed carpal tunnel syndrome that made it difficult to hold a hammer or other tools. (T. 58, 318, 495.)

Plaintiff has had surgeries on both hands to address symptoms associated with carpal tunnel syndrome and related impairments. (T. 440-441, 455, 465.)  Although Plaintiff appeared to have a good initial response to these surgeries, he soon reported continued numbness, swelling, tingling, and pain, particularly in the right hand. (T. 465, 550. 1280.)  His physicians

have advised him that additional surgery would likely lead to greater nerve damage and scar tissue and would not alleviate his continued symptoms. (T. 54-55, 319, 755.)

At his hearing, Plaintiff described other limitations that arose after the date last insured. (T. 56-58.)  Following a car accident, he experienced significant back pain that has been treated with multiple epidural steroid injections. (T. 55, 1468, 1619.)  His physicians have also considered whether other diagnoses, such fibromyalgia or Complex Regional Pain Syndrome ("CRPS"), would explain his worsening hand pain and other symptoms. (T. 768, 1243, 1592.) Plaintiff has not received any formal mental health treatment but reported that his primary care physician had prescribed medication to address longstanding difficulties with memory and concentration.  (T. 55, 1079-1080.)

The record includes Plaintiff's treatment history.  Rather than summarizing these records at the outset, I will refer to the pertinent records during my evaluation of the ALJ's disability determination.

## IV.    <u>THE ALJ'S DECISION</u>

As an initial matter, the ALJ determined that Plaintiff met the insured status requirements through September 30, 2017. (T. 18.)  Based upon his review of the administrative record, the ALJ next found that Plaintiff had not engaged in substantial gainful activity during the relevant period between the alleged onset date of November 10, 2015, through the date last insured.  (*Id*.) At step two, the ALJ found that Plaintiff has the following severe impairments during the relevant period: "carpal tunnel syndrome status bilateral carpal tunnel releases, mild left cubital tunnel syndrome, and De Quervain's tenosynovitis in the right wrist." (T. 19-20.)

At step three of the evaluation, the ALJ found that Plaintiff's impairments either singly or in combination did not meet or medically equal the severity of a listed impairment during the

relevant period.  Next, the ALJ found that Plaintiff could perform less than the full range of light

work. (T. 20-25.)  Specifically, the ALJ found that Plaintiff

> could lift and carry twenty pounds occasionally and ten pounds occasionally;
> [Plaintiff] could stand and walk for six hours in an eight-hour workday; [Plaintiff]
> could sit for six hours in an eight-hour workday; [Plaintiff] could reach in all
> direction with both upper extremities without limitation, and [Plaintiff] could
> frequently finger and handle.

(T. 20.)

In making this RFC determination, the ALJ stated that he considered all of Plaintiff's

symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent

with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R.

404.1529" and Social Security Ruling ("SSR") 16-3p. (*Id.*)  The ALJ further stated that he

considered opinion evidence and prior administrative medical findings in accordance with 20

C.F.R. § 404.1520c. (*Id.*)  The ALJ also considered Plaintiff's subjective complaints regarding

pain, symptoms, and functional limitations along with a corresponding written statement from

Plaintiff's wife and found them "not fully consistent with the evidence prior to the date last

insured of September 30, 2017." (T. 21.)

Citing VE Highcove's hearing testimony, the ALJ found that Plaintiff was unable to

perform any of his past relevant work through the date last insured. (T. 25.)  He proceeded to

step five, and again stating his reliance on the VE testimony, the ALJ found that there were jobs

existing in significant numbers in the national economy that Plaintiff could have performed

during the relevant period, citing the representative unskilled light exertional occupations of

cashier, housekeeper, and sales attendant. (T. 26-27.)  Accordingly, the ALJ found that Plaintiff

was not disabled at any time between from his alleged onset date of November 10, 2015 through

the date last insured of September 30, 2017. (T. 27.)

V.    **ISSUES IN CONTENTION**

Plaintiff was represented by counsel during the administrative process, including two

hearings and his request for review by the Appeals Council. (T. 42-86, 423-429, 432-438.)  He

commenced this judicial proceeding *pro se*. (Dkt. No. 1.)

On July 30, 2024, Plaintiff filed a letter with the Court requesting that it review the full

scope of his medical and mental health history, and faulting the ALJ for adopting a limited

review of the record that understated the limiting effects of his impairments. (Dkt. No. 15.)  On

July 31, 2024, I directed Plaintiff to either clarify that this correspondence was intended to serve

as his brief or to timely file a brief presenting his arguments to the court. (Dkt. No. 16.) On

August 12, 2024, Plaintiff filed a brief consisting of excerpts from his prior counsel's

administrative filings, raising several arguments:

- The ALJ failed to properly consider all of Plaintiff's severe impairments, including back pain, fibromyalgia, and ADHD.

- The ALJ improperly relied on medical records from a treating orthopedic surgeon despite other evidence that challenged the accuracy of those findings.

- The ALJ's RFC determination did not accurately reflect Plaintiff's physical and mental functional limitations.

- The ALJ failed to properly consider the vocational expert testimony at step five.

(Dkt. No. 17.)

The Commissioner contends that the ALJ's disability determination properly applied the

five step sequential evaluation and was thus supported by substantial evidence, and that the ALJ

properly limited his review of Plaintiff's application for DIB benefits to the relevant period

between the alleged onset date and the date last insured.

"In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants." *Hubbard v. Comm'r of Soc. Sec.*, No. 6:14-CV-1401 (GTS/WBC), 2016 WL 551783, at *4 (N.D.N.Y. Jan. 14, 2016). As such, when a *pro se* plaintiff declines to file a brief or files an insufficient brief, a court should still independently "examine[ ] the record to determine whether the ALJ applied the correct legal standard and reached a decision based on substantial evidence." *Id.* (citing *Gregorka v. Comm'r of Soc. Sec.*, No. 6:13-CV-1408 (GTS/TWD), 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015)); *Sean Quinton T. v. Comm'r of Soc. Sec.*, No. 1:19-CV-154, 2019 WL 5842791, at *4 (N.D.N.Y. Nov. 7, 2019) (recognizing that court may "independently scrutinize[] the Commissioner's final decision to ensure that it complies with the applicable standard of review even where *pro se* plaintiff filed a brief).

This Court has applied such independent scrutiny in this case and recommends remand for further administrative proceedings in light of the obvious[2] harmful discrepancy between the ALJ's RFC determination and the hypothetical question upon which the VE based his testimony regarding jobs available in the national economy, resulting in a step five determination that is not supported by substantial evidence.

## VI.  **AVAILABILITY OF WORK**

### A.  Legal Standard

If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a hypothetical question incorporating Plaintiff's limitations. *See Aubeuf v. Schweiker*, 649 F.2d

---

[2] Despite the discrepancy being obvious on the face of the ALJ's July 27, 2023 decision, this Court notes that it went unaddressed by Plaintiff's former legal counsel or the Commissioner in any of their administrative or judicial filings.

107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's testimony regarding the availability of

work as long as the hypothetical facts the expert is asked to consider are based on substantial

evidence and accurately reflect Plaintiff's limitations.  *Calabrese v. Astrue*, 358 F. App'x 274,

276 (2d Cir. 2009).  Where the hypothetical is based on an ALJ's RFC analysis which is

supported by substantial facts, the hypothetical is proper.  *Id.* at 276-77.

### B. The ALJ lacked substantial evidence to find that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.

Mirroring the narrow arguments that his counsel raised during the administrative process,

Plaintiff contends that the ALJ's failure to accurately reflect his functional limitations in the RFC

resulted in a corresponding error in the ALJ's questioning of the VE and his step five

determination. (Dkt. No. 17 at 6-7.)  As discussed below, this argument is unpersuasive because

it is primarily based upon diagnosed impairments and potential functional limitations that arose

after the date last insured and asks the Court to reweigh relevant evidence presented to the ALJ.

In raising this narrow argument, Plaintiff overlooks a more fundamental error in the ALJ's step

five analysis.  Namely, that the ALJ's physical RFC determination is more restrictive than the

hypothetical functional limitations that formed the basis for the VE's opinion that there were jobs

existing in significant number that Plaintiff could perform during the relevant period.

At step four of his decision, the ALJ found that Plaintiff had the ability during the

relevant period to:

> perform light work as defined in 20 CFR 404.1567(b) except: claimant could lift
> and carry twenty pounds occasionally and **ten pounds occasionally**; claimant
> could stand and walk for six hours in an eight-hour workday; claimant could sit
> for six hours in an eight-hour workday; claimant could reach in all direction with
> both upper extremities without limitation; and claimant could frequently finger
> and handle.

(T. 20.) (emphasis added.)  At step five, in purported reliance on the testimony of VE Highcove,

the ALJ found that Plaintiff could perform a number of representative unskilled light work

positions. (T. 26-27.)  However, the VE identified those jobs in response to a less restrictive

hypothetical RFC, as reflected in the transcript of the July 6, 2023 hearing:

> Q:      Okay.  At this time, then, let me give you my first residual functional
> capacity.  This RFC assumes that the Claimant is able to lift and/or carry 20
> pounds occasionally and **10 pounds frequently**, able to stand and/or walk about 6
> of 8 hours, able to sit about 6 of 8 hours, is able to frequently finger and handle,
> able to perform unlimited reaching in all directions with bilateral upper
> extremities, able to understand, remember and apply simple instructions and
> directions.
>
> Given those limitations, would the Claimant be able to do any of his past work?
>
> A:      No, would not.
>
> Q:      . . . Let's go a little further, then, with this RFC, again assuming RFC
> number one, and we have someone similarly situated to the Claimant, in fact, born
> in 1981 and, thus, would be a younger-aged person per our regulatory categories.
> Has a high school education and the same past work as the Claimant.
>
>       Are there any unskilled jobs that this individual could perform?
>
> A:      Yes, oh, cashier II, 211.462-010, light, SVP: 2, 466, 844, 4-6-6-8-4-4,
> cleaner, housekeeping, 323.687-010, light, SVP: 2, 177,267, 1-7-7-2-6-7 and sales
> attendant, 299.677-010, light, SVP: 2 174,250 - - 245, 174-2-4-5.

(T. 81-82.) (emphasis added.)

"It is bedrock Social Security law that the responses of a vocational expert are relevant

only to the extent offered in response to hypotheticals that correspond to medical evidence of

record."  *See Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 298 (W.D.N.Y. 2006)

(internal quotation omitted).  VE testimony "is only useful if it addresses whether the particular

claimant, with his limitations and capabilities, can realistically perform a particular job."  *See*

*Aubeuf*, 649 F.2d at 114.  Accordingly, if an ALJ finds that an individual's "limitations are

different than the ALJ earlier concluded, the ALJ must newly present a hypothetical to a vocational expert that captures [those] limitations." *Julia P. v. Saul*, No. 6:19-CV-01171 (LEK), 2021 WL 11549419, at *12 (N.D.N.Y. Feb. 19, 2021) (remanding where ALJ's hypothetical questions to VE did not account for documented limitations in plaintiff's ability to use her hands); *see also Horbock v. Barnhart*, 210 F.Supp.2d 125, 134 (D.Conn.2002) (". . . in order for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record.") (internal citation omitted.)

Due to the obvious discrepancy between the ALJ's hypothetical to the VE and the ALJ's final physical RFC determination, the ALJ lacked substantial evidence to carry the Commissioner's burden to show that there were jobs existing in significant numbers that Plaintiff could have performed during the relevant period. *See Hanlon v. Comm'r of Soc. Sec.*, No. 5:07-CV-747 (FJS), 2010 WL 5285311, at *6 (N.D.N.Y. Dec. 17, 2010) ("A VE's testimony will not constitute substantial evidence to support an ALJ's decision where the ALJ relies on a VE's opinion regarding a hypothetical claimant whose limitations do not mirror the plaintiff's."); *see also Baylis v. Colvin*, No. 8:13-CV-0977 (RFT), 2015 WL 5642921, at *9 (N.D.N.Y. Sept. 24, 2015) (". . . the most problematic error committed by the ALJ . . . is what he failed to present to the VE yet included in the RFC"). Thus, this Court recommends remand for further administrative proceedings to resolve the discrepancy between the RFC determination and the VE testimony, potentially including solicitation of additional VE testimony covering the relevant period.

Before recommending remand, this Court has considered whether the RFC limitation to occasional, rather than frequent, lifting of ten pounds can be considered harmless error. *See*

*Michael C. v. Comm'r of Soc. Sec.*, No. 1:18-CV-1115 (ATB), 2019 WL 7293683, at *3 (N.D.N.Y. Dec. 30, 2019) (recognizing long-standing doctrine that an ALJ's errors in weighing the evidence or applying the law may be considered harmless where proper consideration of the evidence or law would not have changed the outcome).  For example, courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is not substantive.  *See Van Valkenberg ex rel. B.G. v. Astrue*, No. 08-CV-0959 (DNH/VEB), 2010 WL 2400455, at *13 (N.D.N.Y. May 27, 2010) (collecting cases); *see also Brown ex rel. S.W. v. Astrue*, No. 105-CV-0985 (NAM/RFT), 2008 WL 3200246, at *13 n.19 (N.D.N.Y. Aug. 5, 2008) (disregarding ALJ's reference to the wrong exhibit number as a "typographical error").

Taking the opinion as a whole, this Court cannot conclude that a restriction to only occasional lifting of ten pounds was a mere typographical error.  While the ALJ did not explain how he determined how often Plaintiff could lift ten pounds, his RFC analysis did discuss medical evidence related to Plaintiff's lifting ability.  This included treating orthopedic surgeon Dr. Andrew Gunther's various opinions that the ALJ found to be "generally persuasive." (T. 24-25.)  In particular, the ALJ cited Dr. Gunther's September 2016 opinion that Plaintiff "was capable of working at that time provided he was not required to lift more than ten pounds with his right hand."  (T. 25, 481.)  The ALJ's decision later cited Dr. Gunther's September 2017 opinion that Plaintiff could return to work provided he was not required to lift more than ten pounds. (T. 24, 610.)  The ALJ also found a March 21, 2016 opinion from Dr. James McGlowan that Plaintiff should not lift more than fifteen to twenty pounds to be "generally persuasive." (T. 24, 576.)  None of these opinions are inconsistent with the ALJ's RFC determination limiting Plaintiff to only occasional lifting of ten pounds.

Moreover, the different lifting requirements are not the only time that the ALJ departed from the hypothetical that formed the basis of the VE's opinion, suggesting that the changes in his final decision were intentional rather than an inadvertent typographical error. The ALJ also excluded any mental limitations from the RFC, despite asking the VE to limit his testimony to unskilled jobs that involved only simple instructions and directions. (T. 20, 81-82.) However, this error, by itself, is harmless because all of the representative jobs identified at step five were still unskilled. Thus, the failure to include a specific restriction to unskilled work in the actual RFC determination would not have changed the outcome.

In contrast, the discrepancy between the physical RFC determination and the only hypothetical provided to the VE cannot be considered harmless, because the distinction between an individual's ability to "frequently" lift ten pounds and the more limited ability to lift ten pounds "occasionally" is a sizable one. The Social Security regulations define "frequently" as occurring between one-third to two-thirds of a workday. *See* SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983). "Occasionally" means occurring from very little up to one-third of the workday. *Id*. at *5. Being classified as light work positions, the identified jobs of cashier, housekeeping cleaner, and sales attendant ordinarily require the ability to lift ten pounds on a frequent basis. *See* 20 CFR 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."); *see also* Dictionary of Occupational Titles ("DICOT"), Cashier II, Code 211.462-010, 1991 WL 671840 (4th Ed. 1991); DICOT, Cleaner, Housekeeping, Code 323.687-014, 1991 WL 672783 (4th Ed. 1991); DICOT, Sales Attendant, Code 299.677-010, 1991 WL 672643 (4th Ed. 1991).

At the hearing, the VE was not given an opportunity to opine whether a significant number of these light work jobs would still be available if Plaintiff was limited to occasionally

lifting ten pounds.  (T. 81-83.)  This Court notes that a restriction to occasionally lifting ten pounds is typically more consistent with sedentary work.  See 20 CFR 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."); *see also Carvey v. Astrue*, 380 F. App'x 50, 52 (2d Cir. 2010) (". . . in the Social Security context, a person must be able to lift ten pounds occasionally, sit for a total of six hours, and stand or walk for a total of two hours in an eight-hour workday to be capable of 'sedentary work' ").  Thus, there is a reasonable likelihood that the reduced lifting ability described in the ALJ's RFC determination would erode the number of unskilled light work jobs available to Plaintiff, and the error should not be considered harmless.

### C.  Plaintiff's Other Challenges to the ALJ's Disability Determination Do Not Present Independent Grounds for Remand.

If the District Court were to find that the discrepancies between the RFC determination and the VE testimony were all harmless error, this Court would recommend affirmation of the Commissioner's decision because none of Plaintiff's other challenges to the ALJ's disability determination present independent grounds for remand.

The fundamental flaw in the arguments presented in Plaintiff's brief is the focus on diagnoses and functional limitations arising after the date last insured.  Even if the medical and other evidence showed new or worsening symptoms, they fall outside the relevant period between the alleged onset date of November 10, 2015, and the date last insured of September 30, 2017.  *See Vilardi v. Astrue*, 447 Fed. Appx. 271, 272 (2d Cir. 2012) (holding that reliance on evidence demonstrating a worsening of plaintiff's condition after the date on which she was last insured was of "little value" to counter the substantial evidence the ALJ relied on to determine entitlement to DIB benefits); *Behling v. Comm'r of Social Sec.*, 369 Fed. Appx. 292, 294 (2d Cir.

2010) (rejecting plaintiff's request for the court to consider her current condition because she "was required to demonstrate that she was disabled as of the date on which she was last insured" and "[a]ny new impairments are not relevant.")

For example, Plaintiff contends that the ALJ should have found that a ganglion cyst on his right wrist, Complex Regional Pain Syndrome ("CRPS"), fibromyalgia, back pain, and ADHD were all severe impairments that impacted his RFC, but he has not shown that these impairments imposed functional limitations during the relevant period. (Dkt. No. 17 at 2-7.) Most of these conditions are absent from treatment notes dated between the alleged onset date of November 10, 2015 and the date last insured of September 30, 2017.  Imaging results first revealed a ganglion cyst had developed on Plaintiff's right wrist in May 2018. (T. 1592.)  A potential diagnosis of CRPS was considered by Plaintiff's physicians in May 2018 and September 2018. (T. 768, 1592.)  A potential diagnosis of fibromyalgia was first discussed in treatment notes in August 2018. (T. 1243.)  Plaintiff first received treatment for back pain after a car accident in May 2022. (T. 1416, 1468.)

The ALJ expressly considered Plaintiff's reports that he was prescribed medication for ADHD symptoms since the age of twelve, but found Plaintiff "does not appear to have received any treatment for attention deficit hyperactivity disorder or any other mental impairment during the alleged period of disability." (T. 19, 57.)  The ALJ noted that one of Plaintiff's treating physicians, Dr. Kevin King, opined that Plaintiff had memory and concentration deficits in February 2019, but did not address any impacts that may have existed before that date. (T. 19, 1080.)  Therefore, the ALJ had substantial evidence to find Dr. King's opinion unpersuasive as to the functional limitations imposed by Plaintiff's ADHD and related symptoms for the relevant period.  *See Shook v. Comm'r of Soc. Sec.*, No. 12-CV-185, 2013 WL 1213123, at *6 (N.D.N.Y.

16

Jan. 25, 2013), *report and recommendation adopted*, No. 1:12-CV-185, 2013 WL 1222008

(N.D.N.Y. Mar. 25, 2013) (doctor's opinion written more than two and a half years after date last

insured did not relate to relevant time period); *Gill v. Astrue*, No. 1:10-CV-985, 2011 WL

4352410, at *12 (N.D.N.Y. Sept. 15, 2011), *report and recommendation adopted*, No. 1:10-CV-

985, 2011 WL 4352719 (N.D.N.Y. Sept. 15, 2011) (treating source report completed two years

after date last insured did not address plaintiff's condition during the relevant time period).

    A similar flaw afflicts Plaintiff's contention that the ALJ should have relied on recent

opinions from Dr. Roman Isaac, who provided a second opinion regarding Plaintiff's hands and

performed follow-up surgery on Plaintiff's right hand in November 2018. (T. 24. 754, 1344.)

The ALJ noted that Dr. Isaac first saw Plaintiff on October 30, 2017, one month after the date

last insured. (T. 24, 754.)  Dr. Isaac's findings suggested an ongoing worsening of symptoms and

functional limitations, and none of his opinions were retrospective. (T. 24, 771-772, 843.)

    Mirroring arguments that his counsel raised during the administrative process, Plaintiff

relies on these more recent impairments and worsening of symptoms to propose an alternative

RFC that would support a disability determination. (Dkt. No. 17 at 6-7.)  At best, these

challenges are "premised upon a disagreement over how the ALJ resolved arguably conflicting

evidence." *See Kimball v. Comm'r of Soc. Sec.*, No. 6:14-CV-0698 LEK/ATB, 2015 WL

4251163, at *9 (N.D.N.Y. July 13, 2015).  This Court will not reweigh the evidence presented to

the ALJ.  *See Warren v. Comm'r of Soc. Sec.*, No. 3:15-CV-1185 (GTS/WBC), 2016 WL

7223338, at *9 (N.D.N.Y. Nov. 18, 2016) ("When applying the substantial evidence test to a

finding that a plaintiff was not disabled, the Court 'will not reweigh the evidence presented at the

administrative hearing, . . . nor will it determine whether [the applicant] actually was disabled.

[Rather], [a]bsent an error of law by the Secretary, [a] court must affirm her decision if there is

substantial evidence [in the record] to support it.'") (quoting *Lefford v. McCall*, 916 F. Supp.

150, 155 (N.D.N.Y. 1996) (alteration in original)), *report-recommendation adopted*, 2016 WL

7238947 (N.D.N.Y. Dec. 13, 2016); *Vincent v. Shalala*, 830 F. Supp. 126, 133 (N.D.N.Y. 1993)

("[I]t is not the function of the reviewing court to reweigh the evidence.") (citing *Carroll v. Sec'y

of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

      Therefore, absent the discrepancy between the lifting requirements identified in the RFC

and the hypothetical that formed the basis for the VE testimony regarding available jobs, this

Court would have recommended affirmation of the Commissioner's disability determination.

      **ACCORDINGLY**, it is

      **RECOMMENDED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 17)

be **<u>GRANTED</u>**; Defendant's motion for judgment on the pleadings (Dkt. No. 22) be **<u>DENIED</u>**

and that the matter be **<u>REVERSED AND REMANDED</u>** to the Commissioner pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and

Recommendation.

      **ORDERED** that the Clerk of the Court shall file a copy of this order, report, and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[3]

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written

objections to the foregoing report.[4] Such objections shall be filed with the Clerk of the Court.

---

[3] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[4] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a

**FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.


Dated:    May 5, 2025
          Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 20 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

2016 WL 551783

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Kim HUBBARD, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

6:14-CV-1401 (GTS/WBC)

|

Signed 01/14/2016

**Attorneys and Law Firms**

KIM HUBBARD, PRO SE, 270 Day Ave., Rome, NY 13440.

DANIEL R. JANES, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, Counsel for Defendant, 26 Federal Plaza – Room 3904, New York, NY 10278.

## *REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kim Hubbard ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is Defendant's unopposed motion for judgment on the pleadings. (Dkt. No. 17.) For the reasons set forth below, it is recommended that Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on July 20, 1982. (T. 88.) She completed four years of college. (T. 109.) Generally, Plaintiff's alleged disability consists of diabetes, attention deficit hyperactivity disorder ("ADHD"), back impairments, and anxiety. (T. 108.) Her alleged disability onset date is September 22, 2010. (T. 60.) Her date last insured is June 30, 2015. (*Id.*) She previously worked as a customer service representative, medical records scanner, processor, waitress, and child care provider. (T. 109.)

### B. Procedural History

On February 25, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 60.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 11, 2013, Plaintiff appeared, pro se, before the ALJ, David J. Begley. (T. 25–59.) The ALJ advised Plaintiff of her right to be counseled by an attorney or representative, but Plaintiff waived that right. (T. 28–29.) On June 5, 2013, ALJ Begley issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7–24.) On September 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 21 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

decision of the Commissioner. (T. 1–4.) Thereafter, Plaintiff, again appearing pro se, timely sought judicial review in this Court. On November 19, 2014, the Court issued Plaintiff a copy of this Court's General Order 18, governing the procedural rules with respect to Social Security appeals. (Dkt. No. 3.) At that time the Court also issued Plaintiff a copy of the Pro Se Handbook and Notice. (Dkt. No. 4.)

Pursuant to General Order 18, plaintiffs are notified that "the failure to file a brief as required by this order will result in the consideration of this appeal without the benefit of plaintiff's arguments and may result in a decision heavily influenced by the commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order 18 at 4.

Plaintiff failed to file a brief by the April 27, 2015 deadline and because of her pro se status, the Court granted an extension to June 1, 2015. (Dkt. No. 14.) Plaintiff failed to file a brief by June 1, 2015 and the Court directed Defendant to file her brief. (Dkt. No. 15.) As of the date of this report and recommendation, Plaintiff has not filed a brief.

### C. The ALJ's Decision

**\*2** Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12–24.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 22, 2010. (T. 12.) Second, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus, hyperthyroidism, degenerative disc disease of the lumbar and cervical spine, left wrist tendinitis, left wrist carpal tunnel syndrome (status post release), right wrist capsulitis, panic disorder, and ADHD. (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except Plaintiff:

> [could] not climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl; work [was] limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions, with few, if any, work-place changes, and only occasional interaction with coworkers and supervisors; [and] no regular interaction with the general public.

(T. 13–14.) [1] Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20–21.)

## II. DEFENDANT'S BRIEFING ON HER MOTION FOR JUDGMENT ON THE PLEADINGS

In support of her motion for judgment on the pleadings, Defendant makes four arguments. First, Defendant argues Plaintiff knowingly and voluntarily waiver her right to representation. (Dkt. No. 17 at 11–12 [Def.'s Mem. of Law.].) Second, Defendant argues the ALJ's RFC finding was supported by substantial evidence. (*Id.* at 12–14.) Third, Defendant argues the ALJ's step five finding was supported by substantial evidence. (*Id.* at 14.) Fourth, and lastly, Defendant argues Plaintiff failed to meet her burden. (*Id.* at 14–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 22 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*3** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### A. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982).

### IV. ANALYSIS

In a civil case, the Court may dismiss an action where, as here, "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order...." Fed.R.Civ.P. 41(b); *Storey v. O'Brien,* No. 10–3303, 2012 WL 1889408, at *1 (2d Cir. May 25, 2012). Further, other districts in the Second Circuit have dismissed Social Security appeals, sua sponte, due to a

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 23 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

pro se plaintiff's failure to prosecute. *See Gonzalez v. Commissioner of Social Security,* No. 09–CV–10179, 2011 WL 2207574, at *2 (S.D.N.Y. June 2, 2011), *see also Winegard v. Barnhart,* No. 02–CV–6231, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr. 5, 2006). However, the Court declines to do so in this case.

**\*4** In this District, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order No. 18 at 4. General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence. *See Gregorka v. Comm'r of Soc. Sec.,* No. 6:13–CV–1408, 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015).

After a careful review of the administrative record on appeal, the Court recommends the Commissioner's determination be affirmed, for the reasons stated in Defendant's memorandum of law, that (1) the Plaintiff knowingly and voluntarily waived her right to representation, (2) the ALJ's RFC finding was supported by substantial evidence, (3) the ALJ's step five finding was supported by substantial evidence, and (4) Plaintiff failed to meet her burden. (Dkt. No. 17 at 11–15 [Def.'s Mem. of Law].)

### A. Plaintiff Knowingly and Voluntarily Waived Her Right to Representation

Although plaintiffs do not have a constitutional right to counsel at a Social Security hearings, they do have a statutory and regulatory right to be represented if they chose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. Here, the Commissioner sent Plaintiff an acknowledgement letter explaining the hearing process and advising her of her right to representation, as well as the availability of free legal services. (T. 77–78.) At the hearing, the ALJ again reviewed with Plaintiff her right to have representation and Plaintiff knowingly waived that right. (T. 28–30.) Therefore, the Commissioner and ALJ complied with their obligations to inform Plaintiff of her right to counsel and Plaintiff knowingly and voluntarily waived her right.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was supported by substantial evidence, specifically, the medical source opinions of consultative examiners Dennis Noia, M.D. and Pamela Tabb, M.D.

An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.,* No. 08–CV–1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010).

Dr. Noia performed a psychiatric consultative exam on April 30, 2012. At that time he observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 205.) He further observed her speech was normal, her thought process was normal, her mood was calm, and her affect was congruent. (T. 206.) Dr. Noia observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were "mildly to moderately" impaired; and her intellectual functioning was average. (*Id.*) In a medical source statement, Dr. Noia opined Plaintiff was capable of understanding and following simple instructions and directions; capable of performing simple and some complex tasks; capable of maintaining attention and concentration; could regularly attend to a routing and maintain a schedule; capable of making appropriate decisions; able to relate to and interact moderately well with others; and Plaintiff had some difficulty dealing with stress. (T. 206–207.) [2]

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 24 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

**\*5** Dr. Tabb performed a physical consultative exam on April 30, 2012. At that time she observed Plaintiff appeared in no acute distress, had a normal gait, could walk on heels and toes, needed no help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 209.) Dr. Tabb observed Plaintiff's cervical spine and lumbar spine showed full flexion, extension, later flexion bilaterally and full rotary movement bilaterally. (T. 210.) Dr. Tabb observed Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Tabb observed Plaintiff had mild tenderness in the medial aspect of her left wrist. (*Id.*) In a medical source statement Dr. Tabb opined Plaintiff had mild restrictions for performing activities involving repetitive movement of the left wrist. (T. 211.) [3]

In making his physical RFC determination, the ALJ also relied on objective medical imagining from March of 2012 which indicated "very minimal" degenerative change and "mild" disc space narrowing in the mid thoracic spine. (T. 200.) Medical imaging from March of 2012 indicated degenerative disc disease with "mild" multilevel bulging in the lumbar spine. (T. 201.) Medical imaging of Plaintiff's cervical spine revealed "mild" disc desiccation with "minimal" disc bulging at multiple levels.

The ALJ thoroughly discussed all the medical evidence in the record and his RFC determination was supported primarily by the consultative examiners, Drs. Noia and Tabb. In addition to Dr. Tabb's opinion, the ALJ's physical RFC determination was supported by Plaintiff's treating physicians who reported Plaintiff had normal gait and stance, appeared in no acute distress, ambulated well, and had negative straight leg raises. (T. 182–185, 192–197.)

Plaintiff's orthopedic surgeon, Gregory Shankman, M.D., completed a medical source statement in August of 2007, which the ALJ discussed in his opinion but ultimately rejected. Dr. Shankman opined Plaintiff's pain was "too severe for her to work" and she was "totally and permanently disabled." (T. 161.) Dr. Shankman further opined Plaintiff could not walk for more than five minutes without pain, could not sit for more than five minutes without severe pain, and could not sleep for more than a few hours without pain. (*Id.*) He opined Plaintiff could not lift or carry more than ten pounds. (*Id.*) The ALJ properly assigned Dr. Shankman's opinion "limited weight" because there were no records to support his opinion, Plaintiff's own allegations of limitations were not as restrictive as Dr. Shankman's, and the opinion predated Plaintiff's alleged onset date by over three years. Therefore, for the reasons stated herein, and for the reasons provided in Defendant's brief, the ALJ's RFC determination was supported by substantial evidence.

### C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*6** "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type,

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 25 of 153

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.*, see 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir.2013) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ properly applied the Regulations in his credibility analysis. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (T. 15.) The ALJ provided an accurate synopsis of Plaintiff's testimony. (T. *Id*.) The ALJ discussed objective medical evidence and opinion evidence which he found to be inconsistent with Plaintiff's statements. (T. 15–18.) The ALJ discussed Plaintiff's activities of daily living, treatment she received for her impairments including medication, and aggravating factors. (T. 15.) Therefore, for the reasons stated herein, the ALJ properly adhered to the Regulations in making his credibility determination and substantial evidence supports the ALJ's credibility determination.

### D. The ALJ's Step Five Determination

At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. 20 C.F.R. § 404.1569. In making his determination, the ALJ relied on the testimony of a vocational expert ("VE"). (T. 5658.) At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. (T. 56–57.) Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record). **ACCORDINGLY**, based on the findings above, it is

**\*7 RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health* and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 551783

---

### Footnotes

1    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of

2016 WL 551783

walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

2      Plaintiff did not undergo mental health treatment. In November of 2011, during an evaluation by her orthopedic provider, Plaintiff denied depression and anxiety. (T. 183.) In December of 2011, Plaintiff complained to her primary care provider of "slight depression." (T. 177.) A prescription history indicated Plaintiff was prescribed Alprazolam for her anxiety by Scott Brehaut, M.D. (T. 167.)

3      In June of 20120, subsequent to Plaintiff's examination by Dr. Tabb, she underwent CTS release surgery. (T. 255.)

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 3915959
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leo GREGORKA; and Eve Gregorka, Plaintiffs,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:13–CV–1408 (GTS/TWD).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Leo Gregorka and Eve Gregorka, Little Falls, NY, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY, Office of General Counsel, Social Security Administration, Emily M. Fishman, Esq., of Counsel, New York, NY, for Defendant.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** The above matter comes to this Court following a Report–Recommendation by United States Magistrate Judge Thérèse Wiley Dancks, filed on May 28, 2015, recommending that the Commissioner's decision denying benefits be affirmed with regard to Social Security income benefits ("SSI") but reversed with regard to disability insurance benefits ("DIB"). (Dkt. No. 14.) No objections to the Report–Recommendation have been filed and the time in which to do so has expired. After carefully reviewing all of the papers herein, including Magistrate Judge Dancks' thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety; and the case is remanded to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 20) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that the Commissioner's decision is ***AFFIRMED*** with regard to the denial of SSI benefits but ***REVERSED*** with regard to the denial of DIB benefits; and it is further

**ORDERED** that this matter is ***REMANDED*** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### *REPORT AND RECOMMENDATION*

THÈRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to supplemental security income ("SSI") benefits but remand the disability insurance benefits ("DIB") claim to the Commissioner for further proceedings.

## I. BACKGROUND AND PROCEDURAL HISTORY

On June 9, 2011, Thomas Leo Gregorka ("Mr.Gregorka") submitted applications for SSI and DIB. (Dkt. No. 15–2 at 21.) The applications were denied on December 13, 2011. *Id.* On January 19, 2012, Mr. Gregorka filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* Mr. Gregorka died on April 1, 2012. *Id.* Mr. Gregorka was fifty-eight years old when he died. *Id.* at 30.

Plaintiffs Leo and Eve Gregorka, the parents of Mr. Gregorka, filed a substitution of party to proceed with the hearing requested by their son. (Dkt. No. 15–2 at 21.) They did not, however, wish to appear at the hearing in person. *Id.* Thus, the ALJ based his decision on the record alone. *Id.*

**\*2** On June 19, 2012, the ALJ issued a decision finding that Mr. Gregorka was not disabled. (Dkt. No. 15–2 at 21–31.) Plaintiffs filed a request for review by the Appeals Council (Dkt. No. 15–2 at 16) and submitted additional evidence (Dkt. No. 15–2 at 5). On September 5, 2013, the Appeals Council issued separate decisions on Mr. Gregorka's SSI claim and his DIB claim. (Dkt. No. 15–2 at 1–4, 8 .) The Appeals Council dismissed the request for review of the SSI claim, finding that Plaintiffs were not proper parties pursuant to Social Security regulations. (Dkt. No. 15–2 at 8.) The Appeals Council denied the request for review of the DIB claim, finding that there was no basis for changing the ALJ's decision. (Dkt. No. 15–2 at 2, 3.)

Plaintiffs commenced this action on November 12, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In addition, the claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a) (4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir.2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas,* 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

**\*3** The claimant bears the burden of proof regarding the first four steps. *Kohler v. As true,* 546 F.3d 260, 265 (2d Cir.2008) (quoting *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove that the claimant is capable of working. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue,* 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010); [1] *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

### III. THE ALJ'S DECISION

Here, the ALJ found at step one that Mr. Gregorka was not engaged in any substantial gainful activity from September 27, 2008, to April 1, 2012. (Dkt. No. 15–2 at 23.) At step two, the ALJ found that Mr. Gregorka suffered from the severe conditions of hypertensive and arthroscopic cardiovascular disease, chronic obstructive pulmonary disease, degenerative disc disease of the

cervical and lumbar spine, and physical residuals from chronic alcohol abuse, including seizures, near syncope, and tremor. *Id.* at 23–24. The ALJ found that Mr. Gregorka did not have any severe mental impairment, granting "great weight" to the medical opinion of a non-examining agency medical consultant and "little weight" to the opinion of consultative psychologist Dennis Noia, Ph .D. *Id.* at 25. At step three, the ALJ found that none of Mr. Gregorka's impairments met or medically equaled a listed impairment. *Id.* at 25–26. At step four, the ALJ found that Mr. Gregorka had the RFC to perform medium work, except that he needed to avoid climbing ladders or scaffolds and should avoid working at heights or around dangerous machinery. *Id.* at 26. Based on that RFC, the ALJ found that Mr. Gregorka was not able to perform any past relevant work. *Id.* at 29. At step five, however, the ALJ found that Mr. Gregorka could perform jobs that exist in significant numbers in the national economy. *Id.* at 30. Accordingly, the ALJ found that Mr. Gregorka was not disabled. *Id.* at 30–31.


## IV. PLAINTIFFS' FAILURE TO FILE A BRIEF

**\*4** This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiffs failed to comply with General Order 18, the undersigned issued an order of June 9, 2014, which directed Plaintiffs to file their brief within forty-five days after service of Defendant's brief. (Dkt. No. 17.) Despite this, Plaintiffs filed neither papers opposing Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02–CV–6231 CJS, 2006 U.S. Dist. LEXIS 31973, at \*27–28, 2006 WL 1455479, at \*9–10 (W.D.N.Y. Apr.5, 2006); *Feliciano v. Barnhart,* Civ. No. 04–9554 KMW AJP, 2005 U.S. Dist. LEXIS 14578, at \*34–36, 2005 WL 1693835, at \*10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart,* Civ. No. 01–4059 LTS JCF, 2004 U.S. Dist. LEXIS 3689, at \*6–7, 2004 WL 439495, at \*3 (S.D.N.Y. Mar.9, 2004).

In this District, however, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.) General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiffs' failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.


## V. DISCUSSION

### A. SSI Claim

The ALJ denied Mr. Gregorka's claim for both SSI and DIB on the merits. (Dkt. No. 15–2 at 21–31.) The Appeals Council dismissed Plaintiffs' request for review of the ALJ's decision regarding SSI on the grounds that Plaintiffs were not eligible survivors for underpayment of SSI under the agency's regulations. *Id.* at 8. In their complaint, Plaintiffs explicitly challenge the denial of "Title II benefits (Social Security Disability)." (Dkt. No. 1 at 1.) The complaint does not explicitly challenge the denial of SSI benefits under Title XVI. Defendant argues that to the extent that the complaint can be construed as asserting an SSI claim, that claim is moot and was properly dismissed by the Appeals Council. (Dkt. No. 18 at 8–10.) Defendant is correct.

**\*5** Agency regulations drastically limit the categories of individuals who can recover benefit underpayments on behalf of a deceased individual. 20 C.F.R. § 416.542(b)(4). Surviving parents can recover only if the deceased underpaid recipient was a disabled or blind child when the underpayment occurred. 20 C.F.R. § 416.542(b)(2)-(3). A "child" is an individual under the

age of eighteen or an unmarried individual under the age of twenty-two who is attending school. 20 C.F.R. § 416.1856. Here, Mr. Gregorka was fifty-seven years old when he applied for SSI. (Dkt. No. 15–2 at 21, 30.) Accordingly, Plaintiffs are not the surviving parents of a disabled child pursuant to agency regulations. Therefore, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to recover SSI benefits.

**B. DIB Claim**

Defendant concedes that remand is appropriate regarding Plaintiffs' DIB claim. (Dkt. No. 18 at 10–14.) Specifically, remand is appropriate because it is not clear from the Appeals Council's decision whether it considered four medical assessments by Mr. Gregorka's treating physician that were submitted as new evidence. (Dkt. No. 15–2 at 5; Dkt. No. 15–9 at 59–66.) Those assessments related to the period on or before the ALJ's decision and contradicted the ALJ's RFC finding. (Dkt. No. 15–9 at 59–66.) The Appeals Council was thus required to consider it. 20 C.F.R. § 404.970(b). Accordingly, it is recommended that the Court remand this matter to the Commissioner for further proceedings regarding Plaintiff's DIB claim.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), [2] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 87 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: May 28, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3915959

---

**Footnotes**

1    On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Comm'r of Soc. Sec.,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart,* 717 F.Supp.2d 241 (N.D.N.Y.2010). The Court has used the title listed by Westlaw.

2    Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 32 of 153

Sean Quinton T. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 5842791

2019 WL 5842791
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

SEAN QUINTON T., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

1:19-CV-154
|
Signed 11/07/2019

**Attorneys and Law Firms**

SEAN QUINTON T., Plaintiff, Pro Se, P.O. Box 53, Napanoch, NY 12458.

OF COUNSEL: ANDREEA L. LECHLEITNER, ESQ., Special Ass't United States Attorney, OFFICE OF REGIONAL GENERAL COUNSEL SOCIAL SECURITY ADMINISTRATION REGION II, Attorneys for Defendant, 26 Federal Plaza, Room 3904, New York, NY 10019.

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, United States District Judge

## I. INTRODUCTION

**\*1** On February 7, 2019, *pro se* plaintiff Sean Quinton T. [1] ("Sean" or "plaintiff") filed this action seeking review of defendant Commissioner of Social Security's ("Commissioner" or "defendant") final decision denying his application for Disability Insurance Benefits ("DIB").

The Commissioner filed the Administrative Record on Appeal on March 20, 2019. However, on April 17, 2019, defendant informed the Court it had been unable to mail Sean a copy of the record because (1) mail sent to his address on file repeatedly came back as "undeliverable" and (2) plaintiff would not return phone calls or messages from defendant's counsel. *See* Dkt. No. 10.

Thereafter, the Court issued an Order directing Sean to file a status report on or before May 6, 2019 advising whether or not he intended to proceed with this case. The Order warned plaintiff that his failure to comply with Court rules, including the requirement that he "immediately notify the Court of any change of address," could result in the dismissal of his action.

On April 23, 2019, Sean telephoned the Court to explain that "he ha[d] been out of town and just received all of his mail." In that call, plaintiff (1) assured the Court that his listed address was accurate; (2) indicated his desire to move forward with this appeal; and (3) requested an extension of time to file his supporting brief. U.S. Magistrate Judge David E. Peebles granted plaintiff an extension by text order later that day. Dkt. No. 12. At that time, plaintiff had until June 7, 2019 to file his brief. *Id.*

That date came and went. On June 11, 2019, Sean again telephoned the Court to request another extension of time. Judge Peebles granted plaintiff's request, giving him until July 7, 2019 to file his brief. Dkt. No. 13. At that time, Judge Peebles warned plaintiff that it would be the final extension of this deadline. *Id.*

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 33 of 153

Sean Quinton T. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)
2019 WL 5842791

Shortly after the twice-modified deadline expired, the Court received from Sean a short letter, entitled "brief," which the Clerk of the Court has construed as plaintiff's brief in support of his appeal. Dkt. No. 15. The Commissioner has since filed his brief in opposition as well. Dkt. No. 16. Accordingly, the motions will be considered on the basis of these submissions without oral argument. [2]

## II. BACKGROUND

On October 29, 2013, Sean filed an application for DIB alleging that problems with his neck, lumbar back, and cervical spine caused a "prick[l]ing feeling in [his] finger tips" and "radiating pain down [his] legs" and that his migraines and "[post-traumatic stress disorder]/anxiety/depression" caused him to have trouble focusing and to suffer from balance issues and memory loss. R. at 108-09. [3] Plaintiff's application for benefits alleged that these impairments rendered him disabled beginning on March 25, 2010. *Id.* Plaintiff's benefits claim was initially denied on February 4, 2014. *Id.* at 169-80.

**\*2** At Sean's request, a video hearing was held before Administrative Law Judge ("ALJ") Brian Lemoine on January 20, 2016. R. at 34-65. Plaintiff, represented by attorney Noreen Tuller, appeared and testified. *Id.* The ALJ also heard testimony from Vocational Expert ("VE") Sugi Komarav. *Id.*

Thereafter, the ALJ issued a written decision denying Sean's application for benefits from March 31, 2012 through December 31, 2013, the expiration date of plaintiff's insured status. [4] R. at 133-41 (ALJ decision dated January 28, 2016).

However, on March 31, 2017, the Appeals Council remanded Sean's claim for another hearing. R. at 147-50. In its decision granting vacatur of the ALJ's decision and directing remand, the Appeals Council concluded the ALJ had improperly (1) rejected the consultative examiner opinions of Lauren Stack, Ph.D, and Gilbert Jenouri, M.D. and (2) found plaintiff's vestibular disorder to be a non-severe impairment at step two. *Id.* at 149-50. The Appeals Council directed the ALJ to cure these deficiencies and to take certain other additional steps necessary to provide a full and fair hearing on plaintiff's benefits claim. *Id.* at 150.

On December 8, 2017, ALJ Lemoine held a new video hearing on Sean's benefits claim. R. at 68-105. Although Robin D'Amore, plaintiff's new attorney, appeared at the hearing, plaintiff initially failed to do so. *Id.* at 68-80. After a brief on-the-record colloquy with the ALJ about plaintiff's likely whereabouts and whether the hearing should go forward in his absence, the ALJ heard vocational testimony from VE Esperanza DiStefano. *Id.* About twenty-five minutes into the proceeding, plaintiff arrived and the ALJ heard additional testimony from him. *Id.* at 80-105.

Thereafter, the ALJ issued another decision denying Sean's application for benefits through December 31, 2013, the expiration date of plaintiff's insured status. R. at 13-24. This decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's renewed request for review. *Id.* at 1-4.

## III. DISCUSSION

### A. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See Williams*, 859 F.2d at 258. Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may differ from the Commissioner's. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

**\*3** However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### B. Disability Determination—The Five-Step Evaluation Process

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ must determine whether the claimant has engaged in substantial gainful activity. A claimant engaged in substantial gainful activity is not disabled, and is therefore not entitled to benefits. *Id.* §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings"). *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Pt. 404, Subpt. P, App. 1. If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether—despite the claimant's severe impairment—he has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The burden of proof with regard to these first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

Sean Quinton T. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)
2019 WL 5842791

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 35 of 153

If it is determined that the claimant cannot perform his past relevant work, the burden shifts to the Commissioner for step five. *Perez*, 77 F.3d at 46. This step requires the ALJ to examine whether the claimant can do any type of work. 20 C.F.R. §§ 404.1520(g), 416.920(g).

**\*4**  The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary. *Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).

"[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity." *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

### C. **ALJ's Decision**
On remand, the ALJ applied the five-step disability determination to find that: (1) Sean had not engaged in substantial gainful activity between March 31, 2012, the amended onset date, and December 31, 2013, the date his insured status expired; (2) plaintiff's vestibular disorder, degenerative disc disease of the cervical and lumbar spine, major depression, panic disorder, and history of attention deficit disorder were severe impairments within the meaning of the Regulations; and that (3) these impairments, whether considered individually or in combination, did not meet or equal any of the Listings. R. at 15-16.

At step four, the ALJ determined that Sean's impairments caused both exertional and non-exertional limitations. R. at 18-23. In particular, the ALJ found that plaintiff retained the RFC to:

> perform light work ... except he can perform occasional crouching, crawling, kneeling, stopping, balancing and climbing stairs. He is limited to simple, routine and repetitive tasks in an environment with no more than occasional interaction with coworkers and the general public.

*Id.* at 18.

The ALJ determined that these limitations precluded Sean from performing his past relevant work as a customer service representative, teller, insurance clerk, sales clerk, janitor, and as a school bus driver. R. at 23. However, the ALJ found that plaintiff's RFC, considered together with his age, education, and work experience, still allowed him to perform the job duties of a "marker," a "photocopying machine operator," and an "electrical equipment assembler." *Id.* at 24.

Because these jobs fit in with Sean's assessed limitations and were present in sufficient numbers in the national economy, the ALJ concluded plaintiff was not disabled during the relevant time period. R. at 24. Accordingly, the ALJ denied plaintiff's application for benefits. *Id.*

### D. **Sean's Appeal**
Sean's letter brief states only that:

> Due to my many physical and mental ailments and not having any legal representation. It is very difficult to write the proper legal brief that would explain my case in a beneficial way. Therefore, I ask the court for leniency in this ongoing painful time.

Sean Quinton T. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 5842791

Pl.'s Mem., Dkt. No. 15.

Because he is proceeding *pro se*, the Court has independently scrutinized the ALJ's second written decision to ensure that it complies with the remand order from the Appeals Council. *See, e.g., Forjone v. N.Y. State Dep't of Motor Vehicles*, —— F. Supp. 3d ——, 2019 WL 5684437, at *3 (N.D.N.Y. Nov. 1, 2019) (discussing principles of special solicitude afforded to parties seeking relief without the benefit of an attorney). The Court has also reviewed the Commissioner's brief in support of affirmance.

 **\*5** Unfortunately, though, Sean's single-paragraph letter brief does not give an indication of what, if any, errors he believes the ALJ committed on remand. In the absence of any additional guidance from the claimant, the Court has nevertheless done its best to examine, within the confines of the fairly deferential standard of review appropriate in the Social Security setting, whether there is any reason to second-guess the findings and conclusions memorialized in the ALJ's second written decision. R. at 13-24.

Because no grounds for reversal or remand are apparent from the record and the Commissioner's brief sets forth a persuasive argument in favor of affirmance, defendant's final decision denying Sean's claim for benefits will be affirmed.

## IV. <u>CONCLUSION</u>

The ALJ applied the appropriate legal standards and supported his written decision with substantial evidence in the record.

Therefore, it is

ORDERED that

1. Sean's motion for judgment on the pleadings is DENIED;

2. The Commissioner's motion for judgment on the pleadings is GRANTED;

3. The Commissioner's decision is AFFIRMED; and

4. Sean's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5842791

---

### Footnotes

1    In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be used in this opinion.

---

2019 WL 5842791

2       Pursuant to General Order No. 18, consideration of this matter will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

3       Citations to "R." refer to the Administrative Record. Dkt. No. 9.

4       Sean's attorney amended his onset date at the hearing after a different ALJ issued an unfavorable decision running through March 30, 2012. R. at 36-37.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)

2021 WL 11549419

2021 WL 11549419
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

JULIA P., Plaintiff,

v.

Andrew SAUL, Commissioner of the Social Security Administration, Defendant.

6:19-CV-01171 (LEK)
|
Signed February 19, 2021

**Attorneys and Law Firms**

Peter W. Antonowicz, Office of Peter W. Antonowicz, Rome, NY, for Plaintiff.

Christopher Lewis Potter, Social Security Administration Office of the General Counsel, Baltimore, MD, for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, United States District Judge

## I. INTRODUCTION

**\*1**  This Social Security appeal is before the Court following an August 21, 2019 decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff Julia Parker's application for Disability Insurance Benefits ("DIB"). See Dkt. No. 8 ("Record") at 1–4, 10–23.[1] Both parties have filed briefs. Dkt. Nos. 13 ("Plaintiff's Brief"); 19 ("Defendant's Brief"). For the reasons that follow, the Court remands this action for further proceedings consistent with this Memorandum-Decision and Order.

## II. BACKGROUND

### A. Regulatory Framework

In SSA regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). For purposes of an application for DIB, there is a five-step sequential evaluation process for determining whether an individual is "disabled":

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 39 of 153
2021 WL 11549419

functional capacity ["RFC"] to perform his past work. Finally, if the claimant is unable to perform his past
work, the Commissioner then determines whether there is other work which the claimant could perform.

Andrew S. v. Saul, No. 19-CV-570, 2020 WL 6709833, at *1 (N.D.N.Y. Nov. 16, 2020) (Kahn, J.) (alterations omitted); 20 C.F.R. §§ 404.1520, 416.920. The ultimate "burden is on the claimant to prove that he is disabled." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). But if the claimant meets her burden with respect to the first four steps, the burden shifts to the Commissioner to prove in the fifth step that the claimant has the RFC to perform substantial gainful work existing in the national economy. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

**B. Factual and Medical Background**

Parker was 45 years old on the application date and 49 years old at the time that her insured status lapsed on December 31, 2017. See Pl.'s Br. at 4. Parker has a high-school education, and her past relevant work consists of employment as a bartender. See id.; R. at 23.

**\*2** In describing Parker's health, the Court focuses on aspects of her physical condition that are relevant to this appeal.

Plaintiff alleges disability due to, among other physical ailments, cervical disc injuries, radiculopathy,[2] and psoriatic arthritis. See Pl.'s Br. at 5. Leading up to a May 26, 2016 spinal surgery, Parker had "long-standing cervical pain which was exacerbated by the movement of her head." R. at 1241. She experienced "sharp pains which radiated into both [arms,] right greater than left[,] and ... intermittent weakness in her [legs]." Id. On March 31, 2016, Dr. Ramsi Kairallah diagnosed Parker with "spinal stenosis, cervical region." Id. at 1220. On April 20, 2016, Dr. Ross Moquin examined Parker and "reviewed results of a cervical MRI that showed significant changes throughout the cervical spine, including disc bulges and osteophytic formations at C4-5, C5-6, and C6-7." Id. at 14; see also id. at 1007. Dr. Moquin diagnosed Parker with "cervicalgia, spinal stenosis, cervical region and cervical disc disorder with radiculopathy." Id. at 14; see also id. at 1007.

On May 26, 2016, she underwent a surgical procedure on cervical discs C4-C7. More precisely, Dr. Moquin performed a "C4 to C7 anterior cervical discectomy and fusion."[3] Id. at 14, 1247. In the course of this procedure, Dr. Moquin inserted biomechanical devices between vertebrae and applied a synthetic bone void filler. See Pl.'s Br. at 4–5. As discussed more fully below, many of the central factual disputes in this case concern the physical consequences of this procedure for Parker. Parker alleges that she experienced chronic post-surgical pain in her skull, spine, shoulders, fingers and hands; numbness and weakness in her hands; and restrictions in the range of motion in her neck, both up and down and left to right. See Pl.'s Br. at 6–7, 15.

**C. Procedural History**

The Court focuses its summary of the procedural history on aspects of prior administrative hearings and decisions that are relevant to this appeal.

On May 14, 2014, Parker filed an application for DIB under Title II of the Social Security Act, alleging an onset date of June 12, 2013. Pl.'s Br. at 2. Parker's claim was initially denied on August 8, 2014. Id. A hearing was held before an Administrative Law Judge ("ALJ"), Barry E. Ryan, on March 29, 2016. See R. at 63–96. The ALJ operated under the mistaken assumption that Parker's last date insured was June 30, 2016. See id. at 65. Parker testified at the hearing that she experienced chronic pain in her neck and spine, which she attributed to lupus, and that she suffered from psoriatic arthritis, which caused pain in her hands. See id. at 84–88. She also reported that, "as of recently," she had "neurological damage caused from rheumatoid arthritis and from osteoporosis in my neck where it is attacking the discs between the vertebras of C1 through C5, and may ... need operation." Id. at 76. The ALJ issued an unfavorable decision on January 13, 2017, in which he found only one severe impairment, systemic lupus erythamatosus. See Pl.'s Br. at 2, 5.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 40 of 153

2021 WL 11549419

**\*3** On December 27, 2017, the Appeals Council vacated and remanded that decision, noting that the ALJ's decision omitted analysis of certain recent events in Parker's medical history:

> The decision found that the claimant's date last insured was June 30, 2016. The decision also found that the claimant was not disabled at any time from June 12, 2013, the alleged onset date, through June 30, 2016. The Appeals Council notes that the claimant's date last insured is December 31, 2017. This information was available at the time of the hearing. Therefore, there is an unadjudicated period from July 1, 2016 through the January 13, 2017 decision date. As a result, consideration should be given to whether the claimant was under a disability during the unadjudicated period.

> The record shows the claimant underwent a C4-C7 anterior arthrodesis; a C4-05, C6-C7 complete discectomy with resection of osteophytes anteriorly and posteriorly, 3 levels; placement of biomechanical interbody devices C4-05, C5-C6 and C6-C7, 3 levels; placement of anterior place C4-C7; and preparation and placement of allograft Actifuse ceramic synthetic bone product on May 26, 2016. This surgery came after the claimant underwent non-operative treatment. The decision does not discuss this procedure or whether the claimant's cervical disc disorder with radiculopathy constitutes an additional severe impairment.

Id. at 3 (citations omitted). In ordering a new hearing, the Appeals Council gave the ALJ the following instructions:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the severity of the claimant's cervical disc disorder.

> If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/ limitations established by the record as a whole.

Id. [4]

On September 4, 2018, a second hearing was held before an ALJ, Elizabeth W. Koennecke. See R. at 97–131. On October 12, 2018, the ALJ issued a decision finding that Parker was not disabled from June 12, 2013 until December 31, 2017, the last date insured. See id. at 10–23.

At the hearing, Parker testified as follows regarding the limiting effects of her physical impairments. After her surgery, she endured a four-month period of recovery, from May to August, during which she wore a "C collar." See id. at 107. Between her surgery and the date of the hearing, she had physical limitations affecting her ability to use the bathroom, dress herself, shower, and prepare food. See id. at 108. During this period, she wore diapers and had a bedside commode that her husband emptied every night after he returned home from work. See id. Her husband dressed her. See id. He also helped her shower, as she was unable to reach her back, under her arms, her feet, or her leg below the knee. See id. at 109. He also woke up early every morning to prepare her breakfast and lunch, which he would leave in a cooler on the bedside table next to her bed. See id. at 108.

**\*4** Parker also testified to having limited mobility in her neck during this period. She could not "turn [her] head like normal people do," but rather had to "turn [her] whole waist to ... turn around to look at something. Id. at 109. She also experienced "constant sharp pains from [her] neck that sho[ ]t down [her] spine," and traveled into her shoulders, arms, and hands as often as five times per day, for one to two hours in each instance. See id. She had difficulty looking downward. See id. at 113. For instance, when she was eating, she had to push her plate six or seven inches forward on the table in order to see her food. See id.

She additionally detailed limitations in her ability to walk and sit. See id. at 110–11. She recounted that it hurt when she walked, that she had to use a cane for stability, and that she frequently fell. See id. at 110. She could only sit ten to fifteen minutes at a time, after which she would need to stand and stretch. See id. She attributed these limitations to stiffness and sharp pain in her neck. See id. at 111. She stated that when she used stairs, she had to hold the railing, surmount one step at a time, putting both feet on each step, and take a short break after each step or two. See id. at 113.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 41 of 153

2021 WL 11549419

She also described difficulty lifting and using her hands. See id. at 111–14. She could not lift a gallon of milk to pour milk into a glass. See id. at 111. She had trouble holding on to a drinking class, and thus used lighter plastic Solo cups to drink. See id. She ate off of paper plates because she could not hold or lift an ordinary plate. See id. She was unable to cut meat, because it hurt her wrists and fingers, and because she had trouble making a grip. See id. at 111–12. She used a geriatric toothbrush, which had a rubber sleeve on the handle to enable her to grip the toothbrush. See id. at 112. She also was unable to do laundry, due to limitations in her ability to lift, and unable to wash to dishes, due to resulting pain in her back, shoulders, and neck. See id. at 112–13. She has a stronger grip with her left than her right hand. See id. at 114.

Prior to the September 2018 hearing—in May 2016, to be precise—the ALJ obtained opinions from two non-examining medical experts, Dr. Louis A. Fuchs and Dr. Anne E. Winkler, regarding Parker's ability to perform work-related activities. See id. at 972–94. In assessing Parker's physical limitations in the context of RFC analysis, the ALJ relied on those two opinions, the July 2014 opinion of consultative examiner Dr. Kautilya Puri, and the ALJ's own review of Parker's medical records post-dating these three expert opinions. See id. at 16–21.

At step two of the sequential analysis, the ALJ found that Parker had the following severe impairments: obesity, psoriatic arthritis, and "a neck impairment." See id. at 13–14. With respect to "a neck impairment," the ALJ noted the following:

> During the office visit with PA Slavich in March 2016, the claimant was assessed with spinal stenosis, cervical region. Ross Moquin, MD examined the claimant on April 20, 2016 and reviewed results of a cervical MRI that showed significant changes throughout the cervical spine, and specifically disc bulges and osteophytic formations at C4-5, C5-6, and C6-7. The radiologist indicated significant diminution of the CSF space around the spinal cord and distortion of the spinal cord and exiting nerve roots. Dr. Moquin assessed the claimant with cervicalgia, spinal stenosis, cervical region and cervical disc disorder with radiculopathy.
>
> On May 26, 2016, Dr. Moquin performed a C4 to C7 anterior cervical discectomy and fusion. The claimant reported to PA Slavich on January 26, 2017 that she has thirty percent loss of range of motion in her neck since her surgery. Overall, she probably has less pain than she had prior to the surgery.

**\*5** Id. at 14 (citations omitted). The ALJ further noted that treatment records from throughout 2015 and 2016 documented symptoms of psoriatic arthritis. See id. at 16. The ALJ recognized that on March 2, 2015, Parker was treated by Dr. Kairallah for this condition, and that in a March 31, 2016 appointment, Dr. Kairallah diagnosed her with "other psoriatic arthropathy" and "other psoriasis" and prescribed methylprednisolone. See id. at 14, 1073–81, 1220. The ALJ also decided that, while Parker's medical records indicated that she had been "diagnosed ... with possible lupus" at some point before 2013 and began treatment for lupus in 2013, a diagnosis of lupus had been ruled out in 2017. See id. at 15–16. The ALJ found that none of Parker's severe impairments met or medically equaled the severity of one of the impairments listed in Appendix 1 of the regulations. See id. at 16.

The ALJ determined that, notwithstanding her severe impairments, Parker had the RFC to perform "sedentary work," as defined in 20 C.F.R. 414.1567(a), "except that" she could "occasionally lift and carry ten pounds," "frequently lift and carry less than ten pounds," "sit for eight hours total during an eight-hour work day," "stand and work for four hours total ... during an eight-hour workday," "frequently balance, occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl," and "never climb ladders or scaffolds." See id. at 16. [5]

In reaching this conclusion, the ALJ assessed Parker's symptoms pursuant to 20 C.F.R. § 404.1529 and SSR No. 16-3p. See id. at 16. In assessing symptoms in the context of RFC analysis, an ALJ is to use a two-step process. First, the ALJ must determine whether an "underlying medically determinable physical or mental impairment(s) ... could reasonably be expected to produce an individual's symptoms[.]" SSR No. 16-3p, 2016 SSR LEXIS 4 at *3. Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." Id.; 20 C.F.R. § 404.1529. In the second step, the ALJ is to consider "all of the available evidence," §

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 42 of 153
2021 WL 11549419

404.1529(a), which includes "information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [SSA] employees and other persons," § 404.1529(c)(3). Other relevant factors include the claimant's daily activities; the "location, duration, frequency, and intensity of [the claimant's] ... symptoms"; treatments and measures used to alleviate the symptoms; "[p]recipitating and aggravating factors"; and the effectiveness of medications. Id.

The ALJ found that while Parker's physical impairments could be "reasonably expected to produce" her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." See R. at 20.

 *6  In reaching this conclusion, the ALJ relied on the following evidence. First, the ALJ noted Dr. Puri's July 2014 opinion. See id. at 18–19. In this opinion, Dr. Puri found subsequent to an examination that Parker did not have any objective limitations with respect to fine or gross motor activity. See id. at 19, 520. He found that she did not have any limitations of motion throughout her cervical or lumbar spine. See id. at 19, 520. He also noted that she had no muscle atrophy or sensory deficits and that she demonstrated full strength in her arms and legs. See id. at 19, 520. He found, however, that she had positive trigger points [6] affecting her neck, shoulders, back, and ribs, and tenderness on palpation [7] with movement of her knees, hips, shoulders, and back. See id. at 19, 519–20. The ALJ gave "some weight" to this evidence, because "Dr. Puri [is] a program knowledgeable expert who examined the claimant and his findings that the claimant has no gross limitations related to gross activity is supported by his findings that the claimant had full range of motion throughout the cervical and lumbar spine with negative straight leg raising." See id. at 19.

Second, the ALJ relied on Dr. Winkler's May 17, 2016 opinion, which she submitted in response to a medical interrogatory, and which was based on her review of Parker's medical records. See id. at 19–21. Dr. Winkler concluded that Parker had mild osteoarthritis in the hips, lumbar spine, and cervical spine. See R. at 20, 992. She opined that Parker could lift and carry twenty pounds occasionally and up to ten pounds frequently. See id. at 20, 985. According to Dr. Winkler, in the course of an eight-hour workday, Parker could sit for a total of eight hours, stand for a total of six hours, and walk for a total of six hours, but that she could sit for three hours at one time without interruption, stand for one hour at a time, and walk for one hour at a time. See id. at 20, 986. Further, Dr. Winkler concluded that Parker could frequently reach, handle, finger, feel, and push/pull, with each hand. See id. at 20, 987. Additionally, when asked whether she found "sufficient credibly clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain," Dr. Winkler responded, "It appears her symptoms are significantly out of proportion to any objective evidence." See id. at 20–21, 994. The ALJ gave "great weight" to Dr. Winkler's opinion, because "[her] opinion[ ] remains unrebutted even after the Appeals Council remand." Id. at 20.

Third, the ALJ relied on Dr. Fuchs's May 21, 2016 opinion, which, like Dr. Winkler's, was submitted in response to a medical interrogatory and was based on a review of Plaintiff's medical records. See id. Dr. Fuchs concluded that Parker could lift and carry twenty pounds occasionally and up to ten pounds continuously. See id. at 20, 995. He opined that, in the course of an eight-hour workday, she could sit for a total of eight hours, stand for a total of two hours, and walk for a total of two hours, but that she could sit for two hours at one time without interruption, stand for one hour at a time, and walk for one hour at a time. See id. at 20, 996. Dr. Fuchs found that Parker could occasionally reach overhead and could continuously reach in all other directions, handle, finger, feel, and push/pull, with each hand. See id. at 20, 997. When asked whether he found "sufficient credibly clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain," Dr. Fuchs responded, "No!" The ALJ gave "great weight" to Dr. Fuchs's opinion, because "[his] opinion[ ] remains unrebutted even after the Appeals Council remand." Id. at 20.

Fourth, the ALJ relied on treatment notes from Parker's March 29, 2018 appointment with spine and pain specialist Dr. Denny J. Battista. See id. at 21. At that appointment, Dr. Battista "did not indicate complete restrictions of rotation or movement of [Parker's] neck." Id. at 21; see also id. at 1236 (records from that appointment indicating cervical spine flexion of 90 degrees, "neutral" cervical spine extension, cervical spine right rotation of 30 degrees, and cervical spine left rotation of 30 degrees). Further, the ALJ noted that Dr. Battista found that Parker's neck and shoulder area did not demonstrate any muscle atrophy or

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)

Case 1:24-cv-00506-AJB-ML   Document 24   Filed 05/05/25   Page 43 of 153

2021 WL 11549419

loss of muscle strength, and that there was no loss of motor strength or grip strength. See id. at 21, 1236. The ALJ also noted, however, that Parker reported to Dr. Battista that she had neck pain radiating up her arms; that since her last visit, her neck pain had become worse; that her pain was at a moderate to severe level; and that the pain was "aggravated by everything and relieved by nothing," including oxycodone she had been prescribed post-surgery. See id. at 18, 1232. The ALJ observed that Dr. Battista recommended epidural injections for treatment of left-sided axial neck pain. See id. at 18, 1237.

**\*7** Fifth, the ALJ relied on treatment notes from Parker's May 3, 2018 appointment with Dr. Kairallah. See id. at 20. The "History of Present Illness" section of the medical notes state that "[f]rom an arthralgias perspective she's doing well," and that "[s]he has a little bit of pain in her hands and feet but nothing too bad." Id. at 20, 1152.

In assessing Parker's symptoms, the ALJ also concluded that various aspects of her testimony at the hearing were contradicted by medical evidence. The ALJ found that Parker's testimony that she had difficulty looking downward was inconsistent with Dr. Battista's March 29, 2018 findings regarding Parker's range of neck movement. See id. at 21. The ALJ concluded that Parker's testimony that she was bed-ridden twelve to fifteen hours per day was not credible in light of her husband's full-time work schedule and a sentence in her surgery discharge notes that the ALJ read to indicate that she was required to have assistance from her husband for only one week post-discharge. See id. at 21; see also id. at 1241 (discharge note stating, "Her husband will be available 24 hours a day throughout the next week for care."). The ALJ further noted that the only limits indicated in the discharge notes pertained to strenuous activity and heavy lifting. See id. at 21; see also id. at 1241 (discharge note stating "No heavy lifting, strenuous activity, pushing, or pulling"). Regarding Parker's claim that she wore diapers, the ALJ pointed to treatment records from an April 25, 2016 appointment with a gastroenterologist that omit mention of diapers and do not otherwise note digestive problems. See id. at 21. The ALJ discounted Parker's testimony that she uses a geriatric toothbrush, based on Dr. Battista's March 29, 2018 note that her grip strength was 5/5. See id. at 21, 1228. The ALJ also concluded that January 25, 2018 treatment notes from Dr. Daniel Mendez, indicating "mild-moderate neck pain" and noting that she was going to the YMCA and using the pool for aquatherapy, undermined Parker's account of a restrictive post-surgery recovery. See id. at 21, 1224.

The ALJ found that Parker's RFC precluded her from performing her past work as a bartender, but that sufficient employment opportunities existed in the economy as a whole. See id. at 21–23. At the hearing, vocational expert Quintin Boston was posed two hypothetical sets of limitations, and asked to opine on whether a person with those limitations could perform either Parker's past work as a bartender, which is considered "light work," or other, "sedentary" work existing in the economy. See id. at 124–30. In the first hypothetical, the person could lift ten pounds occasionally, lift less than ten pounds frequently, sit for eight hours per day, stand or walk for four hours per day, never climb ladders or scaffolds, and occasionally climb stairs, stoop, kneel, crouch, or crawl. See id. at 124. Boston confirmed that such a person could not work as a bartender, due to lifting restrictions. See id. When asked if such a person could perform any sedentary work existing in the economy, Boston concluded that she could work as an "order clerk," for which there are approximately 30,000 positions in the national economy, an "addresser," for which there are approximately 15,000 positions, or a "document preparer," for which there are approximately 65,000 positions. See id. at 124–25.

**\*8** In the second hypothetical, Parker's attorney asked whether sedentary work existed in the economy for someone with the additional restrictions of 30-degree cervical flexion (flexibility looking downward), and limitations in the use of her hands. See id. at 125–27. Boston responded that such a person could not perform any of the jobs he previously mentioned, due to the need to look down. See id. at 126. Boston stated, however, that such a person could work as a "surveillance systems monitor," for which there are 16,000 positions in the national economy, and stated that a person in that job typically looks straight ahead at a computer screen and does not need to reach, finger, or feel. See id. at 127. But when pressed, Boston clarified that this figure was based on the assumption that the employer would offer an accommodation in the form of relief from documentation requirements, which would require use of one's hands. See id. at 128–29. He further stated that, assuming no accommodation was offered, the number of available positions would decrease by "at least ten percent." See id. at 129.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 44 of 153
2021 WL 11549419

Based on Boston's response to the first hypothetical, the ALJ concluded that through the date last insured, Parker was capable of making an adjustment to other work existing in significant numbers in the national economy. See id. at 23. Accordingly, the ALJ found that Parker was not disabled during that period. See id.

On August 21, 2019, the Appeals Council declined to review the ALJ's October 12, 2018 decision, rendering it the final decision of the Commissioner. See id. at 1–4.

## III. LEGAL STANDARD

When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether her decision is supported by substantial evidence in the record. See 42 U.S.C. § 405(g). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). A court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3, 2013 U.S. Dist. LEXIS 134688, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). A court generally should not uphold the ALJ's decision if it is based on legal error. See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).

## IV. DISCUSSION

On appeal, Parker argues that the ALJ's decision was not supported by substantial evidence, because the ALJ (1) mischaracterized the nature of Parker's cervical disc disorder; (2) failed to acknowledge medical evidence in the record regarding Parker's pain, limitations in neck movement, and limitations in the use of her hands; and (3) improperly relied on expert medical opinions that were conclusory and incomplete. See generally Pl.'s Br.

For the reasons that follow, the Court finds that Parker's second and third arguments are meritorious. The ALJ overlooked a significant quantity of medical evidence pertinent to Parker's physical condition between her March 2016 cervical disc disorder diagnosis and her December 31, 2017 last date insured. The ALJ also did not justify the weight assigned to certain medical opinions. Moreover, in the course of reviewing the medical evidence, the ALJ at times violated regulations governing the assessment of symptoms. Below, the Court provides instructions that the ALJ is to follow in adjudicating Parker's DIB application upon remand.

### A. The ALJ's Characterization of Parker's Cervical Disc Disorder

Parker argues that the ALJ inaccurately described her cervical disc disorder, understating its severity in a manner that led to an erroneous assessment of her RFC. See Pl.'s Br. at 11–12. More precisely, Parker contends that the ALJ failed to detail the complexity and invasiveness of her May 26, 2016 surgery. See id. at 12.

**\*9** This challenge is without merit. In describing Parker's surgery as a "C4 to C7 anterior cervical discectomy and fusion," the ALJ was quoting the description provided by the surgeon who conducted the procedure, Dr. Ross Moquin. See R. at 1247. This appears to be a literally accurate, succinct paraphrase of the more detailed description provided by the Appeals Council, which Parker prefers. See supra Part II(c); Pl.'s Br. at 3.

### B. The ALJ's Review of Parker's Medical Records

The Appeals Council instructed the ALJ to consider the effect of Parker's cervical disc disorder, diagnosed in March of 2016, and her spinal surgery, conducted on May 26, 2016, on her ability to work. See Pl.'s Br. at 3. The Appeals Council directed the ALJ to focus on the impact of these medical events on Parker up until her date last insured, December 31, 2017. See id.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 45 of 153

2021 WL 11549419

Inexplicably, the ALJ relied almost entirely on medical records from outside of this date range, despite the availability of relevant medical records during this period. On remand, the ALJ must evaluate Parker's medical records between March of 2016 and the end of 2017. Additionally, there are certain relevant aspects of the medical records from prior to this period that the ALJ must newly consider upon remand.

As Parker correctly notes, there are treatment notes from the March 2016-December 2017 period that pertain to the range of movement of her spine and neck, and pain in her neck, hands, and other areas. See Pl.'s Br. at 6, 12–13. For guidance, the Court provides the following, non-exhaustive list of relevant parts of Parker's medical records from this period that the ALJ did not mention:

(1) March 31, 2016 treatment notes from an appointment with Dr. Kairallah, stating "She is being careful about ambulation because of her neck pain"; "She does not feel as if her spine is stable and it just aches all the time"; "The pain severity is 8/10"; "No point tenderness cervical, thoracic or lumbar spine limitation of range of motion of extension and rotation of the cervical spine"; "joint exam shows 8 tender joints, including MCP3, PIP2, and PIP4 of the left hand, MCP2, MCP3, and PIP3 of the right hand"; and "some scattered tenderness in the small joints of her hands." R. at 1218–20.

(2) April 20, 2016 treatment notes from an appointment with Dr. Moquin, stating "patient states having extreme pain in her neck patient states in the last 3 months lifting bilateral hands above head causes them to go numb and right arm and hand always has numbness tingling sharp pain from base of neck to the lower back down the spine more when movement of the neck"; and "patient presents neck and right arm pain." Id. at 1005–06.

(3) May 18, 2016 treatment notes from a nurse practitioner during an appointment with Dr. Moquin, stating "The level of pain on today's evaluation is 7/10, but can readily increase to 10/10, with marked decrease in range of motion of the neck, both looking up, down, and to the left and right"; and "positive for joint pain, neck, hands, and feet." Id. at 1247–48.

(4) November 16, 2016 treatment notes from an appointment with Dr. Kairallah, stating "pain severity is 7/10"; and "no point tenderness cervical, thoracic or lumbar spine, limitation of range of motion of extension and rotation of the cervical spine." Id. at 1203–05.

(5) May 22, 2017 treatment notes from an appointment with Dr. Kairallah, stating "Lately, her joints have been bothering her significantly and she is in severe pain at times especially in her hands"; "the pain severity is 7/10"; "significant limitation in all directions of the cervical and lumbar spine," "the bulk of her joint complaints are in the spine and peripheral joints with significant limitation on her spinal exam." Id. at 1185–87.

  *10  (6) June 6, 2017 treatment notes from an appointment with Dr. Kairallah, stating the same. Id. at 1180–82.

(7) November 6, 2017 treatment notes from an appointment with Dr. Mary Abdulky, stating "the pain severity is 8/10." Id. at 1163.

While the ALJ need not necessarily examine every bit of medical evidence in the record, the ALJ cannot disregard a significant quantity of relevant evidence supporting the claimant's position without explanation. See Anne F. v. Saul, No. 19-CV-774, 2020 WL 6882777, at *10 (N.D.N.Y. Nov. 24, 2020) ("While it is undoubtedly true that an ALJ does not have to state on the record every reason justifying a decision, and is not required to discuss every piece of evidence submitted, an ALJ also may not cherry-pick out of the record those aspects of the physicians' reports that favor [her] preferred conclusion and ignore all unfavorable aspects' without explaining [her] choices."); Brown v. Comm'r of Soc. Sec., No. 15-CV-1506, 2017 WL 2312914, at *4 (N.D.N.Y. May 26, 2017) ("[T]he ALJ ... cannot ignore evidence supporting Plaintiff's claim while at the same time accepting evidence that supports his decision."). Horbock v. Barnhart, 210 F. Supp. 2d 125, 136 (D. Conn. 2002) ("Although the ALJ was not required to address every piece of evidence, he could not ignore the substantial evidence from plaintiff's treating physician that she had nonexertional limitations involving the use of her hands."). And to the extent that the ALJ chooses to consider medical evidence from after the date last insured, she must explain the weight assigned to notes from Parker's physical therapist in March and April 2018 appointments, in which he determined that her cervical flexion was limited to thirty degrees.

See R. at 1513, 1520–21; Trank v. Saul, No. 18-CV-1002, 2020 WL 2553278, at *3 (W.D.N.Y. May 20, 2020) ("Because the Commissioner considers a physical therapist to be an 'other source', rather than an 'acceptable medical source', a physical therapist's opinion is not entitled to controlling weight. However, an ALJ is still required to weigh opinion evidence from a physical therapist, and, in rendering the disability determination, should explain the weight afforded to the opinion and why.") (citing S.S.R. 06-03p, 2006 SSR LEXIS 5); Macintyre v. Comm'r of Soc. Sec., No. 17-CV-6833, 2019 U.S. Dist. LEXIS 17385, at *15–16 (W.D.N.Y. Jan. 23, 2019) (finding that the ALJ's decision was not supported by substantial evidence when he selectively mentioned unfavorable but not favorable medical evidence from after the date last insured).

As Parker correctly identifies, the ALJ additionally overlooked evidence from 2015 relevant to Parker's grip strength. See Pl.'s Br. at 6; R. at 1059. Treatment notes from a May 4, 2015 appointment with Dr. Kairallah indicate "weak hand grips." See R. at 1059. Dr. Kairallah noted the same in May 2017 treatment notes. See R. at 1187. That the same treating physician made this same finding twice two years apart suggests that Parker has limitations in the use of her hands. The ALJ noted only the May 2017 treatment note and, again, a treatment note from after the date last insured, in March 2018, which indicated full grip strength. See id. at 16, 18. The Commissioner additionally highlights a May 2016 note from a nurse practitioner the ALJ did not mention, indicating "[g]ood grip strength bilaterally." See Def.'s Br. at 8.

**\*11** The Commissioner argues that overlooking the May 2015 treatment note would not change the analysis, because an impairment and its resulting limitations must last for a continuous twelve months for a claimant to qualify as disabled, and the nurse practitioner's note suggests intermittent grip strength weakness between May 2015 and May 2017. See Def.'s Br. at 9 ("[P]laintiff's argument must fail ... in light of the sporadic nature of the grip weakness[.]") (citing Barnhart v. Walton, 535 U.S. 212, 222–223, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) ("[T]he statute's 12 month duration requirements apply to both the impairment and the inability to work requirements.") (internal quotation marks omitted)); see also 42 U.S.C. § 423(d)(1)(A) (defining "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected ... to last for a continuous period of not less than 12 months"). It is improper for the Commissioner to offer this post-hoc rationalization in a brief on appeal. See Macintyre, 2019 U.S. Dist. LEXIS 17385, at *19 ("[N]one of the rationalizations advanced by Defendant are present in the ALJ's written determination, and Defendant's after-the-fact explanation as to why the ALJ properly rejected Dr. Deiss's opinion cannot serve as a substitute for the ALJ's findings.").

In any case, the Commissioner's argument is without merit, for two reasons. First, courts have not interpreted the twelve-month requirement to categorically deny benefits to people whose symptoms wax and wane over a period of at least twelve months. See Anne F., 2020 WL 6882777, at * 10 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days ... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.") (quoting Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008)). [8] Second, while this nurse practitioner's May 2016 note would be appropriate to consider, it would not necessarily override the May 2015 and May 2017 determinations of Dr. Kairrallah, to the extent that they conflict. See Wicks v. Saul, No. 19-CV-171, 2020 U.S. Dist. LEXIS 174042, at *7–8 (W.D.N.Y. Sep. 21, 2020) ("[Nurse practitioners] are included among the 'other sources,' whose opinion may be considered as to the severity of the claimant's impairment and ability to work. While an 'other source' opinion is not treated with the same deference as a treating physician's opinion, the assessment is still entitled to consideration, especially when there is a treatment relationship with the claimant.") (internal citations omitted).

Before remanding this case, the Court must determine whether the ALJ's failure to assess the relevant evidence mentioned was harmless error. See, e.g., McIntyre v. Colvin, 758 F.3d 146, 148 (2d Cir. 2014) (noting that harmless error analysis applies to challenges to an ALJ's decision in a Social Security context); Cheeseman v. Berryhill, No. 16-CV-273, 2018 WL 1033226, at *11 n.5 (D. Vt. Feb. 23, 2018) (noting that "[d]istrict courts in the Second Circuit have come to the same conclusion," and collecting cases). "An error is harmless 'where application of the correct legal principles to the record could lead only to the same conclusion.' " Jessica R. v. Berryhill, No. 17-CV-236, 2019 WL 1379875, at *8 (D. Vt. Mar. 27, 2019) (alterations omitted) (quoting Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010)).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 47 of 153
Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
2021 WL 11549419

Failing to review medical records from the relevant time period was not harmless error, because this failure affected the instructions given to the vocational expert. Among other relevant potential omissions, the ALJ did not mention in the hypothetical she posed to Boston any limitations in Parker's use of her hands. See id. at 24. In the second hypothetical, this addition prompted Boston to postulate the existence of one occupation Parker could perform, at 16,000 total positions in the economy rather than over 100,000. See id. at 124–25, 127.

 **\*12**  The Government argues that failure to mention hand-related limitations would be harmless error at worst, citing cases holding that demonstrating the existence of 16,000 jobs in the economy is sufficient for the Commissioner to meet his burden. See Def.'s Br. at 10. But when further questioned, Boston revealed that the 16,000 figure was based on an assumption that employers would make reasonable accommodations, as required under the Americans With Disabilities Act; and he did not provide a precise number of jobs available without accommodation. See id. at 128–29.

Boston's answer was based on a legally impermissible premise, and thus does not provide useful guidance. The Social Security Act requires no determinations about reasonable accommodation in order to ascertain whether an individual is disabled and entitled to benefits. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.") (emphasis omitted). Indeed, SSA policy prohibits consideration of whether a claimant can perform "other work that exists in significant numbers in the national economy ... with accommodations, even if an employer would be required to provide reasonable accommodations under the [ADA]." SSR 11-2p, 2011 SSR LEXIS 2 at *19; see also West v. Comm'r of Soc. Sec., No. 16-CV-2333, 2018 WL 2221673, at *5 (D. Or. May 15, 2018). Accordingly, if the ALJ finds that Parker's limitations are different than the ALJ earlier concluded, the ALJ must newly present a hypothetical to a vocational expert that captures Parker's limitations.

### C. The ALJ's Assessment of Medical Opinions from Puri, Winkler, and Fuchs

The ALJ assigned significant weight to the opinions of two government medical experts, Dr. Winkler and Dr. Fuchs, who reviewed Parker's medical records shortly before her surgery, and some weight to the opinion of Dr. Puri, who examined Parker two years prior. The ALJ failed to justify the weight she assigned to these opinions.

For reasons that need not be explained at length, the opinions of Dr. Winkler and Dr. Fuchs are of no value in determining the physical effects of a surgery that occurred after they wrote their opinions. See Charles M. v. Berryhill, No. 18-CV-92, 2019 WL 3886901, at *10 (D. Vt. Aug. 19, 2019) ("Because Dr. Abramson did not review all of Plaintiff's relevant medical information, her opinion is not supported by evidence of record as required to override the opinion of a treating physician.") (internal quotation marks omitted); Mead v. Colvin, No. 13-CV-71, 2014 WL 1165836, at *8 (D. Vt. Mar. 21, 2014) (finding ALJ erred by assigning significant weight to the opinion of an agency consultant who neither examined plaintiff nor considered medical opinions submitted after her review of the plaintiff's claim). And Dr. Puri examined Parker long before the underlying cervical conditioning necessitating surgery was diagnosed.

Additionally, insofar as Dr. Winkler and Dr. Fuchs's opinions are relevant to ascertaining the impact of Parker's cervical spine disorder prior to surgery, they arguably do not deserve significant weight. This is so, first, because around the time that these government medical experts rendered their armchair opinions based on a review of Parker's medical records, doctors who actually examined Parker determined that her pain was real and justified a surgical procedure on her spine. See R. 1007, 1220, 1241, 1247; see also Pl.'s Br. at 13–14 ("Here a board-certified neurosurgeon, relying upon the results of an MRI and his own examination observations, performed invasive and complicated surgery to address the plaintiff's allegations of pain and numbness."). While the weighing of evidence is the province of the ALJ, the ALJ cannot ignore this elephant in the medical records, or contradict the medical conclusion of a treating source without acknowledging its evidentiary significance. See Gough v. Saul, 799 F. App'x 12, 15 (2d Cir. 2020) ("While we agree with the district court that it is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such, here the ALJ did not

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 48 of 153

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
2021 WL 11549419

explain how the evidence conflicted, nor did the ALJ explain how he purported to resolve that conflict.") (internal quotation marks, citations, and alterations omitted).

**\*13** Moreover, upon close inspection, the opinions of Dr. Winkler and Dr. Fuchs are strikingly conclusory. Both were asked the following question: "In your view of the medical record ... do you find sufficient credible clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain in her skull, spine, shoulders, knuckles and right heel and ankle bones?" R. at 994, 1004. Dr. Winkler responded, "It appears her symptoms are significantly out of proportion to any objective evidence," without providing any reasoning, and, ironically, *without citing any objective medical evidence.* See id. at 994. Dr. Fuchs, in a manner both colorful and uninformative, replied, "No!" See id. at 1004. While the ALJ is permitted the discretion to assign weight to medical opinions, within certain bounds, the Court is skeptical that these ones have much value and will scrutinize the reasoning of any subsequent decision that relies upon them. See, e.g., Curry, 209 F.3d at 123 (finding error in ALJ's reliance on a conclusory medical opinion describing claimant's functional capacity in demonstrating that the claimant could perform certain exertional requirements); Villanueva v. Barnhart, No. 03-CV-9021, 2005 WL 22846, at \*9, 2004 U.S. Dist. LEXIS 26243, at \*27–29 (S.D.N.Y. Dec. 31, 2004) (same).

Failure to justify the weight accorded to Dr. Winkler and Dr. Fuchs's opinions was not harmless error, because their characterizations of Parker's limitations informed the hypothetical posed to Boston. See R. at 124–25.

### D. The ALJ's Assessment of Symptoms

Parker's claim to be disabled depends in part on her subjective descriptions of physical pain and other symptoms, both in her appointments with medical professionals and in her testimony before the ALJ. Parker contends that the ALJ discounted much of Parker's subjective evidence without adequate explanation. See Pl.'s Br. at 13–14. The SSA advises that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," SSR 16-3p, 2016 SSR LEXIS 4, at \*10–11, and that an ALJ shall "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual," id. at \*12–13. Moreover, to the extent that an ALJ uses objective medical evidence to undermine the claimant's subjective accounts of symptoms, the ALJ is "required ... to 'explain which of an individual's symptoms [the ALJ] found consistent or inconsistent with the evidence in [the claimant's] record and how [the ALJ's] evaluation of the individual's symptoms led to [the ALJ's] conclusions.' " Wagner v. Saul, No. 18-CV-195, 2019 WL 3955421, at \*4 (W.D.N.Y. Aug. 22, 2019) (quoting SSR 16-3p, 2016 SSR LEXIS 4, at \*21). Notwithstanding this guidance, the ALJ discounted Parker's subjective accounts of pain and other symptoms in some instances based merely on the absence of objective medical evidence, and in other instances on the basis of spurious assertions of conflicts with the objective medical evidence.

In addressing Parker's subjective accounts of pain and other symptoms, the ALJ remarks, "Despite repeated diagnoses and treatment, there continues to be no credible evidence in support of the claimant's allegations regarding the nature and extent of her limitations." R. at 20. As support, the ALJ cites thirty exhibits worth of medical records, spanning from 2013 to 2018. Id. The implication appears to be that there is an absence of objective evidence in the record as a whole. But this mode of reasoning directly contravenes SSR 16-3p. Moreover, as discussed, Parker's medical records from the relevant time period contain numerous references to subjective complaints of pain and other symptoms, which the ALJ cannot ignore.

The ALJ additionally relies upon the determinations of Dr. Winkler and Dr. Fuchs that the Court earlier determined to be conclusory. See R. at 20–21; *supra* Part IV(c). The question these experts were posed seems to assume the same legally erroneous premise that Parker had the burden to present objective medical evidence to support her account of the intensity, persistence, and limiting effects of her pain. See R. at 994, 1004 ("[D]o you find sufficient credible clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain in her skull, spine, shoulders, knuckles and right heel and ankle bones?"). Simple "no" answers to this question, without citations to specific parts of the medical record that conflict with Parker's account, do not justify discounting Parker's reported symptoms.

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)

2021 WL 11549419

Case 1:24-cv-00506-AJB-ML   Document 24   Filed 05/05/25   Page 49 of 153

**\*14**  The ALJ also discounted much of Parker's testimony at the hearing. While the ALJ's reasoning is defensible at parts, the following aspects of her reasoning are not justifiable to an extent that a "reasonable mind might accept." Shaw, 221 F.3d at 131. First, the ALJ discounted Parker's testimony that she is bedridden 12-15 hours per day, and that her husband must empty her commode and make her food, by pointing to a note in her hospital release record stating "Her husband will be available 24 hours a day[ ] throughout the next week for care." See R. at 21, 1241. The ALJ notes that Parker's "husband works full time and at the time of her discharge from the hospital after the discectomy, she was required to have assistance for one week only." See id. at 21. But Parker represented in her testimony that her husband assisted her before and after work. See id. at 107–13. And the hospital discharge note does not appear to provide that his assistance was recommended for only one week, but rather that he as a matter of fact would be available full-time for that period. See id. at 1241. Elsewhere, the ALJ discounts Parker's claim that she had to wear diapers, based on treatment notes from an appointment with a gastroenterologist in which this was not mentioned. See id. at 21, 1101. But that appointment was on April 25, 2016, before her surgery. See id. at 1101, and Parker was testifying exclusively to her experience after the surgery, see id. at 106. Moreover, by Parker's account, she wore a diaper not due to gastrointestinal issues, but due to the difficulty of climbing stairs to reach her second-floor bathroom. See id. at 113. In discounting Parker's general account of a restrictive post-surgery recovery, the ALJ cites January 2018 treatment notes indicating that she was participating in aqua therapy. See id. at 21. But as discussed, the ALJ ignored treatment notes for the eighteen months preceding January 2018, which are at least as relevant.

On remand, to the extent that the ALJ contradicts Parker's subjective account of pain and other symptoms, the ALJ must cite to specific parts of the record—during the relevant time period, where warranted—that undermine Parker's representations. Where such contradictions are absent, the ALJ must credit Parker's subjective account.

## V. REMAND INSTRUCTIONS

Because the ALJ's decision is not supported by substantial evidence, and because the ALJ made legal errors in the course of assessing Parker's symptoms, the Court remands this action. The Court specifies the following requirements and offers an optional recommendation.

The Court begins with the requirements. First, the ALJ must acknowledge and account for relevant medical evidence from between the March 2016 cervical disc disorder diagnosis and the December 31, 2017 date last insured. Second, the ALJ also must acknowledge evidence prior to the March 2016 diagnosis that is relevant to Plaintiff's claimed impairments, including but not limited to Dr. Kairallah's May 4, 2015 treatment notes indicating "weak hand grips." See R. at 1059. Third, in assigning weight to the May 2016 opinions of Dr. Winkler and Dr. Fuchs regarding Parker's alleged symptoms, the ALJ must account for contrary medical evidence, including but not limited to records relating to her diagnosis with cervical disc disorder and her subsequent surgery. Fourth, the ALJ must accord weight to Parker's subjective evidence in a manner faithful to the governing regulatory standards. See supra Part IV(D).

Fifth, because there are no expert opinions rendered after May 21, 2016 regarding Parker's work-related limitations, the ALJ must obtain expert assistance at least in reviewing records after that date. See Wilson v. Colvin, No. 13-CV-6286, 2015 WL 1003933, at \*21 (W.D.N.Y. Mar. 6, 2015) ("[W]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, the general rule is that the Commissioner may not make the connection himself.") (internal quotation marks omitted); Holt v. Colvin, No. 16-CV-01971, 2018 WL 1293095, at \*7 (D. Conn. Mar. 13, 2018) ("An ALJ cannot determine the RFC solely 'on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.' ") (quoting Guarino v. Colvin, 14-CV-598, 2016 WL 690818, at \*2 (W.D.N.Y. Feb. 22, 2016)). The opinion of a treating source would be preferable, although not required, as long as the ALJ's decision is otherwise sufficiently supported.[9] Wright v. Berryhill, No. 16-CV-6156, 2017 WL 2720004, at \*3–4 (W.D.N.Y. June 23, 2017) ("Many courts in this circuit have held that the ALJ has a duty to develop the record to obtain an opinion from a treating source whenever possible ... The Second Circuit has indicated, however, that an ALJ's failure to obtain such a report does not necessarily require remand where the record otherwise contains sufficient information about the claimant's residual functional capacity."); see also Tankisi v. Comm'r

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 50 of 153

Julia P. v. Saul, Not Reported in Fed. Supp. (2021)
2021 WL 11549419

of Soc. Sec., 521 Fed.Appx. 29, 34 (2d Cir. 2013) ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.").

**\*15** The Court also recommends that the ALJ consider assigning an onset date different from the one alleged. The ALJ has the authority to do so. See SSR 83-20, 1983 SSR LEXIS 25, at \*6 ("In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy."); Lockwood v. Colvin, No. 12-CV-0973-A, 2014 WL 3894494, at \*10 (W.D.N.Y. Aug. 8, 2014) ("In addition to determining that an individual is disabled, the Commissioner must also establish the onset date of disability."), report and recommendation adopted, No. 12-CV-973, 2014 WL 4996429 (W.D.N.Y. Oct. 7, 2014). The Court reaches no conclusion as to whether Parker has been disabled since June 12, 2013. But the Court notes that Parker evidently developed a severe impairment involving her cervical spine at some point not long before her March 2016 diagnosis, and underwent a significant surgery in May 2016 that common sense indicates had some physical effects. Additionally, evidence of pain and weakness in her hands arguably emerges most clearly in 2015. The ALJ is not confined to a choice between a finding of disability beginning on June 12, 2013 and a finding of no disability at any time; and the ALJ should consider the third option of finding Parker disabled starting at a later onset date. See, e.g., Rose v. Astrue, No. 06-CV-1885, 2008 WL 243691 at \*21, 2008 U.S. Dist. LEXIS 6229 at \*60 (D. Ariz. Jan. 26, 2008) (noting in remand instructions that "[i]n the event Plaintiff is determined to be under a disability, the ALJ may have to change the onset date"). In analogous circumstances, ALJs have unilaterally assigned later onset dates than alleged. See, e.g., Lockwood, 2014 WL 3894494, at \*11 (affirming ALJ's selection of an onset three years later than alleged, because "substantial evidence indicates that the time around August 1, 2007 was a time of significant change in Lockwood's medical history").

## VI. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision denying Plaintiff's application for DIB is **VACATED**, and this case is **REMANDED** to the Commissioner for further administrative proceedings consistent with this order; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 11549419

---

### Footnotes

1    The administrative record has been filed as a series of exhibits rather than a single document. For simplicity, the Court cites to the Record as if it is a single uploaded document.

2    Radiculopathy is a disorder of the spinal nerve roots. See *Radiculopathy*, Stedmans Medical Dictionary 748650 (2014).

---

2021 WL 11549419

3    A discectomy is a procedure by which an intervertebral disk is removed. See *Discectomy*, Stedmans Medical Dictionary 252070 (2014). Spinal fusion involves connecting vertebrae. See *Spinal fusion*, Stedmans Medical Dictionary 358540 (2014).

4    The Record does not include either the January 13, 2017 ALJ decision or the December 27, 2017 Appeals Council decision. The Commissioner concedes that Plaintiff's account of the procedural history is accurate in its entirety. See Def.'s Br. at 2.

5    "Sedentary work" entails "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 414.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 SSR LEXIS 30, at *13.

6    A trigger point is a specific point or area where stimulation by touch, pain, or pressure induces a painful response. See *Trigger point*, Stedmans Medical Dictionary 706250 (2014).

7    Palpation is examination with the hands. See *Palpation*, Stedmans Medical Dictionary 645750 (2014).

8    While it is for the ALJ to assess this factual question in the first instance, the Court notes that there is some suggestion in the record that Parker's limitations in the use of her hands are intermittent. See, e.g., R. at 744 (note from August 5, 2015 appointment with Dr. Dodji Madjinou stating that Parker "intermittently gets pain in her hands").

9    The Court notes that Dr. Kairallah treated Parker for most of the relevant time period.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5285311
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jean A. HANLON, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 5:07–CV–747 (FJS).
|
Dec. 17, 2010.

### Attorneys and Law Firms

Amdursky, Pelky, Fennell & Wallen, PC, Gregory R. Gilbert, Esq., of Counsel, Oswego, NY, for Plaintiff.

Social Security Administration Office of Regional, General Counsel–Region II, Tomasina Digrigoli, Esq., of Counsel, New York, NY, for Defendant.

### MEMORANDUM–DECISION AND ORDER

SCULLIN, Senior District Judge.

## I. INTRODUCTION

**\*1** Plaintiff Jean A. Hanlon brought this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c) (3), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB"). Currently before this Court are Plaintiff's and Defendant's cross-motions for judgment on the pleadings or, in the alternative, for summary judgment.

## II. BACKGROUND

Plaintiff, then forty-five, filed an application for DIB on or about August 19, 2004. *See* Administrative Record ("AR") at 16. In her disability report, Plaintiff cited spinal stenosis and carpal tunnel syndrome in both arms as her disabling conditions. *See id.* at 88. The Social Security Administration denied her request on November 22, 2004. *See id.* at 16, 59–61. Plaintiff filed a timely Request for a Hearing on December 3, 2004, which was held before Administrative Law Judge ("ALJ") Elizabeth W. Konnecke in Syracuse, New York, on June 8, 2005. *See id.* at 353. Attorney Gregory Gilbert represented Plaintiff, who appeared and testified. *See id.* at 353, 355. ALJ Konnecke denied Plaintiff's claim on September 21, 2005. *See* AR at 50–57. Plaintiff filed a timely request for review on November 21, 2005. *See id.* at 39–46. The Appeals Council remanded the case for further consideration of the evidence on February 3, 2006. *See id .* at 36–38. A second hearing occurred on December 11, 2006, before ALJ Konnecke in Syracuse, New York. *See id.* at 378. Once again, Attorney Gregory Gilbert represented Plaintiff, who appeared and testified. *See id.* at 378, 380. Victor Alberigi, a vocational expert ("VE"), testified via telephone. *See id.* at 378, 382. The VE opined that Plaintiff could perform the work of a charge account clerk, a telemarketer, or a food order clerk. *See id* at 388–89. The ALJ again denied Plaintiff's claim on February 16, 2007. *See id.* at 16–27.

In her February 2007 decision, ALJ Konnecke made the following findings:

1) Plaintiff last met the insured status requirements of the Act on December 31, 2008.

2) Plaintiff has not engaged in any substantial gainful activity since March 1, 2004, the amended alleged onset date.

3) Plaintiff experiences cervical spinal stenosis and bilateral carpal tunnel syndrome, status post repair on the right and left sides. Both are severe impairments.

4) Plaintiff's impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

5) Plaintiff has the residual functional capacity ("RFC") to lift or carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. Plaintiff is unable to engage in repetitive bending or twisting of the neck, repetitive use of the hands, and overhead lifting.

 **\*2** 6) Plaintiff is unable to perform any of her past relevant work.

7) Plaintiff was forty-eight years old at the time of the decision, defined as a younger individual, aged forty-five to forty-nine.

8) Plaintiff has at least a high school education and can communicate in English.

9) Plaintiff has no transferrable skills to either the light or sedentary level of exertion.

10) Given Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform.

11) Plaintiff has not been under a "disability" as defined in the Act from March 1, 2004, through the date of the ALJ's decision.

*See* AR at 19–27.

The ALJ's February 16, 2007 decision became the Commissioner's final decision on July 7, 2007, when the Appeals Council of the Social Security Administration denied Plaintiff's request for review. *See* AR at 6–9.

Plaintiff commenced this action on July 18, 2007, *see* Dkt. No. 1, and filed a supporting brief on March 7, 2008, *see* Dkt. No. 7. Defendant filed a response brief on July 31, 2007. *See* Dkt. No. 10.

### III. DISCUSSION

**A. Standard of review**

Absent legal error, a court will uphold the Commissioner's final determination if there is substantial evidence to support it. *See* 42 U.S.C. § 405(g). The Supreme Court has defined substantial evidence to mean " 'more than a mere scintilla' " of evidence and " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quotation omitted).

To be eligible for DIB, a claimant must show that she suffers from a disability within the meaning of the Act. The Act defines "disability" as an inability to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to cause death or last for twelve consecutive months. *See* 42 U.S.C. § 1382c(a)(3)(A). To determine if a claimant has sustained a disability within the meaning of the Act, the ALJ follows a five-step process:

1) The ALJ first determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 416.920(b), 416.972. If so, the claimant is not disabled. *See* 20 C.F.R. § 416.920(b).

2) If the claimant is not engaged in substantial gainful activity, the ALJ determines if the claimant has a severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(c). If not, then the claimant is not disabled. *See id.*

3) If the claimant has a severe impairment, the ALJ determines if the impairment meets or equals an impairment found in the appendix to the Listings. If so, the claimant is disabled. *See* 20 C.F.R. § 416.920(d).

4) If the impairment does not meet the requirements of the Listings, the ALJ determines if the claimant can do her past relevant work. *See* 20 C.F.R. § 416.920(e), (f). If so, she is not disabled. *See* 20 C.F.R. § 416.920(f).

**\*3** 5) If the claimant cannot perform her past relevant work, the ALJ determines if she can perform other work, in light of her residual functional capacity, age, education, and experience. *See* 20 C.F.R. § 416.920(f), (g). If so, then she is not disabled. *See* 20 C.F.R. § 416.920(g). A claimant is only entitled to receive disability benefits if she cannot perform any alternative gainful activity. *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *See Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir.1998).

## B. The ALJ's Step Three conclusion and the necessity of an updated medical opinion

### 1. Listings §§ 1.02B [1] and 1.04A

The characteristics of a disability to the extremities or joints under 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02 are

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02.

Paragraph B of § 1.02 states that, in addition to the above requirements, a plaintiff's medical condition must include the "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively [.]" 20 C .F.R., Part 404, Subpart P, Appendix 1, § 1.02B.

Section 1.04A defines spinal disorders as "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.04. Paragraph A of Section 1.04 states that, in addition to the above requirements, a plaintiff's medical condition must include "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) [.]" 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.04A.

In the instant matter, ALJ Konnecke found that Plaintiff had cervical spinal stenosis and bilateral carpal tunnel syndrome, both of which were "severe" impairments within the meaning of the regulations, and which were found in the Listings at § 1.02B and § 1 .04A, respectively. *See* AR at 19. However, the ALJ found that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "Listings"). *See id.* at 21.

**\*4** Regarding § 1.02B, which pertains to dysfunction of the joints in the extremities, the ALJ reasoned that the extent of Plaintiff's daily activities indicated that her condition did not meet the criteria set forth in the Listings. *See* AR at 22. Regarding § 1.04A, which pertains to spinal disorders, the ALJ reasoned that the record did not contain sufficient evidence of compromise of the nerve root to meet the Listing criteria. *See* AR at 21.

The ALJ did not err in finding that Plaintiff's limitations were not severe enough to constitute an impairment listed in the Listings. Plaintiff's conditions place her in pain, but a finding of disability requires that Plaintiff have more than the inability to work without pain. *See Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Plaintiff's conditions must prevent her from performing any type of substantial gainful employment in order for the ALJ to determine that she is under a disability. *See* 42 U.S.C. § 423(d)(2)(A). Plaintiff's daily activities indicate that her limitations are not so severe as to preclude gainful employment. At her first hearing, Plaintiff testified to vacuuming and performing other housework tasks and buying groceries, albeit with some help from her husband. *See* AR at 372. She also testified to her ability to sit and stand for approximately one hour at a time and to walk approximately a quarter of a mile. *See* AR at 368. When Plaintiff met Dr. Shayevitz, she stated that she cooked on weekends, performed house cleaning twice per week, washed laundry three times per week, shopped every other week, and performed self-care. *See* AR at 220. Accordingly, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's conditions are not so limiting as to meet or medically equal an impairment listed in the Listings.

### *2. Updated medical opinions*

For cases at the ALJ or Appeals Council level, the ALJ or Appeals Council is ultimately responsible for deciding whether a plaintiff's impairments meet or equal the Listings. *See* 20 C.F.R. § 404.1526(e); SSR 96–6p, \*3. In making this determination, an ALJ or the Appeals Council must obtain an updated medical opinion from a medical expert in one of two situations. *See* SSR 96–6p, at \*4 The first situation occurs where "no additional medical evidence is received, but in the opinion of the [ALJ] or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable[.]" *Id.* The second situation occurs where "additional medical evidence is received that in the opinion of the [ALJ] or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.*

Here, Plaintiff's case does not appear to fit within either of the two situations outlined in SSR 96–6p. First, neither the ALJ nor the Appeals Council represented that anything in the case record suggested that a judgment of equivalence could be reasonable. Second, there is no indication that either the ALJ or the Appeals Council received additional medical evidence that contradicted the medical findings in the record. Moreover, Plaintiff makes no effort to explain how her situation might meet the criteria of SSR 96–6p. Without such an explanation and in the absence of any other indication that the ALJ was required to obtain an updated medical opinion, the determination of equivalence is for the ALJ alone. *See* 20 C.F.R. § 416.926(e).

**\*5** Accordingly, the Court finds that the ALJ did not err by not obtaining an updated medical opinion and finds that substantial evidence supports the ALJ's Step Three assessment.

### C. Plaintiff's credibility and the VE's testimony regarding Plaintiff's ability to work

#### *1. Plaintiff's subjective statements of limitation*

A plaintiff's statements about her condition, on their own, are not enough to establish disability. *See* 20 C.F.R. § 404.1529; SSR 96–7p, \*1. The ALJ must consider a claimant's observable signs and laboratory findings, as well as reported symptoms. *See* 20 C .F.R. § 404.1529. A plaintiff's subjective complaints of pain and limitation are " 'entitled to great weight where ... [they are] supported by objective medical evidence.' " *Futia v. Astrue,* No. 1:06–CV–0961, 2009 WL 425657, \*6 (N.D.N.Y. Feb. 19, 2009) (quoting *Simmons v. U.S.R.R. Retirement Bd.,* 982 F.2d 49, 56 (2d Cir.1992)).

If a plaintiff's testimony is not fully supported by clinical evidence, the ALJ must employ a two-step process to evaluate a plaintiff's reported symptoms. *See* SSR 96–7p, at \*2. First, the ALJ must determine if the plaintiff has medically determinable

2010 WL 5285311

impairments that could produce the alleged symptoms. *See* 20 C.F.R. § 404.1529(a); SSR 96–7p, at *2. Second, if impairments do exist, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the plaintiff's ability to work. *See* 20 C.F.R. § 404.1529(a); SSR 96–7p, at *2. In so doing, the ALJ must consider (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve her pain or other symptoms; (v) other treatment that the claimant receives or has received to relieve her pain or other symptoms; (vi) any measures that the claimant takes or has taken to relieve her pain or other symptoms; and (vii) any other factors concerning the claimant's functional limitations and restrictions due to her pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii); SSR 96–7p, at *2.

In addition, where an ALJ assesses a plaintiff's subjective statements of pain in light of medical evidence that indicates that the plaintiff can work and finds that the plaintiff's statements cannot overcome the medical evidence to the contrary, "there is no need for further articulation by the ALJ regarding the plaintiff's credibility." *Francis v. Astrue,* No. 3:09–CV–1826, 2010 WL 3432839, *4 (D.Conn. Aug. 30, 2010).

Here, the ALJ properly considered Plaintiff's complaints of pain. After establishing that Plaintiff had a medically determinable impairment capable of producing the alleged symptoms, the ALJ considered these symptoms in light of Plaintiff's daily activities. She also evaluated the intensity of the symptoms; and, by considering and discussing all medical opinions, the ALJ considered Plaintiff's treatment and Plaintiff's efforts to relieve symptoms. The ALJ therefore correctly followed SSR 96–7p and balanced Plaintiff's complaints against the medical reports in the record. Plaintiff's daily activities, as described in the record, belie her claims of total inability to engage in substantial gainful employment. As a result, under *Francis,* the ALJ did not need to discuss Plaintiff's credibility any further.

**\*6** Consequently, the Court finds that the ALJ did not err in her assessment of Plaintiff's credibility.

### 2. ALJ's adoption of the VE's opinion

A VE's testimony will not constitute substantial evidence to support an ALJ's decision where the ALJ relies on a VE's opinion regarding a hypothetical claimant whose limitations do not mirror the plaintiff's. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114–15 (2d Cir.1981); *see also Gilliam v. Califano,* 620 F.2d 691, 693–94 (8th Cir.1980) (holding that a VE's testimony was "fatally deficient" where the hypothetical question did not identify all of the claimant's limitations (citations omitted)).

However, where the ALJ provides a hypothetical to the VE that corresponds to a plaintiff's RFC, and the VE opines on that hypothetical, "[t]he Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence." *Mancuso v. Astrue,* 361 Fed. Appx. 176, 179 (2d Cir.2010) (citation omitted).

The ALJ posed a hypothetical to the VE, which mirrored the ALJ's conclusion about Plaintiff's RFC and which substantial medical evidence supported. *See* AR 344–47. This hypothetical involved someone of Plaintiff's age, education and work history who could lift and carry twenty pounds occasionally and ten pounds frequently. *See id.* at 387. This person could stand or walk for six hours of an eight-hour work day and must avoid repetitive bending or twisting of the neck, as well as repetitive use of the hands and overhead lifting. [2] *See id.* The VE found that such a person could perform the work of a charge account clerk, a telemarketer, or a food order clerk. *See id.* at 388–89.

The ALJ did not err when she relied on the VE's testimony regarding this hypothetical because it correlated with Plaintiff's RFC. Nor did the ALJ err when she chose not to rely on the VE's opinion regarding hypotheticals that Plaintiff's counsel posed because those hypotheticals did not mirror Plaintiff's limitations. Consequently, the Court finds that the ALJ did not err when she determined that Plaintiff retained the ability to perform work that exists in significant numbers in the national economy.

2010 WL 5285311

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED;** and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **GRANTED;** and the Court further

**ORDERS** that the Commissioner's decision is **AFFIRMED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5285311

---

## Footnotes

1    Plaintiff, in her March 7, 2008 memorandum of law, did not argue that her injuries met the requirements of § 1.02B. *See generally* Dkt. No. 7. However, in her request for review of the ALJ's first decision, Plaintiff argued that her limitations constituted a disability under § 1.02B. *See* AR at 39. Accordingly, the ALJ addressed § 1.02B in her second decision.

2    The limitations of the hypothetical claimant can be found in Dr. Perkins' opinion, the April 11, 2004 functional capacity evaluation, Dr. Carr's opinion, Nurse Practitioner Higgins' opinion, and Dr. Shayevitz's opinion.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5642921
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tammy BAYLIS, Plaintiff,

v.

Carolyn W. COLVIN, Commissioner of Social Security, Defendant.

Civ. No. 8:13–CV–0977 (RFT).

|

Signed Sept. 24, 2015.

**Attorneys and Law Firms**

Office of Mark A. Schneider, Mark A. Schneider, Esq., Of Counsel, Plattsburgh, NY, for Plaintiff.

Social Security Administration, Office of Regional General Counsel, Region II, Lauren E. Myers, Esq., Of Counsel, New York, NY, for Defendant.

*MEMORANDUM–DECISION and ORDER* [1]

RANDOLPH F. TREECE, United States Magistrate Judge.

 **\*1**  In this action, Plaintiff Tammy Baylis moves, pursuant to 42 U.S.C. § 405(g), for review of a decision by the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). [2] Based upon the following discussion, the Commissioner's decision denying Social Security benefits is **reversed** and this case is **remanded** back to the Social Security Administration ("SSA") for further development of the record.

## I. BACKGROUND

The Court adopts the facts set forth in Plaintiff's Brief under the heading "FACTS," with the exception of any legal arguments contained therein. Dkt. No. 13, Pl.'s Br., at pp. 2–12; *but see* Dkt. No. 14, Def.'s Br., at p. 2 (adopting statement of facts set forth by the Administrative Law Judge ("ALJ") in his written opinion).

Baylis, born on May 12, 1965, filed an application for DIB and SSI on September 13, 2010, claiming an inability to work as of February 1, 2006, due to a variety of ailments, including swelling of her left knee, problems with her left foot, and rotator cuff issues. Dkt. No. 7, Admin. Transcript [hereinafter "Tr."] at pp. 139–44, 145–48, & 168–69. She also suffers from diabetes mellitus and is morbidly obese. [3] She received her GED in 1982 and did not attend any special education courses while in school. *Id.* at pp. 169–70. Her past work included waitress, chef, customer service, childcare/babysitter, and nursing assistant. *Id.* at p. 176.

Baylis's disability applications were denied on initial review. *Id.* at pp. 79–86. On November 9, 2011, a Hearing was held before Administrative Law Judge ("ALJ") Terrence Farrell wherein testimony was procured from Baylis, who was not accompanied by counsel or any other representative, and from a vocational expert ("VE"). *Id.* at pp. 25–70. On February 24, 2012, ALJ Farrell issued an unfavorable decision finding that Baylis was not disabled. *Id.* at pp. 6–24. On August 1, 2013, the Appeals Council

refused to consider certain evidence submitted to it, finding that the evidence did not pertain to the time period at issue, and concluded that there was no basis under the Social Security Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner. *Id.* at pp. 1–5. Exhausting all of her options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Urtz v. Callahan,* 965 F.Supp. 324, 325–26 (N.D.N.Y.1997) (citing, *inter alia, Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). Succinctly defined, substantial evidence is "more than a mere scintilla" of evidence scattered throughout the administrative record; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 229 (1938); *see also Williams ex. rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988). "To determine on appeal whether an [Administrative Law Judge's] findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex. rel. Williams v. Bowen,* 859 F.2d at 258.

**\*2** The Administrative Law Judge ("ALJ") must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen,* 859 F.2d at 258; 42 U.S.C. § 405(g). However, where the weight of the evidence does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen,* 817 F .2d at 986.

### B. Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id.* at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. §§ 404.1520 & 416.920. At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity." *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. 20 C.F.R. §§ 404.1520(b) & 416.920(b). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *Id.* at §§ 404.1520(c) & 416.920(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id.* at §§ 404.1520(d) & 416.920(d). The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience. *Berry v. Schweiker,* 675 F.2d at 467. Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id.* If the claimant's

impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity ("RFC")[4] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. §§ 404.1520(e) & 416.920(e). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker,* 675 F.2d at 467; 20 C.F.R. §§ 404.1520(f) & 416.920(f).

**\*3** Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker,* 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.;* 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.,* 910 F.2d 64, 65 (2d Cir.1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. §§ 404.1520(f) & 416.920(f); *see also New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990).

## C. ALJ Farrell's Findings

As noted above, Baylis and a VE were the only witnesses to testify at the Hearing. Tr. at pp. 25–70. In addition to such testimony, the ALJ had Baylis's medical records consisting of treatment reports and opinions from various treating and/or consulting physicians. *Id.* at pp. 303–497.

ALJ Farrell noted initially that, for DIB purposes, Baylis met the insured status requirements of the Social Security Act through December 3, 2009.[5] Tr. at p. 11. Using the five-step disability evaluation, ALJ Farrell found that: (1) Baylis had not engaged in any substantial gainful activity since February 1, 2006, the alleged onset disability date;[6] (2) she has severe medically determinable impairments, namely diabetes, obesity, problems with left knee, status post left ankle fracture, hypertension, history of left shoulder surgery, history of kidney stones, reading and math disorders, borderline intellectual functioning, and history of marijuana abuse, but, her depressive disorder is deemed to be not severe; (3) her severe impairments do not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation No. 4; (4) she retains the RFC to perform sedentary work with certain limitations, such as she would be limited to simple, unskilled work, and, as such, she could not return to any of her prior work; but, (5) considering her age, education, work experience, RFC, the VE testimony, and using the Medical–Vocational Guidelines as a framework, Baylis could perform work available in the national economy and was therefore not disabled. *Id.* at pp. 11–19.

## D. Plaintiff's Contentions

Generally, Plaintiff contends that she is disabled by virtue of the combination of her impairments and that the Commissioner rendered several errors necessitating a remand for either calculation of benefits or consideration of further evidence. *See generally* Pl.'s Br. More specifically, Baylis claims that the Appeals Council erred when it refused to consider new evidence submitted to it on appeal and that the ALJ erred when he (1) did not provide Plaintiff with a full and fair hearing; violated the Treating Physician Rule, (2) erroneously assessed Plaintiff's credibility, and (3) gave an inaccurate hypothetical question to the VE. *Id.* In response, Defendant contends that the Appeals Council appropriately considered new evidence and that the Commissioner's decision denying benefits is supported by substantial evidence in the record. Dkt. No. 14, Def.'s Br.

## E. Analysis of ALJ Decision

**\*4** While Plaintiff has identified an array of errors committed by the ALJ, the Court chooses to focus primarily on two of the more glaring errors: 1) the flawed RFC assessment; and 2) the erroneous hypothetical submitted to the VE and the ALJ's apparent reliance on the VE's opinion.

### 1. RFC

As noted above, the Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to do despite the existence of physical and/or mental impairments. *See* 20 C.F.R. §§ 404.1545(a) & 416.945; 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs according to their physical exertion requirements as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567 & 416.967. In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id.* at §§ 404.1545(a) & 416.945(a).

In this action, when assessing Plaintiff's RFC, the ALJ reviewed the medical record and opinion evidence and determined that Baylis had the

> residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except limited to simple, unskilled work, occasionally lift, carry, push, and pull 10 pounds; frequently lift, carry, push, and pull less than 10 pounds; stand/walk at least two hours in a work day with normal breaks; and occasionally reach with the nondominant upper extremity.

*Id.* at p. 16.

The ALJ concluded that Baylis does not have "significant functional limitations due to her left shoulder, left knee, back, and left foot pain" though he apparently considered, to some extent, the effects of her diabetes. *Id.* The ALJ also considered the symptoms alleged by Plaintiff that could "reasonably be accepted as consistent with the objective medical evidence and other evidence; however, he found Plaintiff's statements and testimony regarding her disabling limitations to be "largely unsupported by the medical records, including histories and findings." *Id.* at pp. 16 & 18. The ALJ also considered the paucity of opinion evidence contained in the record and explained why little weight was attributed to those opinions. Specifically, the ALJ gave little weight to the prescription issued by Anita Vigorito, M.D., Baylis's treating physician, dated November 8, 2011, indicating that Baylis should be out of work until further evaluation. *Id.* at p. 18 & 411. The ALJ stated that such opinion was "not specific and ... is only a very recent assessment responding to a new complaint and because the claimant had not yet had treatment." *Id.* at p. 18. And little weight was also given to Dr. Vigorito's letter, dated August 26, 2011, asking that Plaintiff be excused from jury duty due to chronic knee and ankle pain and an inability to sit comfortably for long periods of time. *Id.* The ALJ stated that such opinion is not supported by the medical evidence of record. *Id.*

**\*5** Pointedly absent from this portion of the ALJ's decision is any discussion of how Plaintiff's obesity, newly diagnosed spinal stenosis, and her borderline intellectual functioning could affect her RFC. While it seems that the ALJ considered at least two of these conditions in his severity analysis at Step Two, there is no mention of these conditions in the portion of the opinion whereby he considered the effects such conditions may have on Plaintiff's ability to perform work. Indeed, it appears to this Court that there is a significant gap in the development of the record in terms of the newer stenosis diagnosis, which was raised by Plaintiff during the Hearing, and the opinion evidence. In fact, there are no opinions from Plaintiff's treating physicians as to Plaintiff's functional capacity, and it is not entirely clear whether such opinions were solicited by the ALJ.

This gap is particularly troubling where, as here, Plaintiff represented herself *pro se*. In light of the remedial intent of the Social Security statute, and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty to develop the medical record if it is incomplete. *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999); 20 C.F.R. §§ 404.1512(d) & 416.912(d). This affirmative duty is heightened in cases involving *pro se* claimants as the "ALJ has a duty to adequately protect a *pro se* claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.' " *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (quoting *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980)). In this regard, the ALJ must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (quoting 20 C.F.R. § 404.1512(d)); *see also Sanchez v. Barnhart,* 329 F.Supp.2d 445, 450–51 (S.D.N.Y.2004). "Accordingly, an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Sanchez v. Barnhart,* 329 F.Supp.2d at 450 (emphasis in original) (internal quotation marks and citations omitted). In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability and additional information is needed to reach a determination. 20 C.F.R. at § 404.1512(e).

The "opinion" evidence assessed by the ALJ was nothing of the kind and could not possibly have provided the ALJ with an adequate basis to form an RFC assessment. A note excusing Plaintiff from work and jury duty can hardly be categorized as a statement as to the limitations Plaintiff endures by reason of her medical conditions. Given Plaintiff's *pro se* status and her compounding ailments, the ALJ should have re-contacted her treating physicians in order to procure an assessment of how her many medical conditions may affect her ability to perform certain exertional and nonexertional tasks.

 **\*6**  The Court is also troubled by the ALJ's failure to address Plaintiff's borderline intellectual functioning and whether it plays a role in eroding the sedentary occupational base. Yet, information obtained after the ALJ's decision seems to shed light on this inquiry as it pertains to the period at issue. In assessing the severity of her medical conditions, the ALJ discussed the psychoeducational evaluation performed by Brett T. Hartman, Psy.D., on November 10, 2011. Tr. at p. 13. Ultimately, Dr. Hartman found that based on the testing performed, Plaintiff functioned in the "borderline range of intelligence overall, with a moderate degree of scatter across her overall functioning." *Id.* at p. 433. Dr. Hartman stated that Baylis "clearly qualifies for learning disorder status and should be provided with special accommodations if she returns to a vocational program" and that with such accommodations, she "would have an adequate opportunity to succeed at a vocational program or community college." *Id.* at p. 444. In documentation provided to the SSA after the ALJ issued a decision, we learn that Plaintiff had been involved with the New York State Adult Career & Continuing Ed Services Vocational Rehabilitation ("ACCES–VR") since March 2011 and began taking classes in September 2011. *Id.* at p. 492–97. While the actual exhibit is dated long after the ALJ issued his decision, the time period discussed therein concerns the time period at issue. Specifically, by Letter, dated August 24, 2012, a counselor from ACCES–VR documented Baylis's efforts to receive vocational training and the problems she incurred due to her learning and physical disabilities. *Id.* at p. 494–97. Pointedly, despite the fact that Baylis had received special accommodations with her classes, she struggled to keep up with the workload. As of May 6, 2012, Plaintiff was deemed exempt from participating in temporary assistance work activities due to her medical conditions. *Id.* at p. 495. This evidence directly contradicts the assessment rendered by Dr. Hartman regarding Plaintiff's ability to obtain vocational training and should be explored further. The fact that the ALJ limited Plaintiff to unskilled sedentary work does not ameliorate his failure to fully develop the record.

42 U.S.C. § 405(g) provides in pertinent part that "[t]he court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is *new* evidence which is *material* and that there is *good cause* for the failure to incorporate such evidence into the record in a prior proceeding ...." (emphasis added); *see also Lisa v. Sec'y of Dep't of Health and Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991); *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1998). In accordance with this provision, the Second Circuit requires the Plaintiff to show that the proffered evidence is "(1) new and not merely cumulative of what is already in the record ... (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative ... [and] (3) good cause [exists] for [claimant's] failure to present the evidence earlier." *Lisa v. Sec'y of Dep't of Health and Human Servs.,* 940 F.2d at 43 (internal quotation marks

2015 WL 5642921

and citations omitted). Furthermore, the Regulations provide that when "new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970.

**\*7** The Court finds that this new evidence submitted after the ALJ's decision is both material and relevant to the period at issue. In light of this new evidence, the matter should be remanded for further development of the record. First, the Plaintiff's treating physicians should be re-contacted in order to provide medical assessments of Plaintiff's ability to do work related functions. Next, the SSA should assess the effects Plaintiff's obesity, spinal stenosis, and learning disabilities (along with other medical conditions supported by the record) have, if any, on her ability to perform the full range of sedentary, unskilled work. [7] After receiving further evidence, the Plaintiff should be entitled to another ALJ Hearing, this time represented by counsel, presuming her present counsel will agree to represent her at the SSA.

## 2. VE Hypothetical and Step Five

Although the Court has already determined that the ALJ erred in determining Plaintiff's RFC, it is important to further note that the Commissioner did *not* carry her burden at Step Five.

At Step Five of the sequential disability evaluation, the Commissioner bears the burden of proving that despite the claimant's severe impairments he or she is capable of performing work that is available in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v). Ordinarily, if a claimant suffers solely from exertional impairments, the Commissioner meets her burden at the fifth step by resorting to the Grids. *Rosa v. Callahan,* 168 F.3d 72, 82 (2d Cir.1999); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); 20 C.F.R. § 404.1569. The Grids place claimants with severe exertional impairments who can no longer perform past relevant work into categories according to their RFC, age, education, and work experience (*i.e.,* skilled or unskilled as well as transferability of skills). 20 C.F.R. Pt. 404, Subpt. P, App. 2; *see also Clark v. Barnhart,* 2003 WL 221397777, at \*4–5 (E.D.N.Y. Sept. 16, 2003). Based on these factors, the Grids are dispositive on whether the claimant is disabled or not disabled and proper application thereto will obviate the need for any vocational testing. *Rosa v. Callahan,* 163 F.3d at 82 ("For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."). Exclusive use of the Grids, however, is "inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations," i.e., a combination of exertional and non-exertional limitations. 20 C.F.R. § 404.1569a(d). "[W]hen significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity." *Horbock v.. Barnhart,* 210 F.Supp.2d 125, 127 (D.Conn.2002) (citing *Bapp v. Bowen,* 802 F.2d at 605). "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen,* 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" such significant diminishment renders sole reliance on the grids is inappropriate. *Id.* at 605–06. "A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.' " *Id.* at 606 (quoted in *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)). [8]

**\*8** Exertional limitations are strength limitations, which include the ability to sit, stand, walk, carry, push, and pull. 20 C.F.R. §§ 404.1569a(a)-(b) & 416.969a(a)-(b); *see also Zorilla v. Chater,* 915 F.Supp. 662, 667 n. 3 (S.D.N.Y.1996). Non-exertional limitations imposed by impairments affect one's ability to meet requirements of jobs, other than strength demands including, "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. §§ 404.1569a(c)(1)(vi) & 416.969a(c) (1)(vi); *see also Sobolewski v. Apfel,* 985 F.Supp. 300, 310 (E .D.N.Y.1997).

If a claimant is unable to perform a full range of a particular exertional category of work, or an issue of whether the claimant possesses transferable work skills remains, the ALJ may utilize the services of a VE. 20 C.F.R. §§ 404.1566(e) & 416.966(e). "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations." *Charlebois v. Comm'r, Soc. Sec. Admin.,* 2003 WL 22161591, at *10 (N.D.N.Y. Sept. 12, 2003) (citing, *inter alia, Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983)). In order for the VE's opinion to be considered substantial evidence, the ALJ "must elicit the VE's testimony by asking hypothetical questions addressing the claimant's particular limitations and capabilities." *Valoshin v. Sec'y of Health and Human Servs.,* 1986 WL 14624, at *5 (E.D.N.Y. Oct. 31, 1986) (citing *Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1981)). A VE's testimony should be given credit and due weight when "there is substantial record evidence to support the assumption [underlying the hypothetical] upon which the vocational expert based his opinion." *Renna v. Barnhart,* 2003 WL 21005281, at *3 (E.D.N.Y. May 2, 2003) (citing *Dumas v. Schweiker,* 712 F.2d at 1554). "The vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker,* 649 F.2d at 114. This Court reviews the hypothetical question solely to determine whether there is "substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir.1983); *see also Miller,* 2003 WL 749374, at * 8.

As already noted above, Plaintiff appeared at the Hearing *pro se* and waived her right to representation. Tr. at pp. 28–30. During the ALJ's examination of the VE, the following hypothetical question was presented:

> I would like you to assume that person to whom I'm referring is between the ages of 40 and 46 inclusive, and has the same education and past work as the claimant has. I'd like you to assume the person could occasionally lift, carry, push, and pull at least 10 pounds. The person could frequently lift, carry, push, and pull less than 10 pounds. The person could stand and walk at least two hours in a work day with normal breaks, with standing limited to about 15 minutes at a time. Walking limited to short distances of a block or so, several times a day. The person could sit six hours in a work day with normal breaks, her sitting limited to about one hour. Afterwards, the person would need to stand or walk a few minutes before resuming sitting. The person .... could occasionally climb stairs and ramps. The person could never climb ladders, ropes, and scaffolds. The person could occasionally kneel, crawl, and crouch. And the person should avoid exposure to workplace hazards such as heights and dangerous machinery.

**\*9** *Id.* at pp. 64–65.

The ALJ inquired whether a person with those limitations could perform any of the past work noted in Plaintiff's work history, to which the VE replied "no". *Id.* at p. 65. The ALJ then inquired whether a person with those limitations could perform any other work, to which the VE announced three positions: 1) food checker, a sedentary, semi-skilled job; 2) taxi dispatcher, a sedentary, semi-skilled job; and 3) answering service operator, a sedentary, semi-skilled job. *Id.* at pp. 66–67.

Next, the ALJ asked the VE to assume the same set of facts, but added in the extra restriction that the person could only occasionally reach overhead with the non-dominant upper extremity and asked whether that additional fact would affect the occupations identified, to which the VE again responded "no". *Id.* at p. 68. The ALJ then asked Plaintiff if she had any comments or questions for the VE, to which she responded "no". *Id.*

Despite the hypothetical given the to VE, in his written decision, the ALJ determined that Baylis had the

> residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) **except limited to simple, unskilled work,** occasionally lift, carry, push, and pull 10 pounds;

> frequently lift, carry, push, and pull less than 10 pounds; stand/walk at least two hours in a work day with normal breaks; and occasionally reach with the nondominant upper extremity.

*Id.* at p. 16 (emphasis added).

No where in the RFC does the ALJ include the limitation presented to the VE that the hypothetical claimant would be limited to standing fifteen minutes at a time with "[w]alking limited to short distances of a block or so, several times a day." *Compare id.* at p. 16 *with id.* at p. 65. Nor is there any mention in the RFC that Plaintiff would be limited to sitting for "about one hour" at which point she would need to "stand or walk a few minutes before resuming sitting." *Id.* The limitations presented to the VE regarding climbing, kneeling, crawling, and crouching are also inexplicably missing from the RFC assessment. *Id.* But the most problematic error committed by the ALJ is not so much what he presented to the VE but left out of the RFC—it is what he failed to present to the VE yet included in the RFC, namely, the finding that Plaintiff's ability to do sedentary work is limited to "unskilled" work. *Id.* at p. 16.

According to the Regulations,

> [u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength .... and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. §§ 404.1568(a) & 416.968(a).

The ALJ did not present this limitation to the VE, and the Court notes that each of the occupations identified by the VE were semi-skilled, which, according to the Regulations,

> **\*10**  is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, **but more complex than unskilled work.** A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

*Id.* at §§ 404.1568(b) & 416.968(b) (emphasis added).

Despite this discord, the ALJ seemingly relied upon the VE's opinion in rendering a finding a Step Five and ultimately determining that Plaintiff had the ability to perform work available in the economy.

The Court is confounded with the ALJ's determination at Step Five as it appears to be internally inconsistent. In determining at Step Five whether Plaintiff could perform other jobs available in the national economy, the ALJ invokes language that implies he is relying on the Medical Vocational Rules ("the Grids") to support a finding of "not disabled.' Tr. at p. 19. However, the ALJ then states that "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, a finding of "disabled" is appropriate under the framework

Baylis v. Colvin, Not Reported in F.Supp.3d (2015)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 66 of 153
2015 WL 5642921

of the above-cited rule." *Id.* In light of the procedural posture of this case, the Court presumes the ALJ meant that a finding of "not disabled" is appropriate. Nevertheless, it appears that the ALJ is relying upon a flawed VE opinion, and therefore remand is mandated.

The Court does not agree with the Commissioner's stance that the ALJ's invocation of the VE testimony was simply superfluous or that such invocation was unnecessary and constitutes harmless error. *See* Def.'s Br. at pp. 12–13. The Commissioner argues that the ALJ's RFC is supported by substantial evidence in the record and because there is not a significant erosion of the occupational base, reliance on the Grids was appropriate. In support, the Commissioner points the Court to the Regulations wherein administrative notice has been taken by the SSA that there are "approximately 200 separate sedentary unskilled occupations [that] can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy. These jobs can be performed after a short demonstration or within 30 days, and do not require special skills or experience." Def.'s Br. at pp. 11–12 (quoting 20 C.F.R. Part 404, Subpart P, App. 2, § 201.00(a). But this administrative notice may not be applicable in this case were the occupational base found to have been eroded. According to Social Security Ruling 96–9p, there are many instances where certain RFC limitations could further erode the sedentary occupational base. *See* Social Security Ruling (SSR) 96–9p, *Policy Interpretation Ruling: Titles II and XVI: Determining Capability to do Other Work— Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work,* 1996 WL 374185 (S.S.A.1996). And it is unclear whether any of Plaintiff's limitations could impact the occupational base.

**\*11** Upon remand, and after further development of the record, the Commissioner should provide Plaintiff with another Hearing where a proper hypothetical can be presented to a VE.

### III. CONCLUSION

As noted above, due to the errors committed by the ALJ, there needs to be a further development of the record. The Court directs that upon remand, Plaintiff's physicians be re-contacted so that a functional assessment based upon all of Plaintiff's medical conditions can be provided. Next, the SSA should assess the effects Plaintiff's obesity, spinal stenosis, and learning disabilities (along with other medical conditions supported by the record) have, if any, on her ability to perform the full range of sedentary, unskilled work. After receiving further evidence, the Plaintiff should be entitled to another ALJ Hearing, this time represented by counsel, presuming her present counsel will agree to represent her at the SSA. During the hearing, the ALJ should solicit testimony from another vocational expert and provide proper hypotheticals to such expert.

**WHEREFORE,** based upon consideration of the above, it is hereby

**ORDERED,** that the Commissioner's decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Social Security Administration, pursuant to Sentence Four of 42 U.S.C. § 405(g), for further development of the record; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties to this action.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5642921

---

**Footnotes**

1    On March 27, 2015, the parties consented, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, to
     have this Court exercise full jurisdiction over this matter. Dkt. No. 15.

2    This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when
     appealing a denial of Social Security benefits. Both parties have filed Briefs, though oral argument was not heard. Dkt.
     Nos. 13 & 14.

3    At the time of submitting her disability application, Plaintiff represented that she was 5′5″ and weighed 300 pounds. Tr.
     at p. 169. Her body mass index ("BMI") would be calculated at 49.9, which is categorized as morbidly obese. *See* United
     States Department of Health and Human Services, National Institute of Health BMI calculator, *available at* https://
     www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited September 22, 2015).

4    "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms,
     such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual
     functional capacity is what you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a) & 416.945(a).

5    In order for an individual to qualify for DIB, her disability must have commenced at a time when she met the insured
     status requirements as provided by the Social Security Act. 42 U.S.C. §§ 423(a)(1)(A) & (c)(1); 20 C.F.R. §§ 404.130
     & 404.315(a). Here, Plaintiff met the insured status requirements through December 31, 2009. Tr. at p. 11. Thus, DIB
     could only be paid if Plaintiff showed that prior to this date, she was unable to perform any substantial gainful work
     due to a medically determinable impairment.

     For an individual to be eligible for SSI, she must meet the income and resource requirements of the Social Security Act.
     42 U.S.C. §§ 1382a & 1382b. Furthermore, SSI benefits are not payable for any month before the month in which the
     application for such benefits is filed. 20 C.F.R. § 416.335. Assuming she meets the income requirement, Plaintiff would
     be eligible for SSI if prior to the date of the ALJ's decision she was deemed unable to perform substantial gainful work
     as a result of a medically determinable impairment.

6    The ALJ acknowledged that Baylis had been working during the period at issue, however, the amount she earned did
     not rise to the level of substantial gainful activity. Tr. at pp. 11–12.

7    Because the Court finds that further development of the record is necessary, we do not address Plaintiff's complaints
     regarding her credibility assessments.

8    The Second Circuit arrived at this standard in reliance on sister circuit case law as well as the report accompanying the
     promulgation of the grids. *See Bapp v. Bowen,* 802 F.2d at 605–06. The promulgation report made clear that nonexertional
     limitations may have the effect of excluding certain jobs within a particular category, however, in some cases, such
     exclusions are negligible in that a wide range of jobs exist within the functional level especially in light of the fact
     that an individual "need not be able to perform each and every job in a given range of work." *Id.* at 606 (quoting 43
     FED.REG. 55,349–55,361).

---

**End of Document**                                       © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

2019 WL 7293683
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

MICHAEL C., Plaintiff,

v.

COMM'R OF SOC. SEC., Defendant.

1:18-CV-1115 (ATB)

|

Signed 12/30/2019

**Attorneys and Law Firms**

OF COUNSEL: STEVEN R. DOLSON, ESQ., LAW OFFICES OF STEVEN R. DOLSON, Counsel for Plaintiff, 126 North Salina Street, Suite 3B, Syracuse, NY 13202.

OF COUNSEL: JEAN M. DEL COLLIANO, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL, REGION II, Counsel for Defendant, 26 Federal Plaza - Room 3904, New York, NY 10278.

## DECISION and ORDER

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** Currently before the Court, is a Social Security action filed by Michael C. ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 6). The parties have each filed briefs (Dkt. Nos. 9 and 10) addressing the administrative record of the proceedings before the Commissioner. (Dkt. No. 8.) [1]

# I. RELEVANT BACKGROUND

## A. Factual Background

Plaintiff was born in 1971, making him 43 years old on the amended alleged onset date and 46 years old on the date of the ALJ's decision. Plaintiff reported completing the twelfth grade and past work as laborer, painter, and warehouse worker. At the initial level, Plaintiff alleged disability due to a spine impairment, asthma, and depression. Plaintiff had lumbosacral back surgery in 2007.

## B. Procedural History

Plaintiff initially applied for disability insurance benefits and Supplemental Security Income on July 8, 2015, alleging disability beginning August 1, 2011. Plaintiff's applications were initially denied on October 6, 2015, after which he timely requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at a hearing before ALJ Asad M. Ba-Yunus on June 5, 2017, at which a vocational expert ("VE") also testified. (T. 27-63.) At the hearing, Plaintiff's attorney moved to amend the alleged onset date to July 30, 2014. (T. 34.) On September 8, 2017, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act. (T. 7-21.) On August 13, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-6.)

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

## C. The ALJ's Decision

In his decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. (T. 12.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 1, 2011, the alleged onset date. [2] (*Id.*) The ALJ further found that Plaintiff had severe impairments including low back pain secondary to degenerative disc disease and ruptured disc, status post lumbosacral back surgery, and asthma/chronic obstructive pulmonary disease ("COPD"). (*Id.*) The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 13.) Specifically, the ALJ considered the 12.00 Listings (mental impairments). (*Id.*) The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work

> **\*2** except [he] may never climb ramps, stairs, ladders, ropes, or scaffolds, can no more than occasionally stoop, kneel, or crouch, [ ]and only occasionally be exposed to unprotected heights, humidity, wetness, extremes of indoor cold and/or heat, and moving mechanical parts or dangerous machinery, and must avoid all pulmonary irritants.

(*Id.*) The ALJ determined, based on VE testimony, that Plaintiff was unable to perform any past relevant work, but identified several occupations existing in significant numbers in the national economy that Plaintiff could perform. (T. 16-17.) The ALJ therefore concluded that Plaintiff was not disabled. (T. 17.)

## D. Issues in Contention

In his brief, Plaintiff argues that the ALJ failed to make a ruling on Plaintiff's motion to amend the alleged onset date of disability. Plaintiff further contends that the ALJ relied on VE testimony in response to a hypothetical question that posited less restrictive limitations than those in the ALJ's RFC finding. (Dkt. No. 9, at 5-8.) Plaintiff also argues the ALJ did not properly apply the treating physician rule. (*Id.* at 8-10.)

Defendant's brief argues the ALJ properly amended the disability onset date (Dkt. No. 10, at 5-7), and that any error relating to the ALJ's questioning of and reliance upon the VE constituted harmless error (*id.* at 7-10). Defendant also contends that the ALJ properly applied the treating physician rule and correctly found that Plaintiff could perform occupations existing in significant numbers in the national economy. (*Id.* at 7-12.) For the reasons stated below, the Court agrees with the Defendant and affirms the decision of the Commissioner.

## II. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See, e.g., Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 70 of 153

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

## B. Standard to Determine Disability

**\*3** The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III. ANALYSIS

### A. Disability Onset Date

#### 1. Applicable Law

##### a. Amended Alleged Onset Date

An individual's alleged onset date ("AOD") is the "first day they allege they became unable to perform substantial gainful activity." *Duval v. Colvin*, 13-CV-495 (GLS/ESH), 2014 WL 4637092, at \*6 (N.D.N.Y. Sept. 16, 2014) (citing Social Security Ruling ("SSR") 83-20, Titles II and XVI: Onset of Disability, 1983 WL 31249, at \*1 (S.S.A. 1983)). "If a claimant decides to amend his or her AOD, he or she can do so by contacting [the Social Security Administration] via letter, telephone, visiting

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 71 of 153

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

a field office, or by providing testimony at a hearing." Social Security Program Operations Manual System ("POMS") DI 25501.230 Amended Alleged Onset Date (effective Dec. 6, 2012).

### b. Harmless Error

The harmless error analysis is applicable to Social Security cases. *See Thompson v. Comm'r of Soc. Sec.*, 10-CV-1085 (GLS/ ATB), 2011 WL 5080239, at *13 (N.D.N.Y. Aug. 18, 2011) (noting that the harmless error standard is applied to Social Security actions in appropriate circumstances) (citing *Johnson*, 817 F.2d at 986; *Jones v. Barnhart*, 02-CV-0791, 2003 WL 941722, at *10 (S.D.N.Y. Mar. 7, 2003); *Seltzer v. Comm'r of Soc. Sec.*, 07-CV-0235, 2007 WL 4561120, at *10 (S.D.N.Y. Sept. 26, 1995)). Further, an ALJ's errors in weighing the evidence or applying the law may be considered harmless where proper consideration of the evidence or law would not have changed the outcome. *Cottrell v. Colvin*, 206 F. Supp. 3d 804, 810 (W.D.N.Y. 2016) (noting that an error is considered harmless where proper consideration of the physician's opinion would not change the outcome of the claim) (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)); *Camarata v. Colvin*, 14-CV-0578 (MAD/ATB), 2015 WL 4598811, at *16 (denying the request for remand because application of the correct legal standard would not change the outcome); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) (finding harmless error where the ALJ improperly discounted the treating physician's opinion, but still included the opined limitations from that opinion in the RFC, so remand would serve no purpose). "Courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is typographical and not substantive." *Van Valkenberg ex rel. B.G. v. Astrue*, 08-CV-0959 (DNH/VEB), 2010 WL 2400455, at *13 (N.D.N.Y. May 27, 2010) (citing *Brewerton v. Barnhart*, 235 F.R.D. 574, 578 (W.D.N.Y. 2006); *Lopez v. Comm'r of Soc. Sec.*, 2009 WL 2922311, at *12, n. 37 (E.D.N.Y. Sept. 8, 2009); *Brown ex rel. S.W. v. Astrue*, 05-CV-0985 (NAM/RFT) 2008 WL 3200246, at *13 n. 19 (N.D.N.Y. Aug. 5, 2008)); *Thompson v. Barnhart*, 75 F. App'x 842, 845 (2d Cir. 2003); *Wells v. Colvin*, 87 F. Supp. 3d 421, 433 (W.D.N.Y. Feb. 24, 2015).

### 2. Analysis

**\*4** Plaintiff argues that the ALJ failed to make a ruling on Plaintiff's motion to amend the AOD. (Dkt. No. 9, at 5-6.) Specifically, Plaintiff contends the ALJ adjudicated "the entire period from August 1, 2011, without re-opening his prior application and considering the evidence contained therein." (*Id.*) Plaintiff also contends that ALJ's decision is contradictory in discounting the opinion of Nurse Practitioner Susan Lasker "that was rendered in January 2014 prior to the [AOD]" while the ALJ also made a finding covering this period. (*Id.* at 6.) Plaintiff maintains that there are also other medical source statements pre-dating the amended AOD from Alexander Carangelo, RPA; Richard Adams, RPA; and Ann Marie Cavone-Banks, FNP, which were not addressed by the ALJ. (*Id.*; T. 245, 248, 251.) Plaintiff argues the ALJ's finding that he "was not disabled as of his initial [AOD]" was based upon an incomplete record and did not consider all of the evidence for the time period in question." (*Id.* at 6.) The Court finds that these arguments are not persuasive for the following reasons.

Plaintiff initially asserted an AOD of August 1, 2011. (T. 66, 72.) At the June 2017 administrative hearing before ALJ Ba-Yunus, Plaintiff (through his attorney) made a motion to amend the AOD to July 30, 2014, the day after a prior denial of benefits by the Commissioner, to "clean[ ] the record up a little bit." (T. 34.) The ALJ responded "Okay, got it." (*Id.*) However, in the "Jurisdiction and Procedural History" section of his decision, the ALJ referenced Plaintiff's alleged disability beginning August 1, 2011. (T. 10.) The ALJ found Plaintiff "has not engaged in substantial gainful activity since August 1, 2011, the [AOD]." (T. 12.) In his final conclusion, the ALJ indicated Plaintiff "has not been under a disability, as defined in the Social Security Act, from August 1, 2011, through the date of this decision." (T. 17.)

As Defendant points out, the ALJ, within his analysis, cited to an independent examination conducted "[i]n June 2014, *just prior to the amended alleged date of disability. ...*" (T. 14 (emphasis added).) The ALJ also noted that NP Lasker's January 2014 opinion was prior to the alleged date of disability. (T. 15.) The ALJ's analysis indicates that he was aware of the amended AOD and implicitly granted the motion to amend the AOD. (T. 14-15, 34.) It appears that the references to the original August 1,

2011, AOD in the ALJ's decision are merely typographical or clerical errors which are not substantive and do not moot the ALJ's analysis based on the amended AOD. (T. 10, 12, 17.) *Van Valkenberg ex rel. B.G.*, 2010 WL 2400455, at *13. *See also Bertram v. Colvin*, No. 5:14-CV-109, 2015 WL 4545770, at *4 n.3 (D. Vt. July 27, 2015) (finding that the ALJ's inadvertent citation to the incorrect alleged onset date later in a decision was harmless when the ALJ cited to the correct onset date earlier in the decision).

In arguing that this matter should be remanded for an explicit ruling on Plaintiff's motion to amend his onset date or full consideration of potential re-opening of a prior application for the time period starting on August 1, 2011, Plaintiff's reliance on HALLEX I-2-9-10 is misplaced. (Dkt. No. 9, at 5-6.) As Defendant points out, the ALJ's reference to the original onset date does not imply a reopening of Plaintiff's prior case. The HALLEX provision states that an implied request for re-opening usually occurs "when a claimant alleges an onset date of disability within a previously adjudicated period or, after the ALJ issues a decision, the claimant sends the ALJ new and material evidence that relates to the earlier period at issue." (Dkt. No. 10, at 6-7; HALLEX I-2-9-10(B).) Clearly, Plaintiff in this case specifically requested to amend the onset date to avoid any overlap with the previously adjudicated period. Further, that HALLEX provision also indicates that if the ALJ has jurisdiction, but the additional evidence does not warrant reopening a prior determination or decision, the ALJ "[n]eed not make a finding on the issue of reopening the determination or decision if issuing an unfavorable decision." HALLEX I-2-9-10(B)(1).

 **\*5** The Court further finds that any error made by the ALJ in referring to the original AOD is harmless because the evidence of record and the ALJ's analysis, although not explicit, make it clear that he granted Plaintiff's motion to amend his AOD. (T. 14-15, 34.) Any error made by the ALJ in referring to the original AOD does not trigger an implied reopening of Plaintiff's prior case because the analysis of the medical evidence was based on the amended onset date. (Dkt. No. 10, at 7.) *See, e.g., Brown v. Colvin*, No. 16-CV-3193, 2017 WL 3822891, at *8 n.5 (S.D.N.Y. Aug. 31, 2017) (finding harmless error when the ALJ's failure to amend the onset date to a later date would not have changed the ultimate conclusion) citing *Miller v. Colvin*, No. 3:12-CV-01813, 2014 WL 2047903, at *6–7 (M.D. Pa. May 19, 2014) (finding harmless error when the ALJ cited an earlier onset date in his decision, but only analyzed the medical evidence after the later amended onset date).

Plaintiff's arguments regarding the opinions of NP Lasker (January 2014), and the earlier opinions of RPA Carangelo (March 2013), RPA Adams (March 2013), and FNP Cavone-Banks (writing for Dr. Noce in February 2013) are not persuasive. (Dkt. No. 9, at 6; T. 245, 248, 251, 363.) The ALJ considered NP Lasker's opinion, while recognizing that it pre-dated the July 30, 2014 AOD (by about six months). The ALJ provided other reasons for discounting NP Lasker's opinion, including that it was provided by a non-acceptable medical source, was inconsistent with the totality of the records, and addressed an ultimate issue reserved for the Commissioner. (T. 15, 363.) The other opinions cited by Plaintiff, but not discussed by the ALJ, were less recent than that of NP Lasker, and were rendered more than a year earlier than the AOD. (T. 15, 34.)

The Court further finds that the ALJ's failure to consider the opinions from RPA Carangelo, RPA Adams, and FNP Banks to be harmless because consideration of these opinions would not have changed the outcome of the ALJ's decision. The ALJ accorded little probative value to the January 2016 and May 2017 opinions of treating source, Dr. Cole, who found very restrictive limitations similar to those identified by the other treating source opinions cited by Plaintiff. (T. 15, 245, 248, 251, 363, 418-22.) It is unlikely that weighing similar opinions which pre-dated the amended AOD would have changed the ALJ's analysis or ultimate decision, and therefore any failure to weigh these opinions constitutes harmless error. *Cottrell*, 206 F. Supp. 3d at 810 (citing *Zabala*, 595 F.3d at 409); *Camarata*, 2015 WL 4598811, at *16; *Ryan*, 650 F. Supp. 2d at 217. [3] Accordingly, the Court finds that the ALJ implicitly granted Plaintiff's application to amend the disability onset date and appropriately analyzed the evidence relevant to the time period after the AOD. Remand is therefore not required on this basis.

### B. Substantial Evidence Supports the ALJ's Analysis of the Opinion Evidence

#### 1. Applicable Law

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

### a. Treating Physician

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. §§ 404.1527(c), 416.927(c). " '[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' ' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, "... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

**\*6** In deciding how much weight to afford the opinion of a treating physician, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek*, 802 F.3d at 375 (quoting *Selian*, 708 F.3d at 418). However, where the ALJ's reasoning and adherence to the regulation is clear, and it is obvious that the "substance of the treating physician rule was not traversed," no "slavish recitation of each and every factor" of 20 C.F.R. § 404.1527(c) is required. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran,* 362 F.3d at 31-32). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

### b. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, 11-CV-1386 (MAD), 2013 WL 252970, at \*2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at \*2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. § 404.1545. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta*, 737 F. Supp. at 183; *Sullivan v. Sec'y of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 09-CV-1120 (DNH/GHL), 2010 WL 3825629, \*6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at \*7).

### 2. Relevant Medical Evidence

### a. Dr. Cole's and NP Lasker's Treating Source Opinions

In January 2014, NP Lasker (with Ramon Bidot, M.D., possibly supervising) opined that Plaintiff continued to be totally disabled and was unable to lift/push/pull/stand for extended periods of time. (T. 363.) The ALJ noted that this opinion was rendered "prior to the alleged date of disability, provided by a non-acceptable medical source, is inconsistent with the totality of the

records, and is on an issue reserved to the Commissioner." (T. 15.) The ALJ therefore did not adopt this opinion or afford it any significant weight. (*Id.*)

In January 2016, Dr. Cole rendered a diagnosis of lumbar radiculopathy since November 2015, with a guarded prognosis. (T. 418.) He noted that this condition was very bad if not treated, and that Plaintiff's medications included Oxycodone and Oxymorphone. (*Id.*) He opined that Plaintiff was moderately limited in sitting and very limited in walking, standing, lifting/carrying, pushing/pulling/bending, and stairs or other climbing, and that he could not be on his stomach. (T. 419.) Dr. Cole observed that there was serious damage to Plaintiff's right-sided lumbar spinal roots. (*Id.*)

In May 2017, Dr. Cole listed diagnoses including post-laminectomy right discectomy, osteoarthritis in the shoulder, and chronic pain syndrome with a guarded prognosis. (T. 420.) He noted that Plaintiff's pain or other symptoms were severe enough to interfere with attention and concentration 11-15% of the time during a typical workday. (T. 420.) Dr. Cole opined that Plaintiff could walk one block, sit for 15 minutes at a time, and stand for 10 minutes at a time for a total of less than two hours. (T. 420-21.) He would need to walk around every 15 minutes for five minutes, would require a job permitting shifting positions at will, and would need to take unscheduled breaks every day for 10 minutes per episode. (T. 421.) Dr. Cole also stated that Plaintiff must sometimes use a cane or other assistive device and that he was not competitive because he could rarely lift less than 10 pounds. (*Id.*) Plaintiff could occasionally look down, turn his head right or left, and look up; rarely hold his head in a static position; never twist, stoop, crouch, squat or climb ladders; and occasionally climb stairs. (T. 422.) Dr. Cole observed that Plaintiff could not get to work at a given time of the day, so things he could do at work were irrelevant. (*Id.*) Dr. Cole opined that Plaintiff could not travel or remain in one position for more than 15 minutes without a five to ten-minute break, he would be absent more than four days per month, and he was not capable of sustaining full-time work. (*Id.*) The earliest date that these symptoms and limitations applied, according to Dr. Cole, was 2006. (*Id.*)

 **\*7** The ALJ stated: "[a]lthough this treating source outlined very significantly restricted functioning, his accompanying treatment records do not support the drastic limitations." (T. 15, 406, 408-09.) The ALJ also noted that it was around June 2016 that "treatment sessions were made further apart with three-month intervals between visits, which is not consistent with the opinion offered." (T. 15.) The ALJ observed that "[t]he frequency and intensity of problems simply are not documented, rendering the opinions less persuasive th[a]n is the actual treatment notes, particularly the most up-to-date opinion that details a ten to fifteen minute limitation on sitting and standing." (T. 15, 420-22.) The ALJ, therefore, accorded little probative value on Dr. Cole's opinions. (T. 15.)

### b. Dr. Puri's Consultative Opinion

In September 2015, consultative examiner Kautilya Puri, M.D., noted that Plaintiff appeared in no acute distress, had a normal gait and stance, could stand on his heels and toes although he stated he could not walk on them, and his squat was markedly less than halfway decreased. (T. 387.) On examination, Plaintiff's lumbar spine showed decreased flexion and extension with "local tenderness on palpation movement" and he had a negative straight leg raising test bilaterally. (T. 387-88.) Plaintiff had a decreased right knee jerk and decreased vibratory sensation in the right lower extremity. (T. 388.) An x-ray of the lumbosacral spine showed straightening. (T. 390.) Dr. Puri diagnosed low back pain secondary to degenerative disc disease status post lumbosacral back surgery with radiculopathy, asthma, and depression. (*Id.*)

Dr. Puri opined that Plaintiff did have any objective limitations to communications or fine motor or gross motor activities, but he had mild limitations to his gait and to his activities of daily living; mild limitation to squatting, bending, stooping and kneeling; and moderate limitation to lifting weight. (*Id.*) Dr. Puri recommended that Plaintiff not work in an environment which increases respiratory complaints. (*Id.*) The ALJ noted that, "[w]hile this is not quantified, it appears to be slightly underwhelming and a more restrictive level of functioning has been incorporated into the established residual functional capacity. As such, slightly less than great weight is provided to this consultative examiner's opinion." (T. 15.)

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

### 3. Analysis

Plaintiff argues that the ALJ did not properly apply the treating physician rule because he failed "to comprehensively set forth his reasons for not giving Dr. Cole's opinions controlling weight" and "failed to explicitly consider the relevant factors for weighing a treating source opinion in the absence of controlling weight." (Dkt. No. 9, at 8-10.) The Court finds these arguments unpersuasive for the following reasons.

The ALJ's analysis of Dr. Cole's opinions did provide adequate, specific reasons for the weight afforded to them. (T. 15.) As recounted above, the ALJ found that Dr. Cole's treatment notes did not support the drastic limitations opined and that the frequency and intensity of problems were simply not documented in those treatment notes. (*Id.*) The ALJ noted Dr. Cole's opinion in January 2016 that Plaintiff was very limited in walking, standing, lifting and carrying. However, the doctor's records from that time failed to document any objective musculoskeletal findings, only detailing Plaintiff's own complaints and noting some atrophy of the right lower extremity, an antalgic gait, spasms, and edema in follow-up visits. (T. 15, 405, 408-09, 418-19.) The ALJ also concluded that the increase in time between Plaintiff's visits to Dr. Cole was not consistent with the restrictive medical opinions offered. (T. 15.)

The ALJ's analysis indicates that he considered Dr. Cole's opinions and related treatment records closely in determining the weight to afford to these opinions. (*Id.*) The ALJ's analysis and RFC determination are further supported by his consideration of the other medical opinions of record. The ALJ afforded slightly less than great weight to Dr. Puri's opinion that Plaintiff had no objective limitations for fine and gross motor skills and only mild limitations to his gait, activities of daily living, squatting, bending, stooping, and kneeling. Similar opinions from this consulting examiner have been found to support a light work RFC finding, often notwithstanding contrary treating physician opinions, when properly evaluated by the ALJ. See, e.g., *King v. Comm'r of Soc. Sec.,* No. 1:15-CV-1032 (GTS/WBC), 2016 WL 6833058, at *3-4 (N.D.N.Y. Oct. 13, 2016) (light-work RFC supported by substantial evidence, including the opinion of Dr. Puri that plaintiff did not have any objective limitations to fine motor or gross motor activity; moderate limitations to squatting, bending, stooping, and kneeling; and with mild limitations to her gait and to her activities of daily living), Report and Recommendation adopted, 2016 WL 6833991 (N.D.N.Y. Nov. 18, 2016); *Garber v. Astrue*, No. 1:10-CV-845 (GTS/DEP), 2012 WL 1069017, at *7-12 (N.D.N.Y. Mar. 2, 2012) (the ALJ's light-work RFC finding draws considerable support from the report of Dr. Puri's consultative examination, which concluded that plaintiff had no objective limitations in fine motor or gross motor activities, gait, or activities of daily living), Report and Recommendation adopted, 2012 WL 1069014 (N.D.N.Y. Mar. 29, 2012); *Miller v. Comm'r of Soc. Sec.*, No. 1:13-CV-1388 (GLS/ESH), 2015 WL 1383816, at *2, 6, 8 (N.D.N.Y. Mar. 25, 2015).[4]

**\*8** The Court finds that the ALJ adequately considered the regulatory factors in weighing Dr. Cole's opinion. (T. 15.) Within his RFC analysis, the ALJ noted Plaintiff's treatment with Dr. Cole and stated: "despite the positive and significant diagnostic findings, visits went from once every two months to quarterly visits, therefore once again substantiating the stability of the claimant's symptoms." (T. 14-15, 402-15.) Further, the ALJ also acknowledged that Dr. Cole was "a specialist in physical and rehabilitation medicine." (T. 14.) After reviewing the opinions from Dr. Cole and his treatment notes, the ALJ concluded the opinions were less persuasive than the actual treatment notes. (T. 15.) It was within the ALJ's purview to consider the evidence (including Dr. Cole's opinions and treatment notes) and resolve any inconsistencies therein. *See Bliss v. Colvin*, 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *accord Petell v. Comm'r of Soc. Sec.*, 12-CV-1596 (LEK/CFH), 2014 WL 1123477, at *10 (N.D.N.Y., Mar. 21, 2014). In sum, the Court finds that the ALJ's analysis of the opinion evidence is supported by substantial evidence and that remand is not required on this basis.

### C. The ALJ's Step Five Determination is Supported by Substantial Evidence

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

2019 WL 7293683

### 1. Applicable Law

The burden shifts to the Commissioner at Step Five " 'to show there is other work that [the claimant] can perform.' " *McIntyre*, 758 F.3d at 150 (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical [question] as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [and] ... [the hypothetical question] accurately reflect[s] the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

### 2. Analysis

Plaintiff argues that the ALJ improperly relied on VE testimony in response to a hypothetical question that was less restrictive than the RFC finding. The hypothetical question assumed the ability to **frequently** kneel and crouch, while the RFC included limitations for **occasional** kneeling and crouching. (Dkt. No. 9, at 6-8.) Plaintiff also contends that the Court should not find this error harmless by relying on the descriptions of the positions identified by the VE found in the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations because that would require the Court to engage in a *post-hoc* rationalization and to presume the VE would have testified that the positions identified are performed exactly in line with such descriptions. (*Id.* at 7-8.). Notwithstanding these arguments, the Court finds that any error at Step Five was harmless because it would not have affected the ALJ's ultimate determination that Plaintiff could perform the identified occupations. As Plaintiff acknowledges, the DOT and Selected Characteristics of Occupations indicate that the positions identified by the VE and ALJ do not require kneeling or crouching. (Dkt. No. 9 at 7.)

Here, the ALJ determined Plaintiff had the RFC to perform light work with limitations including no more than occasional stooping, kneeling, and crouching. (T. 13.) The ALJ then found, based on the VE testimony, that Plaintiff could perform other jobs existing in significant numbers in the national economy including routing clerk (DOT# 222.687-022), survey worker (DOT# 305.367-054), and collator operator (DOT# 208.685-010). (T. 17, 55-62.)

When questioning the VE at the administrative hearing, the ALJ posed several hypothetical questions, including one for light work with frequent stooping, kneeling, or crouching. (T. 56.) The VE indicated the three identified jobs (routing clerk, survey worker, and collator operator) would be available with these frequent non-exertional limitations. (T. 55-56.) The ALJ then asked a hypothetical indicating occasional stooping, but did not otherwise mention kneeling or crouching. (T. 57.) The VE indicated the three jobs would still be available given the hypothetical including the occasional stooping limitation. (*Id.*) The ALJ's RFC determination includes limitations to occasional stooping, kneeling, and crouching while the VE testimony does not directly address occasional kneeling or crouching. (T. 13, 55-57.)

**\*9** As defendant argues, the "the inconsistency between the hypothetical and the RFC has no bearing on the final decision in the case" because the identified positions do not require any kneeling or crouching. (Dkt. No. 10, at 7-9.) Reliance on the DOT and Selected Characteristics of Occupations is **not** the type of *post-hoc* rationalization of an ALJ's decision that are disfavored by case law. *See, e.g., Allen v. Astrue*, No. 6:05-CV-101NAM/GJD, 2008 WL 660510, at \*10–11 (N.D.N.Y. Mar. 10, 2008) (in determining that an alleged inconsistency between the hypothetical presented to a VE and the AJL's RFC was harmless error, the Court looked to the DOT profiles to document that the exertional requirements of the positions were ultimately consistent with the ALJ's RFC). Remand on this basis would serve no purpose.

**ACCORDINGLY**, it is **ORDERED** that the Commissioner's decision is **AFFIRMED**, and further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED,** and that judgment be entered for the **DEFENDANT.**

Michael C. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2019)

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 77 of 153

2019 WL 7293683

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7293683

---

## Footnotes

1    The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

2    As discussed below, the ALJ's opinion, in several places, references the original alleged onset date and not the amended onset date of July 30, 2014.

3    There is not a risk of an unadjudicated period because the time prior to Plaintiff's amended AOD was covered by the prior denial of benefits. (T. 34.)

4    The ALJ afforded no significant weight to NP Lasker's opinion, but he fully assessed the range of limitations in the opinion of this treating source, which was provided before the amended onset date. (T. 15.)

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2400455
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kristine VAN VALKENBERG o/b/o, B.G., Plaintiff,

v.

Michael J. ASTRUE Commissioner of Social Security, Defendant.

No. 1:08–CV–0959 (DNH/VEB).
|
May 27, 2010.

**Attorneys and Law Firms**

Irwin M. Portnoy, Irwin M. Portnoy & Associates, PC, New Windsor, NY, for Plaintiff.

Robert R. Schriver, Social Security Administration, Office of Regional General Counsel, New York, NY, for Defendant.

### REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. Introduction

**\*1** Plaintiff Kristine Van Valkenberg on behalf of her son (hereinafter "B.G.") brings this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for child's supplemental security income ("SSI"). [1]

### II. Background

On September 24, 2004, Plaintiff on behalf of B.G., who was then 6 years old, filed an application for SSI claiming disability since September 7, 2004, because of a learning disability, an emotional disability, attention impairment, and encopresis [2] (R. at 49–52) . [3] The application was denied initially on January 25, 2005 (R. at 33). Plaintiff filed a request for a hearing on April 29, 2005 (R. at 35).

On October 4, 2006, B.G., his mother, and his attorney appeared before the ALJ (R. at 295–317). The ALJ considered the case *de novo* and, on October 25, 2006, issued a decision finding B.G. was not disabled (R. at 14–31). The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review on June 27, 2008 (R. at 3–6). On September 10, 2008, Plaintiff filed this action disputing the disability determination.

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings. [4] Plaintiff submitted a Reply Brief and Defendant submitted a Sur-reply Brief, both of which the Court has also considered. Finally, Plaintiff has filed a separate motion requesting this case be remanded pursuant to sentence six of 42 U.S.C. Section 405(g).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 79 of 153

### III. Discussion

#### A. Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

**\*2** "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

A child is considered disabled under the Act if she or he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The ALJ will only conclude the child's impairments are disabling if he has marked limitations in two domains or an extreme limitation in one domain. 20 C.F.R. § 416 .926a(d). The Commissioner has established the following three-step sequential analysis to determine whether a child is disabled. 20 C.F.R. § 416.924. At the first step, if the Commissioner determines the claimant is "doing substantial gainful activity," the claimant will be found not disabled. 20 C.F.R. § 416.924(a). If the claimant is not engaging in substantial gainful activity, at the second step the Commissioner will determine whether the claimant has a severe medically determinable impairment or combination of impairments. 20 C.F.R. § 416.924(a). The Commissioner will determine at step three whether the claimant's impairment or combination of impairments "meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.924(a); *see also* 20 C.F.R. § 416.924(d).

Based on the entire record, the Court recommends remand because the ALJ failed to consider all the relevant probative evidence with respect to B.G.'s ability to acquire and use information.

#### B. Analysis

#### 1. The Commissioner's Decision

First, the ALJ found that B.G. had not engaged in substantial gainful activity (R. at 20). Then, the ALJ found that B.G. had the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), a learning disability, an adjustment disorder, and encopresis (R. at 20). However, the ALJ concluded B.G.'s impairments did not meet or medically equaled a listed impairment, either individually or in combination (R. at 21). Finally, the ALJ found B.G.'s impairments were not functionally

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 80 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

equivalent to the listings (R. at 21–30). Specifically, the ALJ found B.G. had a marked limitation in the domain of attending and completing tasks but less than marked limitations in: acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being (R. at 25–30).

### 2. Plaintiff's Claims

**\*3** Plaintiff argues that the ALJ (a) should have found B.G.'s impairments met or equaled Listing 112.11 and should have explained his conclusion; (b) did not consider the combination of B.G.'s impairments; (c) should have found B.G. had a marked limitation in acquiring and using information or an extreme limitation in attending and completing tasks; (d) made erroneous inconsistent statements (e); did not consider the cumulative effects of B.G.'s encopresis; (f) did not properly consider the social worker's opinions; (g) did not properly consider the special education teacher's opinions; (h) did not properly consider the school psychologist's opinions; and (i) erred in failing to call a medical expert. Plaintiff also requests that (j) the Court should remand in light of new evidence submitted to the Court under sentence six of 42 U.S.C. Section 405(g). Finally, Plaintiff argues that (k) the ALJ should have developed evidence from a Dr. Green. Plaintiff's Brief, pp. 18–26; Plaintiff's Reply Brief, pp. 1–7; Plaintiff's Motion, Docket No. 14.

### a. The ALJ Properly Explained That B.G.'s Impairments did not Meet or Equal Listing 112.11 and his Conclusion was Supported by Substantial Evidence

Plaintiff argues that the ALJ should have found that B.G. met the requirements of Listing 112.11 for ADHD. Plaintiff's Brief, pp. 24–25. Plaintiff further argues that the ALJ failed to explain his conclusion that B.G. did not meet Listing 112.11 for ADHD. Plaintiff's Brief, p. 24. Defendant argues that the ALJ's conclusion was supported by substantial evidence. Defendant's Brief, pp. 20–22.

The Supreme Court has explained that a claimant's impairment does not meet a Listing if it "manifests only some of [the] criteria, no matter how severely." *See Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (*citing* S.S.R. 83–19, 1983 WL 31248). Listing 112.11 describes the criteria for ADHD as follows:

Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

AND

B. ... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

...

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, ...; or

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 81 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

**\*4** c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 112.02(B)(2)(a)-(d), 112 .11(A)-(B).

In this case, the ALJ concluded that B.G.'s impairments did not meet or medically equal Listing 112.11 because they did not meet the listed criteria (R. at 21). The ALJ reasoned that although B.G. had "some of the [paragraph A] diagnostic symptoms necessary to meet the initial criteria of listing 112.11 ... [his ADHD] even when combined with all of his other impairments, does not result in sufficient marked limitation of function necessary to satisfy the functional criteria of [paragraph] B" (R. at 21). The ALJ explained that B.G. "may have marked difficulties in maintaining concentration persistence and pace," but he "does not have a marked impairment in age appropriate cognitive/communicative function, a marked impairment in age-appropriate social functioning, or a marked impairment in age-appropriate personal functioning" (R. at 21).

As an initial matter the Court concludes that the ALJ properly explained his conclusion that B.G. did not meet all of the criteria for Listing 112.11. Plaintiff correctly notes that an ALJ must provide a sufficient rationale, not merely a cursory conclusion that a claimant's impairments do not meet a listing. *See Hunt v. Astrue,* 2008 WL 3836406, at \*10 (N.D.N.Y. Aug.13, 2008) (finding the ALJ "failed to provide a sufficient rationale" where he "cited no medical evidence and provided very little reasoning"). However, in this case the ALJ clearly explained in sufficient detail that he found B.G.'s impairments did not satisfy the diagnostic criteria or the paragraph B criteria for Listing 112.11. *See Sullivan v. Zebley,* 493 U.S. at 530. Therefore, the Court concludes the ALJ did not fail to properly explain the basis for his conclusion.

Furthermore, the Court concludes that substantial evidence supports the ALJ's conclusion that B.G.'s impairments did not meet or equal Listing 112.11. Most notably, the two medical sources to record their observations of B.G.'s ADHD found symptoms below the marked level required by the listing to satisfy the diagnostic criteria of ADHD. For example, on examination, consultative State agency psychologist, Brett Hartman, Psy.D., only noted "restless" motor behavior and "mildly impaired" attention (R. at 153). Psychiatric nurse practitioner, Hani Khalil, observed that B.G. had limited impulse control and concentration and that his motor activity was increased but not agitated (R. at 293). However, neither of these medical records indicated that B.G. had the requisite medically documented marked inattention, impulsiveness, and hyperactivity. Therefore, the Court finds the ALJ's conclusion supported by substantial evidence.

### b. The ALJ Considered B.G.'s Combination of Impairments

**\*5** Plaintiff argues, that the ALJ "did not explain whether or not he considered the cumulative and interactive effects of [B.G.'s] impairments [and] [t]here is not one word in the decision which reflects this." Plaintiff's Brief, p. 19. Defendant replies that this "argument ignores multiple references and acknowledgements in the decision to the combination of B.G.'s impairments." Defendant's Brief, p. 13. The Court agrees with Defendant and finds Plaintiff's argument unavailing.

The regulations require an ALJ to consider the "interactive and cumulative effects of an impairment." 20 C.F.R. § 416.926a(c). Thus, the ALJ "will look first" at a child's activities and limitations and "will evaluate the limitations from [a child's] impairments in any affected domain(s)." 20 C.F.R. § 416.926a(c). The Commissioner has explained that the "technique of looking first at the child's actual functioning in all activities and settings and considering all domains that are involved in doing those activities, account for the interactive and cumulative effects of the child's impairment(s)." Social Security Ruling 09–1 p, 2009 WL 396031, at \*3 (S.S.A.2009).

In this case, the ALJ repeatedly stated that he considered the cumulative and interactive effects of B.G.'s impairments and limitations (R. at 21). The ALJ variously stated that: B.G.'s "impairments or combination of impairments" did not meet or medically equal a listed impairment; B.G.'s "impairment or combination of impairments" did not functionally equal the listings; the ALJ had "considered all symptoms"; and B.G.'s ADHD "even when combined with all of his other impairments" did not sufficiently limit B.G. so as to meet the criteria of Listing 112.11 (R. at 21). The ALJ also analysed B.G.'s functioning across all the domains, as described in SSR 09–1 p. (R. at 21–30). Based upon the ALJ's decision, the Court concludes that the ALJ considered the combined effects of B.G.'s impairments.

### c. The ALJ Erred in Assessing B.G.'s Functional Equivalence

Plaintiff argues that the ALJ should have found that B.G. had either a marked limitation in the domain of acquiring and using information or an extreme limitation instead of only a marked limitation in the domain of attending and completing tasks. Plaintiff's Brief, pp. 19, 20–21, 25. Defendant argues that the ALJ's conclusions were supported by substantial evidence. Defendant's Brief, p. 10.

An ALJ determines functional equivalence by evaluating a claimant child's functioning in six broad domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). In each domain, the ALJ will rate the child's degree of limitation as none, less than marked, marked, or extreme. *See* 20 C.F.R. §§ 416.926a(d)-(e). The ALJ will conclude the child's impairments are disabling if he has marked limitations in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d). A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities" in a particular domain. 20 C.F.R. § 416.926a(e)(2)(i). The regulations explain that a marked limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

### i. The ALJ Failed to Acknowledge Critical Evidence in the Domain of Acquiring and Using Information

**\*6**  The domain of acquiring and using information considers a child's ability to learn, think about, and use information. 20 C.F.R. § 416 .926a(g); Social Security Ruling 09–3p, 2009 WL 396025, at \*2 (S.S.A.2009) (hereinafter SSR 09–3p). The regulations explain that "[l]earning and thinking begin at birth" and "[u]sing the concepts and symbols [children] have acquired through play and learning experience, [they] should be able to learn to read, write, do arithmetic, and understand and use new information." 20 C.F.R. § 416.926a(g)(1)(i). Learning, the regulations explain, "involves being able to perceive relationships, reason, and make logical choices." 20 C.F.R. § 416.926a(g)(1)(ii).

In this case, the ALJ found that "[a]lthough the claimant has had some significant difficulties with learning, with the assistance of his current special education plan, the claimant has made great strides in age-appropriate mathematics, reading, written language, and verbal language" (R. at 25). The ALJ characterized B.G.'s reading as an area of "relative weakness" (R. at 25). In reaching this conclusion, the ALJ explicitly considered intelligence testing conducted by school psychologist, Dr. Hayden Hartmann in May 2006, the opinions of B.G.'s first grade special education teacher, Ms. Schauman from October 2004, the opinions of examining State agency psychologist, Dr. Brett Hartman from January 2005, and the opinions of reviewing State agency physician and psychologist, Dr. Deborah Bostic, M.D. and Dr. Teena Guenther, Ph.D., also from January 2005 (R. at 25). The ALJ then concluded that B.G. had a less than marked limitation in the domain of acquiring and using information (R. at 25). Although the ALJ referred to all of these opinions, as discussed more fully below, he failed to acknowledge critically low standardized test scores and the larger pattern in the record indicating that B.G.'s ability to learn was seriously compromised.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 83 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

After carefully reviewing the evidence of record, [5] the Court concludes that the ALJ's analysis of B.G.'s ability to acquire and use information is flawed because he failed to acknowledge or explain his implicit rejection of a substantial quantity of evidence probative to this domain. Courts the Second Circuit have repeatedly "remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence." *Lopez v. Sec'y of Dept. of Health & Human Servs.,* 728 F.2d 148, 150–51 (2d Cir.1984); *see Kuleszo v. Barnhart,* 232 F.Supp.2d 44, 57 (W.D.N.Y.2002) (finding error where the ALJ failed to acknowledge or explain the implicit rejection of relevant testimony from independent witnesses); *Pagan ex rel. Pagan v. Chater,* 923 F.Supp. 547, 554–56 (S.D.N.Y.1996) (finding that the ALJ erred with respect to the treating physician's opinions because "[a]lthough the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony," it was error for the ALJ to fail to even acknowledge relevant evidence from the treating physician or to explain its implicit rejection) (*citing Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984); *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983); *Smith v. Bowen,* 687 F.Supp. 902, 904 (S.D.N.Y.1988)); *Rivera v. Sullivan,* 771 F.Supp. 1339, 1354 (S.D.N.Y.1991) ("[A]n ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error) (*quoting Ceballos v. Bowen,* 649 F.Supp. 693, 702 (S.D.N.Y.1986); *citing Valente,* 733 F.2d at 1045). In this case, the ALJ failed to acknowledge evidence that B.G. was essentially illiterate despite years of school and special education services and interventions.

**\*7** Evidence of B.G.'s ability to read is especially important because the regulations clearly indicate that reading and writing are crucial to a school-aged child's ability to acquire and use information. 20 C.F.R. § 416.926a(g)(2)(iv) (explaining that school-age children "should be able to learn to read, write, and do math, and discuss history and science" and "use these skills in academic situations to demonstrate" learning, such as reading about various subjects and producing written projects); SSR 09–3p, 2009 WL 396025, at \*2 (describing an example of a limitation as "not reading, writing, or doing arithmetic at appropriate grade level"); *see also McClain v. Barnhart,* 299 F.Supp.2d 309, 315 (S.D.N.Y.2004) (*citing Quinones v. Chater,* 117 F.3d 29, 31–32, 36 (2d Cir.1997)) (explaining that "a twelve-year old child could have a marked or extreme limitation in the domain of acquiring and using information if he had a serious learning disability which had prevented him from learning to read and write even though he was of normal intelligence and had good verbal communication skills").

In this case, the evidence shows that because of the combination of B.G.'s learning disabilities, motor delays, attention deficits, encopresis, and social, emotional and behavioral problems, he struggled to learn, especially to read and write. For example, the record shows that B.G.'s learning disability emerged early and he repeated kindergarten (R. at 135). By the end of his second year of kindergarten, B.G. was assessed for and received an individualized educational plan ("IEP") (R. at 132–49). Initial testing at the time placed B.G. in the average range of intelligence, but he performed poorly on tests of processing speed and working memory (R. at 122). On age-appropriate portions of the Wechsler Individual Achievement Test II ("WIAT–II") B.G. scored more than one standard deviation below the mean in word reading, spelling, and almost two below in listening comprehension (R. at 117). The test administrator opined that "[B.G.]'s academic skills, his ability to apply those skills and his fluency with academic tasks are ... below his age and grade peers in early Reading skills, early Spelling skills and Listening Comprehension skills" (R. at 119–20). A school psychologist assessing the results indicated that these scores were enough below B.G.'s predicted performance that they were indicative of learning disabilities in those areas (R. at 123). On the Test of Early Reading Ability ("TERA–III"), B.G. performed in the fourth or fifth percentile on three out of four subtests (R. at 127). In assessing the TERA–III scores, school psychologist, Dr. Hartmann explained, that although B.G. demonstrated age appropriate knowledge of the alphabet,

> [B.G.'s] ability to look at images of written matter and identify the ways we go about reading was profoundly limited. For example, he could not identify cursive writing on a page, tell where to start and stop reading on a picture of a storybook page, or tell that a word was written upside down. [B.G.]'s ability to absorb meaning from reading materials was also lower than what would be expected for a child his age. For example, he could not guess the names of familiar storybooks from looking at the pictures, identify a picture of a menu, or a school crossing sign.

**\*8** (R. at 127). Dr. Hartmann opined that B.G. would need additional support in reading and math and noted that his "[l]imited processing speed would affect [B.G.]'s ability to learn material both quickly and accurately" (R. at 128). B.G.'s classroom teacher echoed Dr. Hartmann's assessment, reporting "that although this [was] the end of [B.G.'s] second year in kindergarten his level of functioning [was] low" (R. at 135). Report cards from the end of his second kindergarten year showed that B.G. was

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 84 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

not correctly identifying all the letters of the alphabet in either upper or lower case print, and could only indentify corresponding sounds for half the letters (R. at 232–33, 235).

In addition to his learning disabilities, observation, testing and assessment at the end of B.G.'s second kindergarten year showed he also struggled with motor skills, attention and concentration, toileting, and social interaction with peers (R. at 135–37). For example, the consultant teacher observed that B.G. "exhibits low fine motor skills and a persistent lack of handedness. He often needs tasks broken down in to 2 or 3 'sessions' to get to completion" (R. at 135). On standardized test of visual-motor integration, B.G. scored more than two standard deviations below the mean in visual motor integration and in motor coordination (R. at 137, 143). [6] With respect to attention, the consultant teacher noted "he has a difficult time following directions in the classroom. [H]e is unable to complete any task in the classroom independently" (R. at 135). Encopresis was a frequent problem according to the school nurse, Suellen Elmendorf, R.N. Nurse Elmendorf noted that in the period of approximately one month, B.G. visited her office twelve times for encopresis and enuresis and during cleaning and changing she noted that B.G. had trouble with balance and difficulty unbuttoning or unsnapping his pants (R. at 137). [7] Additionally, B.G.'s classroom teacher reported that "[B.G.] is quite physical with his peers but seems to be liked" (R. at 136).

As a result of the combination of B.G.'s impairments, his Individualized Education Plan ("IEP") for the first grade provided him with twenty-five hours a week of consultant teacher services from a special educator and twenty-five hours a week with a teaching assistant, both in an integrated classroom (R. at 133–34). B.G. would also receive counseling one hour a week, occupational therapy thirty minutes a month, skilled nursing services fifteen minutes a day, and speech and language therapy one hour a week (R. at 133). B .G.'s IEP specified that he was to receive preferential seating, access to a teaching assistant during academics, a modified curriculum, refocusing and redirection, assistance attending to all classroom activities, extra time for processing and checking for understanding (R. at 134). The IEP explained that B.G.'s disabilities affected "his ability to process information quickly and accurately, hold information in immediate awareness while manipulating it at the same time, acquir[e] new information at a rate and pace equal to peers, ... follow directions, [stay] on task, [deficits in] auditory short term memory (ability to retrieve words and information), and morphology and syntax (word structure, rules of grammar) ... impact[ed] performance in reading, math and writing tasks" (R. at 135).

**\*9** Despite the supports provided in this IEP, B.G.'s difficulties continued in the first and second grades. In first grade, although his teacher's comments were generally positive, B.G.'s grades reflect that he was still struggling to learn to read and write (R. at 231). His first grade marks also indicate that B.G. only inconsistently worked and played well with his peers, followed classroom and school rules, or listened attentively (R. at 231). Early second grade report cards show that B.G. was below state standards in reading, writing and listening (R. at 234).

Additional testing in 2006, the spring of second grade for B.G., showed he was performing at even lower levels than previously documented (R. at 192–227). Critically, a WIAT–II administered on May 24, 2006, "revealed an Extremely Low Reading Standard Score of 67" on the reading composite (R. at 206). B.G. scored 67 on the word reading subtest and 64 on the reading comprehension subtest (R. at 206). [8] B.G.'s scores on both the reading composite and the subtests were more than two standard deviations below the mean.

Evaluation also showed that B.G. continued to have distinct deficits in writing, caused in part by his poor fine motor control (R. at 143, 197, 225–27). To assist him with writing and fine motor skills, B.G. was given a "pencil grip," a "slant board," and various exercises in occupational therapy (R. at 144, 148–49, 197, 203–04). In third grade, B.G.'s IEP included goals for successfully manipulating zippers and buttons and tying his shoes (R. at 204). Despite these interventions, testing in the fall of 2006 showed B.G. was writing seven to nine words per minute, or "much slower than the typical [second] grade speed of 24–35 letters per minute" and he continued to struggle to write legibly (R. at 226). Occupational therapist, Michele Darling, opined that B.G. "continue[d] to have poor handwriting and fine motor skills that impact his ability to produce readable, written work independently in the classroom" (R. at 227).

2010 WL 2400455

Evaluation further showed B.G. was hampered by continued toileting problems, emotional and social problems, atypical behaviors, poor memory and processing speed, and attention deficits. Nurse Elmendorf documented continued toileting issues that were being "manag[ed] in the classroom with frequent trips to the bathroom" (R. at 208). School psychologist, Dr. Hartmann, assessed B.G. again and described some of B.G.'s problems as follows:

> [B.G.] demonstrates a serious impairment of his reality testing abilities, tending to misperceive events and to form mistaken impressions of people and what their actions signify. This behavioral feature is likely to result in a frequent failure to anticipate the consequences of his actions and to misconstrue the boundaries of appropriate behavior ... [H]e demonstrates a serious impairment in his ability to think logically and coherently. Specifically in this regard, he is much less capable than most people of this age of coming to reasonable conclusions about relationships between events and of maintaining a connected flow of associations in which ideas follow each other in a comprehensible manner.

**\*10**  (R. at 216). In addition, Dr. Hartmann characterized B.G.'s "emotional well being" as "of major concern," explaining that a group of psychological deficits left B.G. in "an emotionally fragile condition that manifest[ed] in inappropriate types of behavior or feelings" and stymied his ability to form interpersonal relationships (R. at 216–17). Special education teacher, Gale VanBaaren observed that B.G. made friends but liked to goad other children and he needed supervision to interact positively with his peers (R. at 197). Also, B.G. sporadically manifested atypical or distracting behaviors, such as making noises and whistling during testing (R. at 213), making silly noises in groups, (R. at 202) chewing his clothing, and having difficulty when he was not chewing something (R. at 152, 202). However, Ms. VanBaaren noted that she had not observed B.G. sucking his clothing or having daily toileting accidents in the spring of 2006 (R. at 229). With respect to B.G.'s processing speed and working memory, testing continued to indicate these were areas of weakness (R. at 195, 214). Similarly, B.G. continued to need support to maintain attention and learn, requiring "a lot of one-on-one assistance," minimal distractions for test-taking, refocusing and redirection supports, preferential seating, and additional time to complete tasks (R. at 193–94). *See* (R. at 133–34) (assigning B.G. a personal teaching assistant for twenty-five hours a week); (R. at 197–98) (placing B.G. in a special behavior management class with only ten students and four adults to provide the intensive support "required to address acute social and behavioral difficulties, attending to task, and low frustration tolerance which interfere with his ability to learn"); (R. at 230) (describing the learning B.G. was able to achieve as the result of "intense support of an adult in the room to have him remain focused and on task).

Based on his second round of testing and assessment, a new IEP for the end of second grade and all of third grade placed B.G. in a special class instead of an integrated setting (R. at 178, 184–85, 192, 198–99). In addition, the 2005–2006 and 2006–2007 IEPs granted B.G. behavioral intervention services one hour a day, counseling thirty minutes a week, occupational therapy thirty minutes a week, and a teaching assistant one hour a day (R. at 178–79, 192–93). The Committee on Special Education noted that B.G. was progressing within the confines of his program and summarized his condition as follows:

> Recommend classification as a student with an Emotional disturbance with a condition exhibiting an inability to learn that cannot be explained by intellectual, sensory, or health factors; an inability to build or maintain satisfactory interpersonal relationships with peers/teachers; inappropriate types of behavior or feelings under normal circumstances that manifest in constricted emotions that impact ability to initiate and maintain social relationships, poor self image, confusion of reality and fantasy and an impairment of ability to think logically and coherently that impact acquisition of academic skills of reading comprehension, word reading, decoding numerical operations, and comprehensive written language

**\*11**  (R. at 198).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 86 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

In the fall of 2006, B.G.'s doctors referred him for extensive neuropsychological testing which included the Kaufman Test of Educational Achievement, Second Edition and the Wide Range Achievement Test, Fourth Edition (R. at 283). On both additional achievement tests B.G. also scored more than two standard deviations below the mean on the reading composite (R. at 283). To put it another way, at the beginning of third grade, having repeated kindergarten, B.G.'s sentence comprehension score was below the score expected of child entering kindergarten and his word reading score was equivalent to the score expected of a kindergartener in the fourth month (R. at 283). In light of these findings, neuropsychologist, Dr. Simone Collymore diagnosed B.G. with a "severe reading disorder" (R. at 260) and "developmental dyslexia" (R. at 270). Dr. Collymore's blunt assessment was that B .G. was "essentially unable to read" (R. at 263). As B.G.'s Mom testified, although B.G. was "technically in third grade" he was "educationally [in] Kindergarten" (R. at 302).

Despite a record replete with evidence such as the above describes, the ALJ's decision appears to ignore the very real possibility that B.G. impairments seriously interfere with his ability to initiate, sustain, and complete the activities required for learning. The ALJ's failure to, at a minimum, explain his apparent rejection of this probative evidence requires remand. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) (*citing Treadwell v. Schweiker,* 698 F.2d 137, 142 (2d Cir.1983)) ("[While] every conflict in a record [need not] be reconciled by the ALJ ... the crucial factors in any determination must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence.").

Most importantly, the ALJ failed to discuss three separate achievement tests on which B.G.'s reading scores were in the first or second percentile, which is more than two standard deviations below the mean (R. at 194, 206, 283). *Johnson v. Astrue,* 563 F.Supp.2d 444, 458 (S.D.N.Y.2008) (*citing* J.L. Devore & K.N. Berk, Modern Mathematical Statistics with Applications 787 (2007)) ("The percentage of a group that scores two or more standard deviations below the mean in normally distributed data (which is the sort of data we would expect on a standardized test) represents only 2.3% of the population."). The regulations state that the ALJ "will find that [the claimant has] a 'marked' limitation" when a claimant child has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the claimant's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). Thus, B.G.'s achievement tests scores may satisfy the regulatory definition of a marked limitation. *See* 20 C.F.R. § 416.926a(e)(2)(iii). [9] Even though the regulations clearly explain that test scores two standard deviations below the mean are consistent with a marked limitation, the ALJ did not reconcile B.G.'s relevant scores with his conclusion that B.G. had a less than marked limitation in acquiring and using information and was making "great strides in age-appropriate ... reading" (R. at 25).

**\*12** The Court recognizes that an ALJ need not mention every piece of evidence presented when "the evidence of record permits [the Court] to glean the rationale of an ALJ's decision." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983). Indeed, the Court recognizes that the ALJ mentioned several doctors' opinions, a first grade teacher's opinion, and early IQ scores (R. at 25). However, the ALJ failed to acknowledge probative evidence contrary to his conclusion. The evidence ignored by the ALJ reveals that B.G. had significant problems learning, writing, and especially reading. The ALJ's characterization of B.G.'s reading as merely a "relative weakness" is so incongruous with the evidence of record that it is clear to the Court that the ALJ's failure to "acknowledge relevant evidence or explain its implicit rejection" requires remand in this case. *Rivera,* 771 F.Supp. at 1354. Thus, on remand, the ALJ must consider all evidence in reconsidering this domain.

### ii. The ALJ Must Necessarily Reconsider the Domain of Attending and Completing Tasks

The domain of attending and completing tasks considers a child's ability to focus and maintain attention; to begin, carry through, and complete activities or tasks; to perform tasks at an appropriate pace; and change tasks. 20 C.F.R. § 416.926a(h); Social Security Ruling 09–4p, 2009 WL 396033, at *2 (S.S.A.2009) (hereinafter SSR 09–4p).

In this case, the ALJ found that B.G. had a "marked limitation in attending and completing tasks" (R. at 26). In reaching this conclusion, the ALJ relied primarily upon B.G.'s first grade special education teacher, Ms. Schauman (R. at 26). The ALJ

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 87 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

considered Dr. Brett Hartman's diagnosis of ADHD and his opinion that B.G. has only a mild impairment in attention and concentration, but believed that Ms. Schauman's report and the overall record was consistent with "a more serious problem than Dr. Brett Hartman's onetime evaluation revealed" (R. at 26). The ALJ also considered whether B.G.'s limitations rose to the level of extreme, but concluded "[b]ecause the claimant is still able to function in a partially integrated setting, and perform some tasks independently, I find that the evidence does not support a finding of an extreme limitation in this domain, but I do find that the evidence supports a finding of marked limitation in attending and completing tasks" (R. at 26).

As an initial matter, the Court notes that B.G. was not able to sustain his functioning in a partially integrated setting. To the contrary, the evidence shows that B.G. required a special class and "a lot of one-on-one assistance" to stay on task (R. at 133–34, 193–94, 197–98). However, because the ALJ will have to reconsider the evidence of record, particularly B.G.'s standardized test scores and the evidence of the modifications and supportive settings he required to function, the ALJ will necessarily have to reconsider B.G.'s functioning in this domain.

### b. The ALJ's Typographical Error is Harmless

**\*13**  As part of her functional equivalence argument, Plaintiff also objects to one of the ALJ's findings, which she argues is inconsistent with the ALJ's outcome. Plaintiff's Brief, p. 19. Under the ALJ's discussion of the domain of attending and completing tasks, the ALJ stated "[t]he claimant's most serious limitations is in acquiring and using information" (R. at 26). Plaintiff objects that on one hand the ALJ found B.G.'s most serious limitation was in acquiring and using information, but on the other hand found B.G. had only a "less than marked" limitation in acquiring and using information but a "marked limitation" in the domain of attending and completing tasks (R. at 25–26). Plaintiff points out that B.G.'s ability to acquire and use information cannot be both his most serious limitation and also limited than his ability to attend and complete tasks. Plaintiff's Brief, p. 19. Defendant argues that "[i]t is readily apparent that the statement ... [was] a typographical error" and that the ALJ "meant to say" that B.G.'s most serious limitations were in the domain of attending and completing tasks. Defendant's Brief, p. 11.

Courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is typographical and not substantive. *See Brewerton v. Barnhart,* 235 F.R.D. 574, 578 (W.D.N.Y.2006) (finding only a typographical error where an ALJ stated an "opinion is given significant weight" but from the decision as a whole it was clear the "opinion was *not* given significant weight"); *Lopez v. Comm'r of Soc. Sec.,* 2009 WL 2922311, at *12 n. 37 (E.D.N.Y. Sept.8, 2009) (finding the ALJ's reliance on a non-existent Medical Vocational Rule a "a typographical mistake and not a substantive error" where there was no ambiguity considering the ALJ's decision as a whole); *Brown ex rel S.W. v. Astrue,* 2008 WL 3200246, at *13 n. 19 (N.D.N.Y. Aug.5, 2008) (finding the ALJ's reference to the wrong exhibit number to be a "typographical error"). Having reviewed the entire decision, the Court concludes that the ALJ's statement that B.G.'s most serious limitation was in acquiring and using information was a typographical error. This is clear because the ALJ carefully separated out his discussion of B.G.'s functioning in each domain and this reference is otherwise out of place (R. at 24–30). More importantly, referencing B.G.'s ability to acquire and use information does not logically fit in the context because the sentences before and after refer to B.G.'s limitations in attending and completing tasks (R. at 26).

### c. The ALJ Properly Considered the Cumulative Effects of B.G.'s Encopresis

Plaintiff further argues that the ALJ failed to consider the cumulative effects of B.G.'s incontinence "in determining the extent of impairment in the domain of caring for oneself, and also in the domain of health and well being." Plaintiff's Brief, p. 20. Defendant argues that the ALJ considered B.G.'s incontinence "when finding that B.G. had less-than-marked limitations in both domains." Defendant's Brief, p. 14.

**\*14**  In determining that B.G. had a less than marked limitation in caring for himself, the ALJ primarily considered B.G.'s encopresis (R. at 29). Plaintiff has not alleged, nor has the Court identified in the record, any other limitation that B.G. had in the domain of caring for himself. The ALJ's decision reflects this in his decision wherein he discusses the various things B.G. can do to care for himself, such as dressing, eating, taking the bus, and even beginning to help his mother by vacuuming (R. at 29). With respect to B.G.'s health and physical well-being, the ALJ again considered B .G.'s encopresis, but nonetheless concluded

Case 1:24-cv-00506-AJB-ML   Document 24   Filed 05/05/25   Page 88 of 153

Van Valkenburg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

that B.G. was "generally in good physical health" (R. at 30). Notably, B.G.'s mother never alleged any impairments in B.G.'s physical health, and reported he was physically active, including swimming and playing on the family's trampoline (R. at 71, 303). Based on the foregoing, the Court concludes that ALJ appropriately considered B.G.'s toileting problems in determining the extent of his limitation in the domains of caring for himself and health and physical well-being.

**d. The ALJ Properly Considered Opinions from Social Worker, Raymond Tartikoff**

Plaintiff argues that the ALJ improperly rejected the opinions of social worker, Raymond Tartikoff. Plaintiff's Brief, p. 23. Defendant argues that the ALJ properly considered the opinion of Mr. Tartikoff. Defendant's Brief, pp. 17–19.

The record indicates that Mr. Tartikoff treated B.G. in therapy sessions since some time in 2005 (R. at 300). Mr. Tartikoff completed a functional assessment form on September 20, 2006 in which he rated B.G.'s limitations as either marked or extreme in all six domains (R. at 253–56). Mr. Tartikoff also briefly noted that B .G. had slurred speech, was unaware of odor or discomfort related to his encopresis, had impaired motor skills, and numerous symptoms of separation anxiety from his mother (R. at 253, 256). The ALJ considered Mr. Tartikoff's report as follows:

> Unfortunately, this report is both poorly supported by the objective clinical and laboratory findings and is inconsistent with all other evidence in the record.... He [has] provided no rational justification for these levels of limitation, and some of them appear laughably inconsistent with the facts. For example, the report lists the claimant as having an extreme limitation in health and physical well-being despite the fact that the claimant is described even by his mother as being in generally good physical health with the exception of some digestive problems.

(R. at 24). Therefore, the ALJ gave Mr. Tartikoff's opinions "little or no weight" with respect to B.G.'s functioning (R. at 24). The ALJ gave "some consideration" to Mr. Tartikoff's handwritten notes, but noted that even those observations were "out of proportion" with the other evidence of record (R. at 24).

The Court finds the ALJ's analysis is proper and supported by the record. Although social workers are not "acceptable medical sources," their opinions are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." Social Security Ruling 06–03p, 2006 WL 2329939, at *3 (S .S.A.) (hereinafter SSR 06–03p); *see* 20 C.F.R. §§ 416.913(a), (d). In considering such opinions, the ALJ may apply the factors in 20 C.F.R. § 416.927(d)(1)-(6), which are "basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources.' " SSR 06–03p, 2006 WL 2329939, at *4. Those factors are: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency of the opinion with the record, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the ALJ. 20 C.F.R. § 416.927(d)(1)-(6). Here, the ALJ assessed the supportability and consistency of Mr. Tartikoff's opinions and found them lacking. Substantial evidence of record supports the ALJ's analysis in this respect. Most notably, Mr. Tartikoff offered no basis or explanation for the degree of limitation indicated in his opinions (R. at 253–56). Furthermore, no other opinions or other evidence of record indicates that B.G. was so severely limited across all domains. Given the lack of supporting evidence and the ALJ's reasonable analysis of Mr. Tartikoff's opinion, the Court concludes that Plaintiff's argument must fail. *See Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir.1995) (explaining that "the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him").

**e. The ALJ Properly Considered Opinions from Special Education Teacher, Heather Schauman**

**\*15** Plaintiff further argues that the ALJ erred in rejecting Ms. Shauman's opinions because he "failed to follow" SSR 06–03p. Plaintiff's Brief, p. 23–24. SSR 06–3p requires an ALJ to consider the opinions of non-medical sources, such as teachers,

2010 WL 2400455

using the factors from 20 C.F.R. sections 404.1527(d) and 416.927(d). SSR 06–03p, 2006 WL 2329939, at *3–4. Those factors include: how long the source has known the individual and how frequently they see the individual; how consistent the opinion is with the other evidence; the degree of relevant evidence the source presents supporting the opinion; how well the source explains the opinion; whether the source has a specialty or expertise; and any other factors that tend to support or refute the opinion. SSR 06–03p, 2006 WL 2329939, at *4–5. Defendant argues that the ALJ applied the requirements of SSR 06–3p and properly assessed Ms. Schauman's opinions. Defendant's Brief, pp. 19–20.

On October 21, 2004, B.G.'s first grade special education teacher, Ms. Schauman, completed a teacher questionnaire provided by the State disability agency (R. 109–16). Ms. Schauman assessed activities under each of the six functional domains and rated B.G.'s functioning on a scale from one, corresponding to no problem, to five, corresponding to a very serious problem (R. at 109–16). For example, in the domain of acquiring and using information, Ms. Schauman was asked to rate ten activities, including "[c]omprehending oral instructions" (R. at 110). To rate B.G.'s functioning in "[c]omprehending oral instructions," Ms. Schauman circled the numeral three, corresponding to "[a]n obvious problem" (R. at 110). Ms. Schauman also wrote comments on B.G.'s functioning in each domain (R. at 110–14).

The ALJ considered Ms. Schauman's opinions and gave "great weight to the observations recounted in this report and the opinion regarding the claimant's relative strengths and weaknesses shown in the checkbox portions of this form" (R. at 23). However, the ALJ carefully explained that he did not give great weight "to the particular numbers circled on this form indicating levels of limitation" because if "taken literally in accordance with the definitions used in the Social Security regulations, they would represent levels of limitations completely inconsistent with the objective clinical and laboratory findings" (R. at 23). For example, the ALJ explained that Ms. Schauman rated B.G.'s ability to move his body from one place to another as a four, or a serious problem, but the ALJ noted B.G.'s own testimony revealed that he was very active and enjoyed biking, swimming, and sports (R. at 23). The ALJ observed: "If we except [sic] that this is what the claimant's special education teacher considers a 'serious problem' moving his body from one place to another, this gives us some idea as to the level of age-appropriate function that she considers 'a serious problem' " (R. at 23). Therefore, the ALJ gave "great weight to [her overall] opinion, but ... generally relied on the numbers indicated only for relative comparison to one another rather than as absolute numbers indicating the claimant's function on an independent objective scale" (R. at 23–24). Thus, the ALJ reinterpreted the specific numbers that Ms. Schauman circled. Thus, the ALJ accepted that her scoring methodology indicated the higher the number she circled the greater she believed B.G.'s limitations to be. Said another way, although her numbers were inflated, they correlated logically with B.G.'s limitations but with a lesser value.

**\*16** Under SSR 06–03p, an ALJ must consider all the evidence, including opinions from other sources, such as educators. SSR 06–3p, 2006 WL 2329939, at *4. As explained above, in assessing such opinions, the ALJ may apply the factors in 20 C.F.R. § 416.927(d)(1)-(6). *Id.* With respect to Ms. Schauman's opinions regarding the number values she assigned to the form, the ALJ relied on her lack of consistency when he found that the specific degrees of limitations indicated on the form were inconsistent with other evidence of record. *See* 20 C.F.R. § 416 .927(d)(4). Therefore, the Court concludes that the ALJ properly "followed" SSR 06–03p. Furthermore, the Court notes that the record supports the ALJ's observation that B.G.'s reported physical activities were inconsistent with Ms. Schauman's numerical values assigned to B.G.'s degrees of limitations. *See* (R. at 308–09) (Mom's testimony that B.G. swims); (R. at 312) (B.G.'s testimony that he runs and plays gymnastic games, baseball, soccer, T-ball, and basketball). In light of the fact that the ALJ properly applied SSR 06–03p, reasonably analyzed Ms. Schauman's opinions, and, with the exception of the particular numbers circled on the teacher questionnaire indicating levels of limitations, granted them "great weight," the Court finds no error.

### f. The ALJ Properly Considered Opinions from School Psychologist, Dr. Hayden Hartmann

Plaintiff also argues that the ALJ did not apply SSR 06–03p in analyzing Dr. Hayden Hartmann's opinions. Plaintiff's Brief, pp. 21–22. Defendant argues that the ALJ properly evaluated Dr. Hartmann's opinions. Defendant's Brief, p. 17.

Dr. Hartmann examined B.G. on several occasions, administering standardized tests and evaluating B.G. for his IEPs (R. at 125–28, 213–17). Although Dr. Hartmann did not offer any diagnoses, her reports offer extensive descriptions of B.G.'s functioning

(R. at 125–28, 213–17). The ALJ did not acknowledge Dr. Hartmann's reports as distinct from any other school assessments. Instead, the ALJ summarily gave "great weight to the opinion[s] of the examining psychologists, occupational therapists, and speech and language therapists who have evaluated the claimant over the past several years" (R. at 22, 24).

Unlike the ALJ's analysis of Mr. Tatikoff's and Ms. Schauman's opinions, here the ALJ did not discuss any of the factors described in SSR 06–03p or describe how he considered Dr. Hartmann's opinions. SSR 06–03p explains that "[a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that ... subsequent reviewer[s][can] follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at *6. In this case, because it is clear that the ALJ at least referred to Dr. Hartmann's reports, the Court declines to find error. *See Baldwin v. Astrue,* 2009 WL 4931363, at *26 (S.D.N.Y. Dec.21, 2009) (finding error where the ALJ failed to even refer to the opinions of two school psychologists). Nonetheless, in light of the ALJ's failure to consider all the evidence relevant and probative to B.G.'s learning, on remand the ALJ should revisit Dr. Hartmann's reports.

### g. ALJ did not Err in Failing to Call a Medical Expert

**\*17** Plaintiff argues that the ALJ erred in failing to call a medical expert. Plaintiff's Brief, p. 26. Defendant argues that the ALJ did not err because calling a medical expert is at the ALJ's discretion. Defendant's Brief, p. 24.

The regulations explain that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any [Listing]." 20 C.F.R. § 416.927(f)(2)(iii). As the Defendant noted, the regulations leave calling a medical expert to the discretion of the ALJ. *Id.; see Carter v. Comm'r of Soc. Sec.,* 2008 WL 1995122, at *5 (W.D.N.Y. May 6, 2008) ("As the court's plain reading of this regulation suggests, and as the cases have confirmed, this language is 'permissive, not mandatory.' "). Based upon the language of the regulation, the Court cannot find that the ALJ erred in failing to call a medical expert.

It is also possible that Plaintiff was relying upon Social Security Ruling 96–6p ("SSR 96–6p") to argue that an "updated medical opinion" was required from a medical expert. Plaintiff's Brief, p. 26. The relevant portions of SSR 96–6p explain that "longstanding policy requires" an ALJ to receive into the record as expert opinion evidence, the judgment of a State agency physician or psychologist on the issue of whether a claimant's impairments are equivalent to a listed impairment. SSR 96–6p, 1996 WL 374180, at *3 (S.S.A.). This requirement is met in the present case by the opinions of non-examining State agency physician, Dr. Bostic and non-examining State agency psychologist, Dr. Guenther (R. at 158–63). *See* SSR 96–6p, 1996 WL 374180, at *3 (explaining that the requirement is met by the ALJ receiving into the record one of various documents signed by medical consultants evaluating equivalence). SSR 96–6p further explains that an ALJ must obtain an "updated medical opinion from a medical expert" when either (1) no additional evidence is received but the ALJ believes the record suggests equivalence, or (2) additional evidence is received "that in the opinion of the [ALJ] ... may change the State agency medical or psychological consultant's finding." *Id.* at *4. The Court notes that in either condition, obtaining an updated opinion from a medical expert depends upon the ALJ reaching the opinion that the claimant's impairments could be equivalent to a listing. Thus, even if Plaintiff was relying on SSR 96–6p, the Court must conclude that seeking additional evidence from a medical expert was within the discretion of the ALJ and the Court can find no error in the ALJ's exercise of that discretion in this case.

### h. The Court Declines to Remand for Taking Additional Evidence

Plaintiff argues that the Court should remand the case to the Commissioner to consider additional evidence submitted to this Court. Plaintiff's Motion Brief, pp. 2–3; Plaintiff's Reply Brief, pp. 6–7. Defendant argues that the evidence submitted to the Court does not provide a basis for remanding under the Act. Defendant's Brief, pp. 25–26.

**\*18** The Act provides that a Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 91 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)

2010 WL 2400455

incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized this three-pronged requirement as follows:

> An appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative, [such that there is] ... a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently [and the] ... claimant must show (3) good cause for her failure to present the evidence earlier.

*Lisa v. Sec'y of Dept. of Health & Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991) (internal citations omitted).

Plaintiff's proffered new evidence consists of a neuropsychological examination conducted by psychologist, Charles Zaroff, Ph.D., a specialist to whom B.G. was referred by his neurologist, Dr. Higgins. Plaintiff's Motion, Dkt. No. 14, Appendix 1, pp. 1–10 (hereinafter "Zaroff Report"). The Court finds that Dr. Zaroff's 2008 report is not "new" because he performed substantially the same tests that B.G. had taken at various times in 2004 and 2006 and he repeated diagnoses found elsewhere in the record. *See DiBlasi v. Comm'r of Soc. Sec.,* 660 F.Supp.2d 401, 407 (N.D.N.Y.2009) (finding evidence cumulative and not new because it reiterated diagnoses and functional limitations already documented in the record). A review of Dr. Zaroff's report shows that he administered a battery of tests, most of which B.G. had taken on previous occasions. *Compare* Zaroff Report, p. 4 *with* (R. at 117–18, 121–24, 205–07, 214–15, 276–82, 284–85). Additionally, Dr. Zaroff diagnosed Plaintiff with a learning disorder not otherwise specified and pervasive developmental disorder not otherwise specified. Zaroff Report, p. 8. However, these diagnoses were already rendered by consultative psychologist Dr. Brett Hartman who diagnosed B.G. with a learning disorder not otherwise specified (R. at 154) and psychiatric nurse practitioner, Hani Khalil, who diagnosed B.G. with pervasive developmental disorder or childhood disintegrative disorder (R. at 294). Based on the foregoing, the Court declines to remand this case under sentence six of 42 U.S.C. Section 405(g) because the evidence proffered is not new within the meaning of the Act. Nonetheless, on remand, Plaintiff may be able to properly submit updated medical evidence to the Commissioner.

**i. The Argument Raised in Plaintiff's Reply Brief for the First Time is Waived**

In a Reply Brief, Plaintiff argued for the first time that the ALJ was obliged to, but failed, to get treatment notes and a medical source statement from "Dr. Green." Plaintiff's Reply Brief, p. 5. Defendant argues that this argument is waived because it was not raised in Plaintiff's opening brief. Defendant's Sur-reply Brief, p. 5.

**\*19** The Court agrees with Defendant and declines to reach this issue because Plaintiff failed to raise it in the opening brief. *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009) (considering an argument waived where Plaintiff raised it in a reply brief but failed to argue it in his opening brief). Nonetheless, for the benefit of the parties, the Court notes that the record indicates that Dr. Roger Green was one of B.G.'s pediatricians at Pine Street Pediatrics, and that the group's treatment notes [10] are already part of the record (R. at 100–107, 137, 164–73, 257). Furthermore, the Court notes that the Commissioner will have to develop the record as necessary on remand.

## IV. Conclusion

After carefully examining the administrative record, the Court finds the Commissioner's decision is not supported by substantial evidence and not determined in accordance with the applicable law. In particular, the Court notes that standardized tests in the domain of acquiring and using information indicate B.G. had greater limitations than found by the ALJ, but the ALJ did not address this critical area of evidence or explain why it was rejected.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 92 of 153

Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)
2010 WL 2400455

Based on the foregoing, it is respectfully recommended that the Commissioner's decision denying disability benefits be REMANDED for further proceedings in accordance with this recommendation and pursuant to sentence four of 42 U.S.C. Section 405(g). However, the Court DENIES Plaintiff's motion to remand pursuant to sentence six of 42 U.S.C. Section 405(g).

## Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

**SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2010 WL 2400455

## Footnotes

1    This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated September 1, 2009.

2    Encopresis is the "repeated, generally involuntary passage of feces into inappropriate places" such as in clothing. *Stedman's Medical Dictionary* (27th ed.2000), STEDMANS 129810 (WestLaw).

3    Citations to the underlying administrative record are designated as "R."

4    Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings ...." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).

5    The Court notes that a substantial amount of evidence, including extensive neuropsychological testing, was submitted to the Appeals Council after the ALJ completed his opinion and therefore was not available for his review (R. at 259–94). The Court has properly considered this evidence as part of the record. *See Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996).

6    The Court notes that on the same test about two years later B.G. was scoring in the average range for visual motor integration, but still scored in the low range for fine motor skills (R. at 225–26).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 93 of 153
Van Valkenberg ex rel. B.G. v. Astrue, Not Reported in F.Supp.2d (2010)
2010 WL 2400455

7    The record also shows that B.G.'s mother repeatedly discussed his encopresis with his pediatrician and other doctors, reporting that at times B.G. soiled himself on a daily basis (R. at 102, 105–06, 167, 169–70, 257).

8    The Court takes notice that the WIAT–II has a mean score of 100 and a standard deviation of 15. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c) (explaining that the Wechsler series tests have a mean of 100 and a standard deviation of 15); *Brown ex rel. T.H. v. Astrue,* 2009 WL 2923062, at \*2 (E.D.Mo. Sept.8, 2009) (explaining that the WIAT–II has "a standard deviation of 15 and a mean of 100").

9    Although it is likely, it is not entirely clear in this case that B.G. has a marked limitation to acquiring and using information. As the regulations explain, an ALJ "will not rely on any test score alone ... [because] [n]o single piece of information taken in isolation can establish whether you have a "marked" or an "extreme" limitation in a domain." 20 C.F.R. § 416.926a(e)(4) (i). In this case, B.G.'s scores on the dozens of standardized tests he took varied from test to test and over time. For example, on February 4, 2005, B.G. achieved a reading composite of 73 (fourth percentile) on the WIAT–II (R. at 182), but on March 4, 2005 he scored a 76 (fifth percentile) on the same test (R. at 182), and on May 24, 2006 he scored a 67 (first percentile) on the same test (R. at 194, 206). Furthermore, the record contains approximately twenty standardized tests that were reported by neuropsychologist, Dr. Simone Collymore, after the ALJ wrote his decision, which also show B.G.'s performance ranging from average to severely impaired levels (R. at 262–86). Thus, the evidence in this case does not conclusively show B.G. had a marked level of impairment, but it does require the ALJ to acknowledge the relevant standardized test evidence.

10    The treatment notes from Pine Street Pediatrics also contain a blank medical source statement form that B.G.'s pediatricians apparently declined to complete (R. at 100–101).

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 3200246
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Barbara BROWN, o/b/o S.W., Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security Administration,[1] Defendant.

No. 1:05–CV–0985 (NAM/RFT).
|
Aug. 5, 2008.

**Attorneys and Law Firms**

Legal Aid Society of Northeastern New York, Inc., Mary M. Withington, Esq., of Counsel, Saratoga Springs, NY, for Plaintiff.

Glenn T. Suddaby, United States Attorney for the Northern District of New York, William H. Pease, Esq., Assistant United States Attorney, of Counsel, Syracuse, NY, and Office of General Counsel, Social Security Administration, Barbara L. Spivak, Esq., Chief Counsel, Region II, Sam Ramrup, Esq., Assistant Regional Counsel, of Counsel, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**I. INTRODUCTION**

**\*1** In this action, plaintiff Barbara Brown, on behalf of her minor stepson, Shaquille, moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying Shaquille's application for childhood disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

**II. BACKGROUND**

Shaquille was born on July 1, 1995 and was 8 years old at the time of the administrative hearing on June 25, 2004. (Administrative Transcript at p. 34, 40).[2] Shaquille resides at 6 Bogart Terrace in Albany, New York with plaintiff, his stepmother and legal guardian. (T. 33). Shaquille was diagnosed with post traumatic stress disorder with psychosis, possible ADHD, dysthymia and depressive disorder.[3] (T. 90, 153). Plaintiff claims Shaquille became disabled on December 1, 1996.[4] (T. 40).

**A. Medical Evidence**

**1. Joan Franco—Child Therapist**

On February 18, 2003, Ms. Franco, a therapist at the County of Albany Crime Victim and Sexual Violence Center, prepared a Telephone Memorandum regarding a call received from plaintiff. (T. 166). Plaintiff stated that Shaquille came to live with her and his biological father in June 2002. (T. 169). Plaintiff stated that Shaquille recently disclosed to her that he was sexually abused by his biological mother's boyfriend. (T. 166). Plaintiff also claimed that Shaquille witnessed the murder of his 22 month old sister by his biological mother's ex-boyfriend. (T. 169).

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.　　　1

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 95 of 153

**Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)**

2008 WL 3200246

From February 2003 until January 2004, Shaquille attended one-hour counseling sessions with Ms. Franco on a weekly basis.[5] (T. 179). The types of services provided during these sessions are described as "crisis intervention" and "criminal justice". (T. 173–179). On July 17, 2003, Ms. Franco wrote a letter to Albany County Mental Health describing her work with Shaquille. (T. 138). Shaquille underwent an evaluation at Albany County Mental Health at the request of Ms. Franco. Ms. Franco stated that she treated Shaquille weekly regarding his sexual abuse, nightmares and behavioral difficulties. (T. 138). Ms. Franco described Shaquille as "guarded" with a "muted demeanor" and "flat affect". (T. 138). Ms. Franco stated that Shaquille "engaged in conversation freely and is able to speak about his abuse". (T. 138). Ms. Franco stated that Shaquille had been hearing voices and noises which he described as "scary". (T. 138).

In September 2003, Ms. Franco noted that plaintiff called with an "update on Shaquille's condition". (T. 177). Plaintiff advised that Shaquille was suspended from school and that his behavior had "regressed". (T. 177). Ms. Franco noted "Shaquille has not been seen in many weeks" and that Shaquille was receiving bi-weekly therapy from Vera Imperiale at Patriot Psychiatric Group. (T. 177). In January 2004, Shaquille had his last visit with Ms. Franco. (T. 179).

### 2. Albany County Mental Health

**\*2** On March 14, 2003, Barbara Gabriel–Catalano, a social worker at Albany County Mental Health ("ACMH"), prepared a telephone memorandum regarding a call received from plaintiff. (T. 86). Plaintiff advised Ms. Gabriel–Catalano that Shaquille was abused when he was 4 or 5 and that he just began receiving counseling from Joan Franco at Crime Victims. (T. 86). Plaintiff advised that she was concerned because Shaquille "heard voices" during the night. (T. 86). Ms. Gabriel–Catalano told plaintiff that Shaquille should continue to receive counseling from Ms. Franco and that plaintiff should "call back if she felt [counseling] was unsuccessful". (T. 86). On March 20, 2003, plaintiff telephoned regarding Shaquille's difficulty sleeping, behavior and continuing nightmares. (T. 85). At the conclusion of the conversation, Ms. Gabriel–Catalano scheduled Shaquille for an evaluation. (T. 85).

On April 4, 2003, Jennifer Eslick, a staff social worker, prepared a telephone memorandum indicating that Shaquille missed his scheduled appointment due to weather conditions. (T. 84). Ms. Eslick spoke with plaintiff and noted that Shaquille's situation was no longer a "crisis" but that Shaquille still had headaches and nightmares. (T. 84). Ms. Eslick noted that Shaquille was receiving counseling through his school and with Ms. Franco. (T. 84). Ms. Eslick recommended that Shaquille seek treatment from his primary care doctor for his headaches and that Shaquille should continue with counseling. (T. 84).

On June 25, 2003, Shaquille was evaluated by Ms. Gabriel–Catalano at the plaintiff's request. (T. 135). Plaintiff advised Ms. Gabriel–Catalano that Shaquille heard voices, hallucinated and experienced nightmares that he described as "scary and dangerous". (T. 135). Plaintiff advised that Shaquille had difficulties in school and that he was manipulative and untruthful. (T. 135).

Upon examination, Ms. Gabriel–Catalano noted that Shaquille provided "one word" answers and appeared "depressed and angry". (T. 136). Shaquille reported hearing adult voices and stated that "the devil tried to take over his head". (T. 136). Ms. Gabriel–Catalano recommended "the Healy House for stabilization" or Patriot Psychiatric for an evaluation. (T. 136). Ms. Gabriel–Catalano also provided plaintiff with information regarding special education services. (T. 136).

### 3. St. Peter's Hospital Clinic—Pediatrician

On February 27, 2003, Shaquille was treated at St. Peter's Hospital Clinic. (T. 82). The attending physician, Mark Osborn, M.D., noted that Shaquille recently told his stepmother that he had been sexually abused by his mother's former boyfriend on a daily basis. (T. 82). A nurse practitioner noted that Child Protective Services was involved and that Shaquille was undergoing educational testing to "rule out any learning disability".[6] (T. 83). Upon examination, the nurse practitioner noted that Shaquille

Case 1:24-cv-00506-AJB-ML   Document 24   Filed 05/05/25   Page 96 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

was a "pleasant child" with "normal growth". (T. 83). The nurse noted the presence of two small circular scars on Shaquille's mid back but noted that Shaquille denied ever being burned. (T. 116).

**\*3** On June 20, 2003, Shaquille returned to St. Peter's Hospital Clinic for a "stuffy nose" however, the attending nurse noted that "therapist feels he needs more intensive psychiatric intervention-having hallucinations". (T. 111). The nurse diagnosed Shaquille with "PTSD". (T. 112). [7]

### 4. Patriot Psychiatric Group

On July 24, 2003, Shaquille underwent an initial evaluation at Patriot Psychiatric Group by Vera Imperiale, NPP. [8] (T. 162). Plaintiff provided Shaquille's history of abuse and difficulties in school. (T. 160). Plaintiff stated that Shaquille could not stay focused and that he recently moved schools but that he had not improved. (T. 160). Plaintiff advised that Shaquille was "aggressive" when he played with other children, heard voices, and was manipulative and dishonest. (T. 160).

Nurse Imperiale performed a mental status examination and found that Shaquille displayed normal speech, thought processes and knowledge. (T. 158). Nurse Imperiale noted that Shaquille did not display any delusions or suicidal/homicidal tendencies. (T. 158). Nurse Imperiale diagnosed Shaquille with post traumatic stress disorder, depressive disorder and past abuse and prescribed Paxil. [9] (T. 162).

On August 7, 2003, a progress note prepared by Nurse Imperiale indicated that Shaquille was "calming" while on medications but that he still had visual hallucinations. (T. 156). Nurse Imperiale prescribed Risperdal for Shaquille's hallucinations. [10] (T. 156). On September 3, 2003, plaintiff indicated that Shaquille's affect was "stiff" and that he did not smile. (T. 155). Nurse Imperiale changed Shaquille's medications and prescribed Zyprexa and Zoloft. [11] (T. 155). On September 29, 2003, Shaquille stated that he "felt fuzzy" but that "the voices went away" and he was able to sleep. (T. 154). The nurse noted that Shaquille "put a boy in a headlock and choked him yesterday", that he was accused of "stealing and lying in school" and that "kids at school pick on him". (T. 154). Nurse Imperiale increased Shaquille's dosage of Zoloft. (T. 154). In October 2003, Nurse Imperiale noted that Shaquille's behavioral problems at school were continuing. (T. 153). Nurse Imperiale noted that Shaquille may suffer from ADHD and requested that Shaquille's teacher complete ADHD "scales". (T. 153). In November 2003, Nurse Imperiale noted that Shaquille no longer heard voices and that he was "better in school". (T. 152).

In December 2003, Shaquille stated that he "knocked 2 kids heads together in school". (T. 151). Nurse Imperiale noted that Shaquille denied hearing voices but plaintiff indicated that Shaquille's behavior was still poor. (T. 151). Shaquille said he was happy but "hit the kids for no reason". (T. 151). Upon examination, Nurse Imperiale noted that Shaquille's mood was neutral and that he appeared embarrassed by his actions. (T. 151). The nurse diagnosed Shaquille with depressive disorder with psychosis and mood instability and increased his medications. (T. 151).

**\*4** In March 2004, Nurse Imperiale noted that Shaquille had not been seen since December 2003. (T. 150). Plaintiff stated Shaquille's anger had increased and that "the voices and hallucinations had returned". (T. 150). Nurse Imperiale noted that Shaquille suffered from an increase in psychosis and increased his dosage of Zyprexa. (T. 150).

On June 9, 2004, Shaquille had his last visit at Patriot Psychiatric. (T. 148). Nurse Imperiale noted that Shaquille was "doing better" and that he was "no longer seeing monsters but still heard voices". (T. 148). Nurse Imperiale advised plaintiff to discontinue Zyprexa in the morning and prescribed Seroquel. [12] (T. 148).

### B. Academic Records and Evaluations

### 1. Academic Year 2002–2003—Second Grade

According to the evidence in the record, Shaquille was in second grade at Giffen Elementary School (P.S. 18) in Albany. Shaquille's progress records indicate that he read "above grade level" but that he needed improvement in all literacy skills and work habits/behaviors. (T. 119).

Shaquille's disciplinary records from the 2002–2003 school year indicate that Shaquille was suspended from school for one day for fighting and for three days for stealing. (T. 130, 132). Disciplinary records also indicate that Shaquille had been absent/ tardy on several occasions. (T. 131).

### 2. Academic Year 2003–2004—Third Grade

Shaquille began third grade at Giffen Elementary School. On September 16, 2003, Shaquille was suspended from school for one day for choking a student in the bathroom. (T. 133).

On October 19, 2003, Shaquille's teacher, Elizabeth Schofield, completed a NICHQ Vanderbilt Assessment Scale and noted that Shaquille "very often" talked excessively, blurted out answers, lost his temper, lied to obtain goods or avoid obligation and stole items of nontrivial value. [13] (T. 123). Ms. Schofield also indicated that Shaquille had "somewhat of a problem" with written expression, relationships with peers, disrupting class and completing assignments. (T. 124).

Shaquille's Mid–Year Progress Records indicate that he transferred to Montessori Magnet School. [14] In the progress reports, Shaquille's teacher described Shaquille as "a very bright child when he chooses to put effort into a task" and noted that "he has come a long way since he came to MMS". (T. 122). Shaquille's teacher noted that he often rushed through work and became angry when asked to fix his work. (T. 122). Shaquille's teacher further stated that "he sometimes takes things that aren't his which makes it difficult for the class to trust him" and that "he needs to work on writing and peer relationships". (T. 122A). Shaquille's teachers noted that he displayed "satisfactory" effort with interactive skills including working and cooperating with others, being courteous and respectful to others, respecting his environment and following school rules. (T. 122).

In March 2004, Shaquille underwent a Psychoeducational Evaluation by the school psychologist, Margaret Capozzola, at plaintiff's request. (T. 125). Plaintiff provided Mrs. Capozzola with details regarding Shaquille's behavioral issues, prior abuse, hallucinations, nightmares and family situation. (T. 125). Mrs. Capozzola noted that Shaquille's biological father was in jail. (T. 125). Plaintiff advised that Shaquille experienced anxiety attacks after spending the afternoon with his biological mother. (T. 125). Mrs. Capozzola consulted with Shaquille's teachers who stated that Shaquille "stole and lied" with no displays of remorse. (T. 125). The teachers also advised Mrs. Capolozza that Shaquille engaged in inappropriate sexual conversations with his peers. (T. 125).

**\*5** Mrs. Capozzola performed a series of standardized tests and found that Shaquille's full scale IQ was 93. (T. 126). Mrs. Capozzola observed Shaquille in his classroom setting and noted that he displayed disruptive behavior which the teacher indicated was common. (T. 127). Mrs. Capozzola noted that Shaquille was "excited to join the examiner" and "quickly made himself comfortable and began conversational speech". (T. 127).

Mrs. Capozzola recommend that Shaquille have a "special friend at school" as he needed to "feel connected and cared about at school". (T. 128). Mrs. Capozzola noted that Shaquille required significant teacher interaction and close contact with home to make sure he met the demands of school. (T. 129). Mrs. Capozzola noted that she would discuss Shaquille's eligibility for special education services with the Committee for Special Education. (T. 128).

### 3. Academic Year 2004–2005—Fourth Grade [15]

In November 2004, the Committee on Special Education met to review Shaquille's educational plan. (T. 221–236). The 2004– 2005 Individualized Education Program (IEP) classified Shaquille as having an "emotional disturbance" and the Committee

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 98 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

recommended that Shaquille be placed in Special Education Programs, specifically in a self contained classroom setting with counseling. (T. 227, 234). The IEP committee noted:

— Requires significant amount of teacher instruction to remain focused and to complete assignments.

— Close contact between home and school needs to be maintained.

— States that nobody likes him.

— Wants to be the center of attention.

— Often will say things of an inappropriate nature to peers.

— History of being asked to leave summer programs due to behavioral issues.

— Quite active within the classroom.

— Moods can change several times during the day. (T. 227).

The committee further found that Shaquille:

— Requires significant teacher interaction to initiate and complete assignments.

— May need additional prompting from teacher and her close proximity to focus. (T. 228).

The committee recommended that Shaquille be seated close to an adult/teacher daily for "the duration of structured activity". (T. 229).

In December 2004, Shaquille was enrolled in special education classes at Schuyler Achievement Academy due to "his inability to focus in a regular education setting". (T. 218–219). On February 18, 2005, Shaquille's teacher, Joseph Smith, prepared a narrative progress report and stated that Shaquille was referred to his "12:1:1 setting due to an inability to focus". (T. 219). Mr. Smith noted that Shaquille was easily distracted and needed special seating arrangements. (T. 219). Mr. Smith stated that Shaquille participated well in class and that "[Shaquille] is an independent learner but has difficulty with relationships with his peers". (T. 219). Mr. Smith stated that Shaquille was very consistent with class and home assignments but that "[Shaquille] is a sensitive child in need of a great deal of support". (T. 219).

 **\*6** On February 17, 2005, Ms. Iglesias, the school social worker, wrote a letter to plaintiff. (T. 218). Ms. Iglesias stated that Shaquille was the only student from Schuyler to represent the school in the local Spelling Bee. (T. 218). Ms. Iglesias noted that Shaquille "responded well" to her and to other adults but that he was working to improve his interpersonal relationships with his peers. (T. 218).

### C. Consultative Examinations

#### 1. John Seltenreich, M.D.

On April 29, 2003, Dr. Seltenreich performed a psychiatric evaluation at the request of the agency. (T. 87). Dr. Seltenreich noted that Shaquille's history (including his history of abuse) was provided by plaintiff. (T. 87). Plaintiff advised that Shaquille had no history of psychiatric hospitalizations or outpatient mental health treatment. (T. 87). Plaintiff stated that Shaquille received counseling on a weekly basis from Joan Franco. (T. 87). Plaintiff reported that Shaquille had difficulty sleeping, nightmares, a pattern of stealing and lying, behavioral difficulties and difficulty with attention and impulse. (T. 87). Shaquille stated that he was sometimes depressed and experienced auditory hallucinations consisting of simple words. (T. 87). Dr. Seltenreich noted Shaquille's father had problems with substance abuse and that Shaquille may have observed his sister's murder. (T. 88).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 99 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

Upon examination, Dr. Seltenreich found Shaquille restless but cooperative, with fluent speech and age appropriate language and expressions. (T. 88). Dr. Seltenreich noted Shaquille was mildly anxious, dysphoric and easily distracted. (T. 89). Dr. Seltenreich noted Shaquille's intellectual functioning was average, his memory was grossly intact and his insight was limited and judgment poor at times and "quite good" at other times. (T. 89). Dr. Seltenreich performed intelligence testing and concluded that Shaquille's IQ was 109. (T. 93). Dr. Seltenreich diagnosed Shaquille with post traumatic stress disorder, dysthymia, and noted that ADHD needed to be "ruled out". (T. 90). Dr. Seltenreich opined that Shaquille had some problems with understanding and following directions and maintaining social behavior. (T. 89). Dr. Seltenreich opined that Shaquille's problems interacting with his peers and the results of the examination were "consistent with allegations of a mental health problem but not a learning disorder". (T. 89). Dr. Seltenreich noted that Shaquille's reports of voices were not consistent with schizophrenia but more likely "his need for attention from his stepmother". (T. 90).

### 2. Childhood Disability Evaluation Form

On May 27, 2003, Dr. Karen Prowda, a state agency review physician, prepared a Childhood Disability Evaluation.[16] (T. 95). Dr. Prowda indicated that Shaquille's impairments of post traumatic stress disorder and dysthymic disorder were severe but did not meet, medically equal or functionally equal a listed impairment. (T. 95). Dr. Prowda found that Shaquille exhibited less than marked limitations in the domains of attending and completing tasks, interacting and relating to others and caring for himself. (T. 97–98). Dr. Prowda found no other functional limitations. (T. 97–98).

### D. Administrative Hearing

 **\*7** On June 25, 2004, a hearing was held before the Administrative Law Judge at which Shaquille and plaintiff testified. (T. 249–272). Plaintiff testified that Shaquille came to live with her three years ago. (T. 257). Prior to that, Shaquille resided with his biological mother and her "boyfriends" in Utica. (T. 257). Plaintiff described Shaquille as a "pleasant" child who is "eager to learn". (T. 266). Plaintiff stated that Shaquille does not have any physical problems and that he is able to care for his personal needs and understands and follows safety rules. (T. 252, 257). Plaintiff testified that Shaquille is responsible for and completes chores around the home. (T. 264).

Plaintiff stated that Shaquille was scheduled to enter the fourth grade in a special education class for emotionally disturbed children pursuant to Education Law § 504. (T. 252–253). Plaintiff testified that Shaquille received "poor grades" but that he excelled in reading and that he "loves doing projects". (T. 253, 255). Plaintiff stated that Shaquille's teachers told her that academically, he is "good" but that his behavior is "poor". (T. 254). Plaintiff testified that Shaquille's "poor behavior" in school consists of stealing, lying to his teachers, failing to follow instructions, speaking of "sexual" issues with his peers, cursing and being unable to sit during class. (T. 254, 256). Plaintiff testified that during the prior school year, she received three phone calls a week from school regarding Shaquille's behavior. (T. 256). Plaintiff also stated that Shaquille was sent to the principal's office twice a week. (T. 256).

Plaintiff testified that Shaquille loves to play with his friends and "sometimes fights" which plaintiff described as "normal fighting". (T. 261). Plaintiff testified that her relationship with Shaquille is "excellent" and that he gets along with other adults. (T. 261, 263). Plaintiff stated that Shaquille does not get violent but prior to taking medication, "[Shaquille] held a boy down and beat him up". (T. 262). Plaintiff testified that Shaquille is "sometimes remorseful" when he hurts others. (T. 262).

Shaquille testified that he liked reading at school, basketball and baseball. (T. 268). Shaquille testified that he liked to play outside but that sometimes other children "annoyed him" and "called him names". (T. 270). Shaquille testified that he liked school but that he gets in trouble and goes to the principal's office "a lot". (T. 271). Shaquille stated that he also gets in trouble on the bus. (T. 271).

### III. PROCEDURAL HISTORY

2008 WL 3200246

On March 18, 2003, plaintiff protectively filed an application on Shaquille's behalf for supplemental security income ("SSI") benefits. (T. 40). On June 2, 2003, the application was denied. (T. 18). Plaintiff requested a hearing which was held before Administrative Law Judge ("ALJ") Thomas P. Zolezzi on June 25, 2004. (T. 34). On August 23, 2004, the ALJ found that Shaquille was not under a disability. (T. 11–17). On June 3, 2005, the Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final determination of the Commissioner. (T. 3). Exhausting all her options for review through the Social Security Administration's tribunals, plaintiff brings this appeal. (Dkt. No. 1).

## IV. ADMINISTRATIVE LAW JUDGE'S DECISION

 **\*8**  An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he

> has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). That definitional provision goes on to exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity...." 42 U.S.C. § 1382c(a)(3)(C)(ii). The agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles ex rel. Lawton v. Barnhart,* 245 F.Supp.2d 479, 487–88 (E.D.N.Y.2003); *Ramos v. Barnhart,* 2003 WL 21032012, at *7 (S.D .N.Y.2003). The first step of the test, which bears some similarity to the familiar, five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles,* 245 F.Supp.2d at 488. If so, then both statutorily and by regulation the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, then the second step requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are severe—that is, which causes more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles,* 245 F.Supp.2d at 488; *Ramos,* 2003 WL 21032012, at *7. If the existence of a severe impairment is discerned, the agency must next determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id.* Equivalence to a Listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles,* 245 F.Supp.2d at 488; *Ramos,* 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve month durational requirement is satisfied, the child will be deemed disabled. 20 C.F .R. § 416.924(d)(1); *Ramos,* 2003 WL 21032012, at *8.

Under the Social Security Regulations (the "Regulations"), analysis of functionality is performed by consideration of how a claimant functions in six areas which are denominated as "domains," and described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1); *Ramos,* 2003 WL 21032012, at *8. Those prescribed domains include:

   (i) [a]cquiring and using information;

   (ii) [a]ttending and completing tasks;

   (iii) [i]nteracting and relating with others;

   (iv) [m]oving about and manipulating objects;

 **\*9**  (v) [c]aring for [oneself]; and

(vii) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1). A finding of disability is warranted if a "marked" limitation, defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), is found in two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos,* 2003 WL 21032012, at \*8. Functional equivalence also exists in the event of a finding of an "extreme" limitation, meaning "more than marked," representing an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," and this rating is only "give[n] to the worst limitations". 20 C.F.R. § 416.926a(e)(3)(i); *see also Morgan v.. Barnhart,* 2005 WL 925594, at \*11 (S.D.N.Y.2005).

Using the three-step disability evaluation, the ALJ found at step one that Shaquille has never engaged in any substantial gainful activity. (T. 16). At step two, the ALJ concluded that Shaquille has severe impairments consisting of severe post-traumatic stress disorder and depressive disorder. (T. 16). At the third step of the analysis, the ALJ found that none of Shaquille's severe impairments meet, medically equal, or functionally equal any of the listed, presumptively disabling conditions set forth in Appendix 1 of the Regulations. (T. 16). The ALJ evaluated Shaquille's functional abilities in the six domains established by 20 C.F.R. § 416.926a(b) (1) and found that Shaquille's limitations were "marked" with respect to interacting and relating to others. (T. 16). The ALJ found that Shaquille's limitations were "less than marked" with regard to attending and completing tasks and health and physical well being. (T. 15–16). The ALJ found that Shaquille had no limitation with regard to acquiring and using information, in his ability to move about and manipulate objects, and his ability to care for himself. (T. 16). Consequently, the ALJ concluded that Shaquille was not disabled. (T. 16).

## V. DISCUSSION

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), [17] the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Urtz v. Callahan,* 965 F.Supp. 324, 325–26 (N.D.N.Y.1997) (citing, *inter alia, Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). Substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams on Behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson,* 817 F.2d at 986.

**\*10** In seeking federal judicial review of the Commissioner's decision denying Shaquille benefits, plaintiff contends that the ALJ erred by failing to find: (1) that Shaquille's impairments met or equaled Listings 112.04; 112.06; and 112.08; and (2) that Shaquille had an extreme impairment in the domain of interacting and relating to others and a marked impairment in the domains of attending to/completing tasks and caring for himself. (Dkt. No. 14).

### A. Listed Impairments

Plaintiff argues that Shaquille's impairments meet or equal the Listings found at 112.04 (affective disorders), 112.06 (anxiety disorders) and 112.08 (personality disorders). [18] (Dkt No. 14, p. 12). Plaintiff claims that the ALJ failed to provide rationale for why the credible findings of Shaquille's educators and medical providers were disregarded. (Dkt. No. 14, p. 24). The Commissioner contends that Shaquille's impairments do not satisfy the criteria of any of the aforementioned Listings. (Dkt. No. 17, p. 7–8)..

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 102 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

By regulation, the Commissioner has set forth a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1; *Lusher ex rel. Justice v. Comm'r of Social Sec.,* 2008 WL 2242652, at *6 (N.D.N.Y.2008). For both adults and children, "if an applicant satisfied the Listings, the applicant was presumed to be disabled, and did not have to prove 'whether he [or she] actually can perform his [or her] own prior work or other work.' " *Lusher,* 2008 WL 2242652, at *6 (quoting *Sullivan v. Zebley,* 493 U.S. 521, 529–530 (1990)).

The Commissioner's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, including any functional limitations that result from the impairment, with the corresponding criteria shown for the listed impairment. 20 C.F.R. §§ 416.925, 416.926a; *see also Giles v. Chater,* 1996 WL 116188, at *5–6 (W.D.N.Y.1996). Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings. *Booker v. Heckler,* 1984 WL 622, at *3 (S.D.N.Y.1984). Mere recitation of the medical evidence is insufficient unless the reports referred to contain substantiated conclusions concerning the Listings, and the ALJ expressly adopts the reasoning of those conclusions. *Id.* The ALJ (not the Commissioner's lawyers) must "build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review". *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002) (internal citations omitted). A court "cannot ... conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Morgan on Behalf of Morgan v. Chater,* 913 F.Supp.184, 188–189 (W.D.N.Y.1996) (quoting *Ryan v. Heckler,* 762 F.2d 939, 941 (11th Cir.1985)).

**\*11** In this case, the ALJ found:

> The medical evidence establishes that the claimant has severe post-traumatic stress disorder and depressive disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P., Regulations No. 4. (T. 16).

The ALJ further concluded that:

> Since there are objective findings to support some of the alleged complaints it may be found that claimant's impairments in combination are severe.

> However, objective findings would not supported [sic] conclusion that any of the claimant's impairments, considered either singly or in combination, are of the degree of severity of any listed impairments in Appendix 1 to Subpart P. of the Regulations. (T. 15).

The ALJ did not specify any particular Listing. Further, the ALJ did not provide any discussion or analysis explaining his determination and failed to state what evidence he rejected or relied upon in making this determination.

### 1. Listing 112.04

To meet or equal Listing 112.04, a claimant's condition must satisfy two criteria set forth in Paragraphs A and B. *See Garrett ex rel. Moore v. Barnhart,* 366 F.3d 643, 648 (8th Cir.2004). The applicable portion of Paragraph A requires "medically documented persistence, either continuous or intermittent" of a major depressive syndrome that is characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

> a. Depressed or irritable mood; or

> b. Markedly diminished interest or pleasure in almost all activities; or

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 103 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

c. Appetite or weight increase or decrease, or failure to make expected weight gains; or disturbance with change in weight; or

d. Sleep disturbance; or

e. Psychomotor agitation or retardation; or

f. Fatigue or loss of energy; or

g. Feelings of guilt or worthlessness; or

h. Difficulty concentrating or thinking; or

i. Suicidal thoughts or acts; or

j. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.04; *see also Garrett,* 366 F.3d at 648. To satisfy Paragraph B, the child must demonstrate marked impairments in two of the following: age-appropriate cognitive/communicative functioning; age-appropriate social functioning; age-appropriate personal functioning; or marked difficulties in maintaining concentration, persistence or pace. 20 C.F.R. Part 404, Subpt. P, App. 1 § 112.02(B)(2).

In this case, the Court finds that the ALJ failed to apply the appropriate legal standard and further, that substantial evidence does not support the ALJ's conclusion. The Court will not engage in a discussion which is a task properly left to the Commissioner, however, given the similarities between Shaquille's symptoms and the criteria of Listing 112.04, the ALJ should have given some explanation as to why the impairment does not meet the criteria. *See Giles,* 1996 WL 116188, at *5–6. The ALJ failed to adequately discuss the significance of Nurse Imperiale's continued diagnosis of depressive disorder with psychosis, possible ADHD and increased mood instability. The ALJ also failed to address Dr. Seltenreich's opinion that "ADHD should be ruled out" and Dr. Seltenreich's diagnosis of post traumatic stress disorder and dysthymia. (T. 90). Further, there is evidence that Shaquille suffered from auditory and visual hallucinations, decreased sleep, feelings of worthlessness and limitations in cognitive functioning and concentration. (T. 123, 125, 135, 151). The ALJ's failure to explain is plain error. *See Morgan,* 913 F.Supp. at 188–189 (holding that a one-sentence denial is insufficient to support the determination, especially in light of the considerable evidence to the contrary). As the ALJ improperly disregarded "highly probative evidence", the case is remanded to the Commissioner for further proceedings. *Wilson v. Callahan,* 1997 WL 714863, at *5 (W.D.N.Y.1997).

**2. Listing 112.06 and 112.08**

**\*12** Listing 112.06 requires medically documented findings of one of several factors, including "excessive anxiety manifested when the child is separated" from a parent. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.06. The anxiety must also result in at least two of the age-specific findings listed in § 112.02(B)(2). *Id.* at § 112.02(B)(2).

The required level of severity for Listing 112.08, Personality Disorders, is met when there is "[d]eeply ingrained, maladaptive patterns of behavior, associated" with seclusiveness or autistic thinking, pathologically inappropriate suspiciousness or hostility, oddities of thought, perception, speech, and behavior, persistent disturbances of mood or affect, pathological dependence, passivity, or aggressiveness, or intense and unstable interpersonal relationships with impulsive and exploitative behavior resulting in a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.08; *see also Morgan,* 913 F.Supp. at 190.

Although it is preferable that the ALJ address a specific Listing, failure to do so is not reversible error if the record supports the overall conclusion. *See Lusher,* 2008 WL 2242652, at *6; *see also Dunahoo v. Apfel,* 241 F.3d 1033, 1037 (8th Cir.2001) (holding that the ALJ's failure to explain why the plaintiff did not meet a specific listing was not error as substantial evidence in

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 104 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

the record indicated that the plaintiff did not satisfy the Listing); *Briggs v. Callahan,* 139 F.3d 606, 609 (8th Cir.1998) (stating that "although the ALJ did not specifically discuss [the] condition in the context of listing 112.05(D)," the record supported the conclusion). The ALJ is not required to discuss Listings for which no evidence exists. *RJM ex rel. Moore v. Astrue,* 2008 WL 833194, at *2, n. 3 (S.D.Ind.2008) (holding that the ALJ's failure to discuss Listing 112.02 (organic mental disorder) was not an error as the plaintiff cited to no evidence of any diagnoses of personality disorder).

In this case, substantial evidence in the record suggests that Shaquille's impairments do not meet the requirements of Listings 112 .06 and 112.08. Plaintiff argues that Shaquille was diagnosed with post-traumatic stress disorder which "is clearly contributing to a personality disorder". (Dkt. No. 14, p. 15). However, plaintiff does not cite to any portion of the record that supports that assertion. Further, plaintiff does not cite to any evidence that Shaquille was diagnosed with a personality or anxiety disorder by any doctor or therapist. In fact, Dr. Seltenreich concluded that Shaquille's auditory hallucinations were not consistent with schizophrenia. (T. 90). Accordingly, the ALJ's failure to specifically mention and analyze the aforementioned Listings does not warrant remand.

### B. Functional Domains

#### 1. Attending and Completing Tasks

**\*13** Plaintiff contends that the ALJ erred by failing to find that Shaquille has a marked impairment in the domain of attending and completing tasks. (Dkt. No. 14, p. 19). The domain of attending and completing tasks gauges how well a child is able to focus and maintain attention. 20 C.F.R. § 416.926a(h). For children of Shaquille's age (ages 6 to 12), the regulations provide:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

Some examples of limited functioning include: (1) being "easily startled, distracted, or over reactive to sounds, sights, movements, or touch"; (2) "being slow to focus on, or fail to complete activities of interest"; (3) becoming repeatedly sidetracked from activities or frequently interrupting others; and (4) being easily frustrated and giving up on tasks. *See* 20 C.F.R. § 416.926a(h) (3)(i)-(v); *see also Morgan,* 2005 WL 925594, at *13.

The ALJ found that Shaquille has "less than a marked impairment" in this domain. (T. 16). To support that conclusion, the ALJ cited to Shaquille's a progress report from Montessori Magnet School for the 2003–2004 academic school year and to plaintiff's testimony. The ALJ concluded:

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 105 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

Exhibit 12F indicates that claimant was very successful when he put effort into his work, although he would rush through his work making careless mistakes and would get angry if he had to fix his work. His guardian testified that he would do his chores if she kept after him. (T. 15–16). [19]

The ALJ did not cite to any other evidence in support of his conclusion despite the existence of evidence favoring a marked limitation in this domain. The ALJ neglected to adequately evaluate the complete academic picture including disciplinary records, Mrs. Capozzola's evaluation and Ms. Schofield's ADHD assessment. These records document Shaquille's behavioral and academic problems. *See Matos ex rel. Mota v. Barnhart,* 2007 WL 943654, at *10 (S.D . N.Y.2007).

Shaquille's educators and doctors/therapists described him as "easily distracted" and noted that he easily lost his temper, rushed through work at school and "very often talked excessively". (T. 89, 90, 122–123, 219). Moreover, Dr. Seltenreich and Nurse Imperiale both note that Shaquille may suffer from "ADHD". (T. 90, 153). The ALJ did not address or discuss this evidence.

 **\*14**  Moreover, plaintiff's "new evidence" (submitted to the Appeals Council) is highly probative on this issue and likely to affect the ALJ's consideration. This new evidence, including the IEP evaluation and report from Shaquille's special education teacher, may persuade the ALJ to find that Shaquille had a marked impairment in this domain. *See Pollard v. Halter,* 377 F.3d 183, 194 (2d Cir.1994). Consequently, the Court finds that the ALJ's decision on this point is legally deficient and not supported by substantial evidence.

### 2. Interacting and Relating to Others

Plaintiff contends that the ALJ erred by failing to find that Shaquille has an extreme impairment in the domain of interacting and relating to others. The domain of interacting and relating with others considers how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). For school-age children of Shaquille's age (age 6 to attainment of age 12), the Regulations further provide:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

The SSA regulations provide that an impairment is an "extreme" limitation when:

> [The] impairment interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities. [The child's] day-to-day functioning may be very seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the]

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 106 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked"... [but] does not necessarily mean a total lack or loss of ability to function.

*Sarauw v. Barnhart,* 2006 WL 2135775, at *3–4 (S.D.N.Y.2006); 20 CFR § 416.926a(e)(3)(i). Alternatively, when a child suffers from multiple impairments within a single domain, each of which, when considered separately, imposes a less-than-marked limitation, the combined result nonetheless may be marked or extreme. *See, e.g., Encarnacion v. Barnhart,* 191 F.Supp.2d 463, 474 (S.D.N.Y.2002) (two less-than-marked limitations in the area of social functioning may cumulatively contribute to the finding of a marked or extreme limitation in the area of social functioning).

In this case, the ALJ concluded:

> The evidence indicates that the claimant has had behavior problems at school and that peers don't trust him, but he does enjoy playing with his friends. Nevertheless he had been found stealing. Although his medication is helping, with respect to "interacting and relating to others" it may be found that he has marked limitations. (T. 16).

**\*15** Upon review of the transcript, the Court concludes that the ALJ's decision cannot withstand analysis. First, the Court notes the ALJ's determination is poorly worded and confusing. The ALJ stated that "it *may* be found that he has marked limitations". (T. 16) (emphasis supplied). Plaintiff and defendant assume that the ALJ concluded that plaintiff suffered from a marked limitation in this domain. (Dkt. No. 10, p. 17; Dkt. No. 17, p. 14). However, the intent of the ALJ is unclear and requires remand for clarification.

Moreover, the domain of interacting and relating with others concerns more than fights and disruptive behavior. *McClain v. Barnhart,* 299 F.Supp.2d 309, 326 (S.D.N.Y.2004). Indeed, the ALJ failed to address evidence that may support a finding of "extreme" limitations. The ALJ failed to discuss plaintiff's inappropriate sexual conversations with his peers, his hallucinations and plaintiff's unexplained physical aggressiveness towards his peers/classmates; (T. 125, 136, 152–154). The ALJ also failed to analyze plaintiff's disruptive behavior in class, lack of respect for his peers and anxiety after spending time with his biological mother. (T. 124–125). Further, plaintiff's "new evidence", most significantly, the IEP evaluation and Mr. Smith's report, must be considered.

In light of the foregoing, upon remand, the ALJ must re-evaluate this domain and the evidence that may support a finding of "extreme" limitations.

### 3. Caring for Yourself

Plaintiff argues that the ALJ erred by failing to find that Shaquille has a marked impairment in the domain of caring for oneself. (Dkt. No. 14, p. 21). The domain of caring for yourself considers how well a child maintains a healthy emotional and physical state, including how well he has his physical and emotional needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he cares for his own health, possessions and living area. 20 C.F.R. § 416.926a(k). For school-age children of Shaquille's age (age 6 to attainment of age 12), the Regulations further provide:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel

**Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)**

2008 WL 3200246

bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

The ALJ cited to plaintiff's testimony and found that Shaquille displayed no evidence of any limitations in this domain. (T. 16). The Court finds that substantial evidence exists to support the ALJ's determination. The domain of caring for yourself includes whether you take care of your own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Plaintiff testified that Shaquille was able to bathe, dress and handle his own personal care. (T. 257). Plaintiff also testified that Shaquille is responsible for and completes chores around the home. (T. 264). Plaintiff testified that Shaquille understands and follows basic safety rules with the exception of watching for cars when he crossed the street. (T. 257–258). After examining Shaquille, Dr. Seltenreich opined that Shaquille was "aware of danger and the need to take precautions". (T. 93).

 *16  As noted in the Regulations, school-age children should be able to identify those circumstances when they feel good about themselves and when they feel bad. 20 C.F.R. § 416.926a(k)(2)(iv). In December 2003, Shaquille told Dr. Imperiale that he "did a little accident, knocked 2 kids heads together in school". (T. 151). Dr. Imperiale noted that Shaquille was "embarrassed by his actions". (T. 151). Plaintiff testified that Shaquille is "sometimes remorseful" when he hurts others. (T. 221).

In light of the foregoing, the Court finds that the ALJ's determination that Shaquille suffered from no impairment in the domain of caring for himself is supported by substantial evidence.

## VI. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

All Citations

Not Reported in F.Supp.2d, 2008 WL 3200246

---

**Footnotes**

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 108 of 153

Brown ex rel. S.W. v. Astrue, Not Reported in F.Supp.2d (2008)

2008 WL 3200246

1    Michael J. Astrue became Commissioner of Social Security on February 12, 2007. Pursuant to Federal Rule of Civil
     Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

2    Portions of the administrative transcript, Dkt. No. 13, will be cited herein as "(T__)."

3    Dysthymia is a mood disorder characterized by depressed feeling, loss of interest or pleasure in one's usual activities,
     and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self esteem, poor
     concentration or decision-making skills, and feelings of hopelessness. *Dorland's Illustrated Medical Dictionary,* (31st
     ed.2007). ADHD is an abbreviation for Attention Deficit Disorder with Hyperactivity. http://www.medilexicon.com
     (last visited July 10, 2008).

4    The "recommended onset date" is March 1, 2003. (T. 77).

5    The records from Ms. Franco are sparse and consist of pre-printed forms entitled "Counseling Follow-up" which provide
     the date, length of the session and administrative information. (T. 173).

6    The name of the nurse practitioner is illegible. (T. 116).

7    PTSD is an abbreviation for post traumatic stress disorder. http://www.medilexicon.com (last visited July 10, 2008).

8    NPP is an abbreviation for Psychiatric Nurse Practitioner. http://www.medilexicon.com (last visited July 10, 2008).

9    Paxil is used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders; administered orally.
     *Dorland's* at 1405, 1419.

10   Risperdal is used as an antipsychotic agent. *Id.* at 1674.

11   Zyprexa is used as an antipsychotic in the management of schizophrenia and for short-term treatment of manic episodes
     in bipolar disorder. *Id.* at 1336, 2125. Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders. *Id.*
     at 1724, 2120.

12   Seroquel is used as an antagonist to multiple neurotransmitter receptors in the brain, used as an antipsychotic in the
     treatment of schizophrenia and other disorders. *Dorland's* at 1590, 1723.

13   The NICHQ (National Initiative for Children's Healthcare Quality) Vanderbilt Assessment Scale is utilized by teachers
     to evaluate a child fro ADHD. http://nichq.org (last visited July 21, 2008).

14   The exact date that Shaquille transferred to Montessori Magnet School is not in the record.

15   These records were submitted by plaintiff for consideration by the Appeals Council. (T. 237). Evidence submitted to the
     Appeals Council following the ALJ's decision becomes part of the administrative record to be considered on judicial
     review of the ALJ's decision. *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). Although the Appeals Council denied
     review of the ALJ's decision, it expressly considered the new evidence. (T. 6). Thus, the new evidence is part of the
     administrative record for purposes of judicial review. The Court further notes that defendant does not object to the
     inclusion of these records.

16   The form allows an individual to indicate whether a claimant's condition meets, medically equals, or functionally equals
     a presumptively disabling condition identified in the listing of impairments set forth in the regulations. *See* 20 C.F.R. Pt.
     404, Subpt. P, App. 1 (the "Listings"). The form also allows the individual to rate the degree of limitation in several areas
     of development or functioning in order to determine whether a condition functionally equals a listed impairment. *Id.*

17   Section 1383(c)(3) makes section 405(g) applicable to the SSI program and provides the basis for this Court's jurisdiction
     and limitations of its review.

18    Plaintiff cites to 112.06 in the introductory paragraph of the Argument. However, plaintiff fails to provide any analysis or argument as to how Shaquille's impairments meet the criteria of 112.06.

19    The citation to "Exhibit 12F" in the ALJ's decision is a typographical error. Exhibit 12F is a Subpoena to the County of Albany Crime Victim and Sexual Violence Center. A review of the entire record reveals that the reference is to Exhibit 7F, records from the Albany County School District. (T. 122).

---

**End of Document**                                                                 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1213123
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ellen J. SHOOK, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 12–CV–185 (TJM/VEB).
|
Jan. 25, 2013.

**Attorneys and Law Firms**

Peter M. Margolius, Office of Peter M. Margolius, Catskill, NY, for Plaintiff.

Andreea L. Lechleitner, Social Security Administration, New York, NY, for Defendant.

## REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

## I. INTRODUCTION

**\*1** In May of 2010, Plaintiff Ellen J. Shook applied for disability and disability insurance benefits ("DIB") under the Social Security Act. Plaintiff alleges that she has been unable to work since February of 2008 due to physical impairments related to multiple sclerosis. The Commissioner of Social Security denied Plaintiff's application.

Plaintiff, by and through her attorney, Peter M. Margolius, Esq., commenced this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The Honorable Gary L. Sharpe, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 14).

## II. BACKGROUND

The relevant procedural history may be summarized as follows:

Plaintiff applied for benefits on May 11, 2010, alleging disability beginning on February 1, 2008. (T at 18, 107–112).[1] The application was denied initially and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on May 31, 2011, before ALJ Dale Black–Pennington. (T at 28). Plaintiff appeared with her attorney and testified. (T at 32–50).

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 111 of 153
Shook v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2013)
2013 WL 1213123

On July 8, 2011, ALJ Black–Pennington issued a written decision finding that Plaintiff was not disabled and was therefore not entitled to benefits. (T at 15–27). The ALJ's decision became the Commissioner's final decision on December 1, 2011, when the Appeals Council denied Plaintiff's request for review. (T at 1–6).

Plaintiff, through counsel, timely commenced this action on January 26, 2012. (Docket No. 1). The Commissioner interposed an Answer on March 22, 2012. (Docket No. 7). Plaintiff filed a supporting Brief on May 7, 2012. (Docket No. 12). The Commissioner filed a Brief in opposition on June 14, 2012. (Docket No. 13).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.[2]

For the reasons that follow, it is recommended that the Commissioner's motion be granted, Plaintiff's motion be denied, and this case be dismissed.

### III. DISCUSSION

**A. Legal Standard**

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*2** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. *See* 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.[3]

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482 U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. *See* 42

U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

## B. Analysis

### 1. Commissioner's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008, and had not engaged in substantial gainful activity since February 1, 2008, the alleged onset date. (T at 20). The ALJ concluded that Plaintiff had the following impairment, as defined under the Act: multiple sclerosis. (T at 20).

However, the ALJ found that, between the alleged onset date and the date last insured, Plaintiff's impairment did not significantly limit her ability to perform basic work-related activities for 12 consecutive months and, as such, Plaintiff did not have a severe impairment. (T at 20–23).

**\*3** Accordingly, the ALJ determined that Plaintiff was not disabled under the Social Security Act between the alleged onset date (February 1, 2008) and the date last insured (December 31, 2008) and was therefore not entitled to benefits. (T at 24). As noted above, the ALJ's decision became the Commissioner's final decision on December 1, 2011, when the Appeals Council denied Plaintiff's request for review. (T at 1–6).

### 2. Plaintiff's Arguments

Plaintiff contends that the Commissioner's decision should be reversed. She offers two (2) principal arguments in support of this position. First, she argues that the ALJ erred by concluding that her multiple sclerosis was not a severe impairment. Second, Plaintiff asserts that the Appeals Council should have remanded the matter based on new evidence. This Court will address both arguments in turn.

### a. Severity of Impairment

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The following are examples of "basic work activities": "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations." *Gibbs v. Astrue,* No. 07–Civ–10563, 2008 WL 2627714, at \*16 (S.D.N.Y. July 2, 2008); 20 C.F.R. § 404.1521(b)(1)-(5).

The claimant bears the burden of presenting evidence establishing severity. *Miller v. Comm'r of Social Sec.,* No. 05–CV–1371, 2008 WL 2783418, at \*6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. § 404.1512(a). Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995). Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97–CV–5759, 1999 WL 294727 at \*5 (E.D.N.Y. March 19,1999) (quoting *Bowen v. Yuckert,* 482 U.S. 137, 154 n. 12, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)).

In this case, the ALJ noted Plaintiff's diagnosis of multiple sclerosis, but concluded that the impairment did not significantly limit Plaintiff's ability to perform basic work activities during the relevant time period (i.e. February 1, 2008–December 31, 2008). (T at 20). For the following reasons, this Court finds that the ALJ's decision is supported by substantial evidence and should therefore be sustained.

**\*4** Plaintiff was seen by Dr. Bruce A. Beesley, her treating neurologist, only once during the relevant time period, on April 30, 2008. Dr. Beesley noted that Plaintiff had given birth to a baby boy about eight weeks prior to the visit and reported that Plaintiff was "doing great." (T at 158). Plaintiff denied any "weakness, clumsiness, sensory loss, monocular vision loss, diplopia or change in bowel or bladder habits." (T at 158). The only complaint noted was "occasional numbness along her left lip if she gets overtired." (T at 158). Dr. Beesley conducted a neurological examination and noted unremarkable findings, including normal muscle tone and strength. (T at 159–60). He described Plaintiff as "clinically stable" with respect to her multiple sclerosis. (T at 160).

Dr. Beesley's April 2008 findings were consistent with treatment notes from shortly before and after the relevant time period. For example, in September of 2007, Dr. Beesley noted that Plaintiff experienced "some occasional tingling over her left lip but other than that [had] no neurologic symptoms." (T at 161). Plaintiff complained of "marked fatigue" during the first trimester of her pregnancy, but noted improvement. (T at 161). Plaintiff's muscle tone and strength were normal. (T at 162). Dr. Beesley described Plaintiff's multiple sclerosis as "quiescent." (T at 162). [4]

In January of 2009, Plaintiff reported "a number of minor issues," including numbness on the bottom of one toe (which was related to a vacation stay in an unheated house on the top of mountain); an episode of left arm weakness and numbness; a single, brief episode of experiencing a "spinning" feeling when rolling over; and slight difficulty lifting her left leg. (T at 155). The only symptom Dr. Beesley attributed to multiple sclerosis was left side weakness. (T at 157). Plaintiff's muscle tone was normal and her muscle strength was essentially normal (weakness of the left triceps and strength of flexion of the left knee were noted to be 4.9 out of 5). (T at 157). Dr. Beesley described Plaintiff's condition as "reasonably stable." (T at 157). He did not feel Plaintiff was "weak enough" to warrant steroid treatment and recommended that she continue with her current treatment with the medication Avonex. (T at 157).

The treatment notes of Dr. Samuel Merkhan, Plaintiff's treating internist, from the relevant time period also support the ALJ's decision. In April 2008, Plaintiff saw Dr. Merkhan with complaints of recurrent sinus symptoms. (T at 242). Dr. Merkhan diagnosed "recurrent sinusitis," but did not note any limitations. (T at 242). In May of 2008, Plaintiff saw Dr. Merkhan in follow-up to laparoscopic surgery and hernia repair. (T at 241). No limitations were noted. (T at 241). In a September 2008 treatment note, Dr. Merkhan reported that Plaintiff complained of "slight fatigue and ... slight sensory symptoms secondary to multiple sclerosis." (T at 240). Dr. Merkhan opined that Plaintiff could "continue current ... activities." (T at 240).

**\*5** The report of J. Bodner, a non-examining State Agency medical review consultant also supported the ALJ's non-severity finding. Dr. Bodner reviewed the medical records and opined that the only significant limitation during the relevant time period was a need to avoid excessive temperatures. (T at 211).

Plaintiff's activities of daily living also support the ALJ's assessment. Plaintiff testified that she can lift twenty-five (25) pounds, sit for "a few hours," and stand for approximately two hours. (T at 41). She performs household chores (e.g. cooking, laundry, cleaning, grocery shopping). (T at 43–44). She is the primary caregiver for her two young children. (T at 45–46). Although Plaintiff testified that she experienced significant left-sided weakness immediately following the February 2008 birth of her son (T at 36), this testimony was inconsistent with the contemporaneous medical record, as outlined above.

This Court is mindful of the evidence, cited by Plaintiff, documenting symptoms from outside the relevant time period. For example, in March of 2006 (nearly two years prior to the alleged onset date), Dr. Beesley indicated that Plaintiff had likely experienced a "mild exacerbation" of her multiple sclerosis, including vision problems and "tingling paresthesias on the right arm and leg," which had resolved. (T at 173, 175). In November of 2006, Dr. Beesley reported that Plaintiff's multiple sclerosis was "relatively stable," except for a "small exacerbation with remission with right optic neuritis." (T at 169). In May of 2009, Dr. Beesley indicated that Plaintiff's condition was "reasonably good," but she was experiencing left side weakness when fatigued. (T at 152). In November of 2009 (nearly a year after the date last insured), Dr. Beesley reported "intermittent heaviness and weakness in the left lower extremity." (T at 149). In May of 2010, Dr. Beesley noted "progressive weakness" in Plaintiff's left leg and "increasing spasticity." (T at 145).

2013 WL 1213123

However, "[c]onflicts in evidence ... are for the Commissioner to resolve." *White v. Comm'r of Social Security,* No. 06–CV–0564, 2008 WL 3884355, at *11 (N.D.N.Y. Aug. 18, 2008) (citing *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983)). Where, as here, there are conflicts in the medical evidence, it is the ALJ's decision that controls as factfinder. *Id.* Where the Commissioner's decision "rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." *Id.*

Moreover, the limited question presented is whether Plaintiff's condition was "severe," within the meaning of the Social Security Act, during the very limited period of time at issue (February 2008–December 2008). For the reasons stated above, substantial evidence (including, in particular, treatment notes and clinical examinations by treating providers that occurred during the relevant time period) supports the ALJ's finding that the condition was not severe during that limited period and the Commissioner's decision should therefore be sustained.

**b. Appeals Council**

**\*6** The Appeals Council is required to consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *see also* § 416.1470(b); *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b); *see* § 416.1470(b)."

To obtain a review of the additional evidence, the claimant must establish that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart,* 470 F.Supp.2d 194, 204 (E.D.N.Y.2007) (citing *Lisa v. Sec'y of Health & Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991)).

Evidence is "material" if there is "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id.* If the Appeals Council fails to consider new, material evidence, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009).

In the present case, Plaintiff provided the Appeals Council with a letter from Dr. Beesley, dated August 22, 2011. (T at 4, 267). The Appeals Council found that Dr. Beesley's letter did not provide a basis for changing the ALJ's decision. (T at 2). This Court finds that the Appeals Council's decision was in accord with applicable law and supported by substantial evidence.

Dr. Beesley's letter was written in August of 2011, more than two and a half years after the date last insured. Although Dr. Beesley reports significant work-related limitations, he is clearly offering an opinion as to Plaintiff's condition in August of 2011, not during the relevant time period. For example, Dr. Beesley states that "[a]t *this point in time"* Plaintiff has "functional limitation including decreased vision in the right eye, left-sided weakness in the arm and leg, decreased balance worse with fatigue and significant fatigue ...." (T at 267) (emphasis added). Dr. Beesely further opined that "[a] *t this point in time,"* he did not believed Plaintiff could "work a full workload due to the fatigue and ... left-sided weakness." (T at 267) (emphasis added).

This Court is mindful that evidence cannot be disregard solely because it post-dates the relevant time period. Rather, information provided after the date last insured should be considered to the extent it sheds light on the Plaintiff's condition as of the relevant time period. *See Pollard v. Halter,* 377 F.3d 183, 193 (2d Cir.2004). Here, however, the medical record from the period between February and December 2008, which includes contemporaneous treatment notes and clinical findings from Dr. Beesley, provides substantial evidence in support of the Commissioner's decision. Dr. Beesley's treatment notes and clinical findings from shortly before, during, and shortly after the relevant time period provide sufficient support for the ALJ's findings, for the reasons outlined above.

**\*7**  The August 2011 letter, which clearly expresses an opinion concerning Plaintiff's condition at that time, and which notes that "fluctuation" of symptoms is common in patients with multiple sclerosis (T at 267), does not materially affect the ALJ's analysis with regard to the relevant time period.

This Court does not doubt that Plaintiff was experiencing significant symptoms as of August 2011 and that her multiple sclerosis may have become disabling at some point. However, the narrow inquiry here is whether the Commissioner's conclusion with respect to the nature and extent of Plaintiff's impairment *during the relevant time period* was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

In other words, the only issue this Court has the authority to consider is whether substantial evidence supports the Commissioner's decision that Plaintiff was not disabled between the alleged onset date (February 1, 2008) and the date last insured (December 31, 2008).

To be eligible for disability insurance benefits, a claimant must be "insured for disability insurance benefits." 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); see also 20 C.F.R. §§ 404.130, 404.315(a) (1988). [5] Generally, if the claimant is otherwise eligible to receive disability insurance benefits and becomes disabled prior to their date last insured, they will receive benefits until the occurrence of one of the following: death, retirement (at which point benefits continue to be paid as retirement benefits), or termination of the disability (*i.e.* the person experiences medical improvement and engages in substantial gainful activity). *See* 42 U.S.C. § 423 (establishing eligibility requirements for DIB and setting forth rules governing duration of benefit payments). As such, if Plaintiff became disabled prior to December 31, 2008 (i.e. while she eligible for DIB coverage) and if she continued to be disabled thereafter, she would receive significant payments from the Social Security Administration.

In the alternative, unfortunately, if Plaintiff did not become disabled until after the date last insured, she is not entitled to an award of disability insurance benefits. *See Arnone v. Bowen,* 882 F.2d 34, 38 (2d Cir.1989).

For the reasons outlined above, this Court finds that substantial evidence supports the Commissioner's conclusion that Plaintiff did not become disabled prior to the date last insured.

This Court obviously feels sympathy for anyone who suffers from chronic pain (whether it is disabling or not). However, this Court is not invested with the authority to review Plaintiff's eligibility for benefits *de novo* or to substitute its own notions of fairness and sympathy for the requirements of the law. The co-equal elected branches of the federal government have established the parameters for determining benefit eligibility and defined the scope of the judiciary's role in reviewing those determinations.

**\*8**  The following observation from a Second Circuit Court of Appeals judge is apt:

> Denying statutory benefits to people in need of assistance is always an unpleasant task. The temptation to blur the distinction between individual need and statutory eligibility is strong; but our authority as judges often fails to match our sympathy for our fellow human beings. Absent [legal] transgressions, we have no more power to disregard the substantive and procedural eligibility limitations built into legislative benefit schemes than we have to change the nature and scope of the benefits themselves. It should not be otherwise. By in effect trying cases de novo at the district and even the court of appeals level ... we reduce the entire administrative process to a mere rehearsal for the actual determination, thereby ensuring that we will be seeing an ever-increasing number of these cases in the courts in the years to come.

*Singletary v. Sec'y of Health & Human Services,* 623 F.2d 217, 220 (2d Cir.1980) (Meskill, J., dissenting). Thus, the significant sympathy this Court has for Plaintiff personally must be set aside and, where the evidence is sufficient to require upholding

**2013 WL 1213123**

the Commissioner, as it is here, the law must be applied without passion or prejudice and the Commissioner's decision must be sustained.

## IV. CONCLUSION

After carefully reviewing the administrative record, this Court finds substantial evidence supports the Commissioner's decision, including the objective medical evidence and supported medical opinions. It is clear that the ALJ thoroughly examined the record, afforded appropriate weight to the medical evidence, including the assessments of Plaintiff's treating providers and the non-examining consultant, and afforded the subjective claims of symptoms and limitations an appropriate weight when rendering the decision that Plaintiff was not disabled with respect to the relevant time period. This Court finds no reversible error and because substantial evidence supports the Commissioner's decision, this Court recommends that the Commissioner be GRANTED judgment on the pleadings and that Plaintiff's motion for judgment on the pleadings be DENIED.

## V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd. .,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

 **\*9** Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1213123

---

## Footnotes

1       Citations to "T" refer to the Administrative Transcript. (Docket No. 8).

---

2013 WL 1213123

2       General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings ."

3       This five-step process is detailed as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

> If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

> If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

> If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

> Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

> *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

4       "Quiescent" means "marked by inactivity or repose" or "causing no trouble or symptoms." *See* http://www.merriam-webster.com/dictionary/quiescent.

5       The determination of the "date last insured," which is not challenged in this case, is based upon the claimant's work history and a ratio of "quarters of coverage" to total quarters. *See* 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.130–404.133.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1222008
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ellen J. SHOOK, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 1:12–CV–185.
|
March 25, 2013.

**Attorneys and Law Firms**

Peter M. Margolius, Office of Peter M. Margolius, Catskill, NY, for Plaintiff.

Andreea L. Lechleitner, Social Security Administration, New York, NY, for Defendant.

## DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

 **\*1**  This matter, brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) (3), was referred to the Hon. Victor E. Bianchini, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Rule 72.3(d) of the Local Rules of the Northern District of New York. No objections to the January 25, 2013, Report–Recommendation have been raised. After examining the record, this Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report–Recommendation for the reasons stated therein.

It is therefore ORDERED that the Commissioner's decision denying disability benefits be AFFIRMED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1222008

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4352410
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lynne GILL, Plaintiff,

v.

Michael J. ASTRUE, Defendant.

No. 1:10–CV–985 (MAD/ATB).
|
Sept. 15, 2011.

**Attorneys and Law Firms**

Stephen J. Mastaitis, Jr., Esq., for the Plaintiff.

Suzanne M. Haynes, Special Ass't U.S. Attorney, for the Commissioner.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

Plaintiff filed a previous application for Social Security Disability Insurance Benefits that was denied following a decision of an Administrative Law Judge (ALJ) dated July 26, 2004. (*See* Administrative Transcript (T.) 63). Plaintiff alleged an onset date of March 25, 1998, and the date last insured was December 31, 2005. (*See* T. 63). The ALJ's denial was affirmed by the Appeals Council, and plaintiff did not pursue any appeal. (Pl.'s Mem. 2 [1]). Instead, plaintiff filed a new application for Social Security Disability Insurance Benefits on November 5, 2004. (T. 106–108).

Following a hearing before a different ALJ, in a decision dated October 24, 2006, plaintiff was found to be not disabled from July 27, 2004, through the date of the hearing. (T. 63–70). Plaintiff appealed the ALJ's decision, and on April 20, 2007, the Appeals Council remanded plaintiff's case for a new hearing. (T. 75–76).

A hearing was held before a third ALJ on October 21, 2008, and in a decision dated November 17, 2008, the ALJ found that plaintiff was not under a disability from July 27, 2004 [2] through December 31, 2005, the date last insured. *Id.* (T. 939–51). Plaintiff appealed to the Appeals Council, which granted plaintiff's request for review on May 27, 2010. (T. 12–15). On July 16, 2010, after reviewing the ALJ's findings, the Appeals Council affirmed the ALJ's November 17, 2008 decision. The Appeals Council's decision became the final decision of the Commissioner from which plaintiff now appeals.

## II. ISSUES IN CONTENTION

The plaintiff makes the following claims:

> The ALJ's Residual Functional Capacity (RFC) determination is not supported by substantial evidence. (Pl.'s Mem. 1).

This court concludes for the reasons below, that the ALJ's decision is supported by substantial evidence and recommends that the complaint be dismissed in its entirety.

### III. APPLICABLE LAW

#### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

**\*2** 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams on behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 197 U.S. 229 (1938)); *Williams,* 859 F.2d at 258.

**\*3** "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

## IV. MEDICAL EVIDENCE [3]

### A. Time Period Covered by the Commissioner's Prior Decision

Plaintiff was diagnosed with carpal tunnel syndrome in both hands in 1998 and had surgery on her right wrist in April 1998 and November 1998. (T. 185, 206–08, 230–31; *see* T. 189, 203). Plaintiff also underwent right trigger thumb and index finger release surgery in January 1999. (T. 203). Occupational therapist Robert Joel Sears completed a functional capacity evaluation on March 16, 1999, concluding that plaintiff could perform light level work. (T. 186–95).

Orthopedic surgeon Dr. Edwin Mohler examined plaintiff in January 2001 and noted that plaintiff had decreased range of motion in her shoulders and right wrist, but had good grip strength and no intrinsic weakness or wasting. (T. 197–205). Dr. Michelle Antiles evaluated plaintiff in conjunction with plaintiff's initial application for Social Security benefits, and plaintiff told Dr. Antiles that she could sit and stand for up to four hours each, with breaks, could walk up to one mile, and lift up to 20 pounds. (T. 422). Plaintiff underwent arthroscopic shoulder surgery in February 2002, and afterward had minimal complaints of pain. (T. 242–44, 245–46). Dr. Kirkpatrick performed decompression of plaintiff's left ulnar nerve at the elbow in January 2003, and, in February 2003, performed surgery to repair the ulnar collateral ligament in plaintiff's right thumb. (T. 223A, 224).

Psychologist Dr. John McCloskey of Glens Falls Hospital Behavioral Health Outpatient Center evaluated plaintiff in May 2002. (T. 211). She told him that she was looking forward to camping and swimming in the summer and that she had ridden a bicycle two days before the evaluation. (T. 211). Dr. McCloskey diagnosed major depression, dysthymic disorder, panic disorder without agoraphobia, and alcohol dependence. (T. 209, 214).

### B. Time Period Most Relevant to Final ALJ's Decision

Plaintiff was evaluated, at the Center for Vocational Rehabilitation on October 24, 2004, by Dr. Phillip Gara and physical therapist Cathy Krueger, who indicated that plaintiff could perform sedentary work and suggested vocational counseling. (T. 233–39). After plaintiff complained of hip and knee pain in November 2004, Dr. Kirkpatrick noted that X-rays revealed mild

arthritis of the right hip with mild lateral spurring. (T. 241). Dr. Kirkpatrick also noted that bilateral knee x-rays were benign, and concluded that plaintiff did not require additional treatment for the mild arthritis. (T. 241).

**\*4** On December 3, 2004, ophthalmologist Dr. Timothy Braim completed a state disability functional assessment form. Dr. Braim reported that he had monitored plaintiff for diabetic retinopathy since 1997 and that plaintiff's best corrected vision in both eyes was 20/20, as of her most recent visit in November 2004. (T. 254–57; *see also* T. 321–34). Dr. Robert L. Evans, plaintiff's primary care physician, dictated a medical report to the state disability determination offices on December 3, 2004, and examined plaintiff on December 7, 2004. (T. 306–10). Dr. Evans noted that plaintiff's diabetes was uncontrolled, plaintiff was noncompliant as to diet, smoking, and alcohol abuse. (T. 309–10). Plaintiff had a history of alcoholism, fibromyalgia, irritable bowel syndrome, reflux, anxiety, and depression, and Dr. Evans opined that he "[did] not see her working" or as "employable." (T. 309–10).

Psychologist Dr. David Funari examined plaintiff on January 5, 2005, at the request of the Commissioner, and diagnosed plaintiff with recurrent major depression (moderate) and generalized anxiety disorder. (T. 260–664). Dr. Funari concluded that while plaintiff's insight and judgment were impaired and she would "probably have difficulty getting along with certain types of supervisors and coworkers," plaintiff was able to understand and follow simple instructions, had a good attention span and short term memory, and was able to handle complex mental processes. (T. 263).

Plaintiff visited Caleo Counseling Services on February 4, 2005, and the licensed clinical social worker noted that plaintiff's appearance, behavior, orientation, memory, and intellectual functioning were within normal limits; her self care, self direction, social functioning and economic self-sufficiency were impaired by her mental conditions; but her activities of daily living and ability to concentrate were not impaired. (T. 351–59). No medical records exist indicating plaintiff ever returned to Caleo Counseling Services.

Dr. Michael Holland examined plaintiff on February 14, 2005, at the request of the Commissioner. (T. 265–71). He noted that plaintiff had a normal station and gait, could get on and off the stretcher, heel and toe walk, perform a deep knee bend, and hop on each foot independently. (T. 266). Dr. Holland found that plaintiff had a good range of motion in her spine and all extremities, normal fine motor coordination, and despite plaintiff's complaints, normal range of motion in all joints. (T. 266).

On March 2, 2005, Dr. Ann Herrick, a state agency medical consultant, assessed that plaintiff was either "not significantly limited" or "moderately limited" in all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (T. 292–93). Dr. Herrick noted that most of plaintiff's limitations were due to her physical problems, and she concluded that plaintiff could engage in work-related activities. (T. 292–93, 295).

**\*5** A nerve conduction study performed on March 1, 2005, revealed evidence of sensory neuropathy in the lower extremities. (T. 300–02). Physician's assistant Sherrill Pronto noted, at a follow-up visit, that plaintiff had years of uncontrolled diabetes and noncompliance, and was now experiencing increased complications. (T. 296). Plaintiff visited Queensbury Family Health on August 9, 2005, and a physical examination revealed that plaintiff could touch her toes and rotate her spine, despite her complaints of lower back pain. (T. 362). At a follow-up visit on September 27, 2005, the doctor noted that plaintiff stated that she did not think her alcohol use was affecting her gastrointestinal issues, but her doctor strongly advised her to stop drinking. (T. 361).

### C. Time Period After Date Last Insured

Notes from a routine visit to Queensbury Family Health on August 24, 2006, indicate that plaintiff did not test her blood sugar regularly, had not followed up with her endocrinologist, and was complaining of lower back pain. (T. 381). X-rays on August 28, 2006, revealed no acute fracture or subluxation, but did show some sclerotic changes. (T. 527). An MRI conducted on September 10, 2006, revealed no abnormality to explain plaintiff's complaints of pain. (T. 532).

On September 15, 2006, Dr. Stratton completed a Medical Source Statement of Ability to Do Work–Related Activities and indicated that plaintiff should have limited exposure to temperature extremes, dust, humidity, hazards, fumes, odors, chemicals, and gases. (T. 388). Dr. Michelle Antiles completed a Medical Source Statement of Ability to Do Work–Related Activities on October 12, 2006, and indicated limitations based on diagnoses of fibromyalgia, left shoulder surgery and tendonitis, right index finger trigger finger, diabetic peripheral neuropathy, bilateral carpal tunnel syndrome and cubital tunnel syndrome. (T. 418).

Dr. Sydney R. Hochman, plaintiff's chiropractor, completed a Medical Source Statement of Ability to Do Work–Related Activities on December 18, 2006, indicating limitations based on diagnoses of polymyalgia rheumatica, median and ulnar neuropathies, chronic neck and lower back pain, insulin-dependent diabetes, and chronic right knee pain. (T. 400). Dr. Hochman completed another Physical Capacities Evaluation on October 10, 2007, stating that plaintiff had been totally disabled since January 2001. (T. 429–31).

On May 22, 2008, Dr. Alexander–Decker, plaintiff's endocrinologist, completed a Physical Capacities Evaluation, finding that plaintiff had been totally disabled since March 2007. (T. 732–34). Dr. Aaron Satloff, a non-examining medical expert in psychiatry, assessed plaintiff's mental functioning at the Commissioner's request on June 16, 2008. (T. 780–87). Dr. Satloff concluded that plaintiff had mild restriction of Activities of Daily Living, mild difficulties in Maintaining Social Functioning, moderate difficulties in Maintaining Concentration, Persistence or Pace, and found no episodes of decompensation. (T. 781)

 **\*6** Dr. Stratton completed a Physical Capacities Evaluation on June 24, 2008, at the request of plaintiff's attorney (T. 777–78). Plaintiff visited Dr. Stratton in 2008 and 2009, reporting pain in her hips and knee after a fall, and x-rays performed March 26, 2009 revealed early degenerative changes in both hip joints, but no fracture or focal bony lesion. (T. 810–21). An x-ray of plaintiff's knee performed on March 26, 2009 showed no fracture, focal bony lesion, or arthritic changes. (T. 815). Another Physical Capacities Evaluation was completed by Dr. Gary Poster on February 9, 2010. (T. 17–18).

## V. TESTIMONY and NON–MEDICAL EVIDENCE

Born in 1963, plaintiff was 42 years old on the date last insured. (*See* T. 888, 948). Plaintiff graduated from high school, and worked as a custodian for 12 years, a copy machine operator for two months, and a motel chambermaid for three months. (T. 141, 147, 890–92). In a November 2004 function report, plaintiff reported that she showered, dressed, and cared for her personal needs on a daily basis. (T. 150). Plaintiff also indicated that she went outside daily, was able to drive, and walked 200 yards to the bus stop three times per week. (T. 152, 158). Plaintiff went camping and fishing a few times per year, and she enjoyed watching television and reading. (T. 153). Plaintiff socialized with her family and reported no difficulties getting along with people in authority. (T. 153, 155). She could manage finances, but had difficulty concentrating and following instructions on "bad day[s]." (T. 153, 155). Plaintiff indicated she suffered from stabbing, aching pain over her entire body, which she treated with Ultram, Flexeril, Soma, Advil, Ben Gay, a heating pad, a transcutaneous electrical nerve stimulation (TENS) unit, and chiropractic treatment. (T. 154, 157–58; *see also* T. 881–83).

Plaintiff testified at hearings before an ALJ on August 15, 2006, (T. 864–884), and on October 21, 2008, (T. 887–935). Plaintiff testified that she lived with her husband in a second floor apartment. (T. 873–74, 888–89). She testified that she has provided daycare for her grandson since April 2006, and has received payment from the county for this work. (T. 880, 904). Plaintiff testified that she watches her grandson by herself for about two and a half to three and a half hours per day during the week. (T. 904). Occasionally, she watches him on weekends for a longer period of time. (T. 904).

Plaintiff testified that she vacuumed, washed dishes, dusted, helped her husband with the cooking, and helped do laundry in the downstairs laundry facility. (T. 874–75, 905–06). Plaintiff testified that she smoked a pack of cigarettes per day, and prior to April 2006, drank six beers per day. (T. 872). She testified that in 2005, she tested her blood sugar and used insulin injections to stabilize it, but still experienced daily fluctuations that caused dizziness, sweating, and numbness. (T. 896–99). Plaintiff also testified that she suffered from irritable bowel syndrome (IBS), fibromyalgia, and depression in 2005. (T. 900–01).

**\*7** Plaintiff testified that from 2004 through 2006, she received sporadic mental health treatment at the Warrensburg Health Center, Glens Falls Behaviorial Health Center, and the Caleo Center. (T. 913–14). Plaintiff estimated that she could sit for half an hour, stand for up to 45 minutes, and lift up to 10 pounds. (T. 911).

Vocational Expert (VE) Peter Manzi testified at the October 2008 hearing. (T. 918–34). The ALJ asked the VE to consider a hypothetical younger individual, with a high school education and the same past relevant work as plaintiff, who could perform light work, could climb, stoop, crouch, crawl, kneel or balance only occasionally, and could stand or sit for one hour before needing to change positions. (T. 925–26). The ALJ added that the hypothetical person would need to avoid respiratory irritants, and would be limited to simple, low-stress work, with no intensive interaction with the public and coworkers. (T. 926). The VE testified that such a person could perform plaintiff's past relevant work as a photocopy machine operator, and could also perform the jobs of "collator operator" or "laundry sorter," which both existed in significant numbers in the national and local economies. (T. 926–27). The VE testified that if the person could only reach occasionally, he or she could not perform those jobs, but could perform the job of "investigative dealer accounts[4]" or "surveillance system monitor." (T. 928–30).

## VI. ALJ'S DECISION
The ALJ found that plaintiff has the following "severe" impairments: diabetes mellitus, status post carpal tunnel release, status post cubital tunnel release, left shoulder surgery, asthma, depressive disorder and history of alcohol abuse. (T. 941). However, the ALJ found that none of these impairments, singly or in combination, rose to the severity of a listed impairment. (T. 942).

The ALJ then determined plaintiff's residual functional capacity, finding that plaintiff could still perform light work, with only occasional stooping, climbing, crouching, crawling, kneeling, and balancing. (T. 944). In addition, the ALJ found that plaintiff must have the option to sit or stand for one hour, and must not be exposed to high concentrations of dust, smoke, fumes, chemicals, noxious gasses, or extremes of temperature or humidity. (T. 944). The ALJ found that plaintiff is capable of performing only simple work that is at the low end of the stress continuum, avoiding intensive interaction with the public or coworkers. (T. 944). The ALJ found that plaintiff's statements as to the intensity, persistence, and limiting effects of her pain and mental impairments were not completely credible. (T. 944–45).

The ALJ gave significant weight to the opinions of medical expert Dr. Satloff, consultative psychiatric evaluator Dr. Funari, and non-examining reviewing psychologist Ann Herrick, Ph.D. (T. 947). The ALJ noted that Dr. Satloff is a board-certified psychiatrist, and he reviewed the entirety of plaintiff's medical records for the time at issue. (T. 947). The ALJ found that Dr. Satloff's opinion was not contradicted by evidence of equal weight, and was supported by objective medical evidence. (T. 947). The ALJ found that Dr. Funari's opinion was consistent with his psychiatric evaluation of plaintiff and was not contrary to the objective evidence in the record. (T. 947). The ALJ found that Dr. Herrick's opinion was supported by the objective evidence in the record, as well as the opinion of the consultative examiner, Dr. Funari. (T. 947).

**\*8** The ALJ considered the opinion of treating chiropractor, Sidney Hochman, DC, but noted that while a chiropractor's opinion may be considered, a chiropractor is not considered a medical expert under the regulations. (T. 947). The ALJ also found that Dr. Hochman's opinion was not supported by the objective evidence in the record. (T. 947).

The ALJ also considered and gave some weight to the opinions of functional capacity evaluators Dr. Philip Gara, M.D. and Kathy Krueger, PT. (T. 947). The ALJ found that the conclusions of the functional capacity evaluators were too limiting, and found that the evidence taken as a whole indicated that plaintiff could perform a wide range of light work.

The ALJ gave some weight to Dr. Christine Alexander Decker, plaintiff's treating physician from 2005 to the then-current date of April 11, 2008. (T. 948). The ALJ found that Dr. Decker's opinion that plaintiff has been disabled since March 2007 affirmatively showed that plaintiff was not under disability prior to the expiration of her date last insured. (T. 948).[5] The ALJ also noted that despite her history of depression going back to her childhood, plaintiff maintained employment for many years, and apparently did not display any psychiatric symptoms in the workplace. (T. 948).

The ALJ found that given her residual functional capacity, plaintiff was unable to perform any past relevant work, and that plaintiff's limitations prevented her from performing a full range of light work. (T. 948, 950). The ALJ, thus, consulted a VE. (T. 950). Based on the testimony of the VE, the ALJ concluded that plaintiff could successfully adjust to other work that existed in significant numbers in the national economy. (T. 950). The ALJ thus found that plaintiff was not under a disability from July 27, 2004 (the date of the prior determination that plaintiff was not disabled), through December 31, 2005 (the date last insured). *Id.*

## VII. ANALYSIS

Plaintiff argues that the ALJ incorrectly found that plaintiff could perform a limited range of light work, based both on medical findings and upon a rejection of any of the plaintiff's statements to the contrary. (Pl.'s Mem. 10–23).

### A. Residual Functional Capacity (RFC)/Treating Physician

#### 1. Applicable Law

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (citing *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990)). An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities. Martone v. Apfel,* 70 F.Supp.2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d Cir.1984); *LaPorta v. Bowen,* 737 F.Supp. at 183; *Sullivan v. Secretary of HHS,* 666 F.Supp. 456, 460 (W.D.N.Y.1987)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue,* 5:09–CV–1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug.17, 2010) (citing Social Security Ruling (SSR) 96–8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *7).

**\*9** While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and *not inconsistent with other substantial evidence. See Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002); 20 C.F.R. § 416.927(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999).

#### 2. Analysis

In this case, the ALJ found that plaintiff could perform a limited range of light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). The ALJ also found additional limitations, including that plaintiff could perform only occasional stooping, climbing, crouching, crawling, kneeling, and balancing; she required a sit-stand option; she could perform only simple, low-stress work, with limited interaction with the public or coworkers; and she should avoid exposure to respiratory irritants or extreme temperatures and humidity. (T. 944).

The medical evidence from the relevant time period supports the ALJ's finding that plaintiff was capable of light work with the additional limitations. As the ALJ noted (T. 947), the functional capacity evaluators, Dr. Philip Gara and Kathy Krueger, PT, examined plaintiff on October 25, 2004, and concluded that plaintiff could sit for four and a half to five hours per day, with changes in position every 45 minutes, could stand two to three hours per day, with changes of position every 15 minutes, and could walk three to four hours per day and could occasionally lift and carry 10 pounds and frequently lift 7 pounds. (T. 233–34). Dr. Gara and PT Krueger also noted that while plaintiff reported pain along her groin, legs, hips, lower back, and upper extremities, "[p]ain behaviors were present, but there was an absence of objective signs of discomfort." (T. 233). They stated

Gill v. Astrue, Not Reported in F.Supp.2d (2011)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 126 of 153
2011 WL 4352410

that "[plaintiff] demonstrated self-limiting behaviors *but* reports *not* [6] being very active at home and had fear of increasing discomfort." (T. 233) (emphasis added). The substance of the ALJ's opinion indicates that he gave some weight to Dr. Gara and PT Krueger's report, but found that because of the contradictory nature of plaintiff's behavior noted therein, the report's conclusion—that plaintiff could perform sedentary work—was too limiting and not fully representative of plaintiff's RFC. (*See also* T. 263, 266, 874–75).

The ALJ relied on other medical evidence which supported his conclusion that plaintiff could perform certain light work, with additional limitations. Plaintiff saw Dr. Douglas Kirkpatrick on November 23, 2004, complaining of hip pain. (T. 241). Dr. Kirkpatrick noted that plaintiff had mild pain with range of motion through the hips, but X-rays only revealed very early mild arthritis of the right hip with mild lateral spurring. (T. 241). Dr. Kirkpatrick did not see anything he thought required treatment related to her hips or knees at that time. (T. 241).

*10  Dr. Michael Holland saw plaintiff at the Glens Falls Hospital Center for Occupational Health as part of a New York State Disability Examination on February 14, 2005. (T. 265–67). Dr. Holland noted that plaintiff had a history of fibromyalgia with multiple musculoskeletal complaints, but indicated that plaintiff's station and gait were normal, and she got up and down off a stretcher without difficulty. (T. 266–67). The range of motion in plaintiff's cervical spine, lumbar spine, both shoulders, both elbows, both wrists, both knees and both ankles was normal, her motor strength was 5/5, and her fine motor coordination was normal. (T. 266). Plaintiff could walk on her heels and toes, do a deep knee bend, and hop on each foot independently. (T. 266–67). X-rays taken in August 2006 revealed no acute fracture or pathologic subluxation, while mild osteophytic endplate spurring throughout the lumbar spine was noted. (T. 527). An MRI performed on September 10, 2006, revealed no abnormality or visible nerve root impingement. (T. 532). In addition, Dr. Holland noted that plaintiff had asthmatic bronchitis, but found no wheezing during a chest exam and plaintiff's spirometry was normal, despite her continued smoking. [7] (T. 267). Dr. Holland's report strongly supports the ALJ's finding that plaintiff was capable of a limited range of light work.

As discussed above, plaintiff's treating physician, Dr. Evans, opined in late 2004 that he "[did] not see her working" or as "employable." (T. 309–10). The Appeals Council appropriately found that Dr. Evans' conclusion was not properly supported by objective findings (T. 9), in that the doctor merely recited a litany of plaintiff's medical conditions, without any discussion of how they effected her ability to work.

The ALJ also discussed evidence regarding plaintiff's mental health that supported his RFC finding. David Funari, Ph.D., conducted a consultative psychiatric examination on January 5, 2005 diagnosing plaintiff with recurrent major depression (moderate) and generalized anxiety disorder. (T. 260). Dr. Funari assigned a GAF [8] of 54 based on plaintiff's psychological problems and a GAF of 41 based on both psychological and physical problems. (T. 263). Dr. Funari noted that plaintiff's insight and judgment were impaired, and she would "probably have difficulty getting along with certain types of supervisors and coworkers." He concluded, however that plaintiff was able to understand and follow simple instructions, had a good attention span and short term memory, and was able to handle complex mental processes. (T. 263).

Dr. Satloff, a non-examining board-certified psychiatrist, reviewed plaintiff's medical records, answered interrogatories, and completed a Medical Source Statement of Ability to Do Work–Related Activities (Mental) dated June 16, 2008. (T. 780–87). Dr. Satloff concluded that plaintiff had no limitations to understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions. (T. 785). He noted that plaintiff had mild limitations in understanding and remembering complex instructions and moderate limitations to carrying out complex instructions and making judgments in complex work-related decisions. (T. 785). Dr. Satloff indicated that plaintiff had no limitations to interacting appropriately with the public, supervisors, and coworkers, and had mild limitations to responding appropriately to usual work situations and to changes in a routine work setting. (T. 786).

*11  Plaintiff argues that Dr. Satloff's report should be rejected due to a lack of basis for his conclusions. (Pl.'s Br. 14). The ALJ is entitled to rely upon the consultative physician's opinion, particularly when there is no contradictory medical evidence in the record. *Edwards v. Astrue*, No. 5:07–CV–898, 2010 WL 3701774, at *11 (N.D.N.Y. Sept. 16, 2010) (citing *Mongeur v.*

*Heckler,* 722 F.2d 1033, 1039 (2d Cir.1983); *Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995)). Dr. Satloff properly relied on Dr. Funari's report and the body of the record as the sources of evidence for his conclusions, and the ALJ gave appropriate weight to Dr. Satloff's findings. (T. 782).

Plaintiff testified that she has never been psychiatrically hospitalized. (T. 913). She recalled attending about four therapy sessions each from the Warrensburg Health Center and Glens Falls Behavioral Health at different times near 2004. (T. 913–14).

Plaintiff testified that she also went for mental health treatment at the Caleo Counseling Services, again only about four times before she stopped going back. (T. 913–14). The records from Caleo Counseling Services indicate that plaintiff suffered from depression, and the therapist assessed a GAF of 40 [9] . (T. 356–58). However, the Caleo report dated February 4, 2005, indicate that plaintiff's appearance, behavior, orientation, memory and intellectual functioning were within normal limits. (T. 353). Plaintiff also had no functional limitations in her daily living activities or her ability to concentrate. (T. 354). The record indicates that the focus of plaintiff's counseling treatment would be to "improve level of functioning," and her discharge criteria were "develop healthy coping skills," and "stabilize moods." (T. 357). The therapist's sole stated treatment objective was that plaintiff was to make one positive statement per session during the course of treatment. (T. 358). All of these observations suggests a prognosis more positive than the reported GAF score would indicate. Based on all the other evidence in the record relating to plaintiff's mental health, the ALJ correctly accorded significant weight to Dr. Satloff's report.

Plaintiff argues that the ALJ should have given greater weight to Dr. Alexander–Decker, Dr. Stratton, Dr. Welch, and Dr. Hochman. [10] (Pl.'s Br. 17). Dr. Alexander–Decker completed a "degree of disability form and a "physical capacities evaluation" on May 22, 2008, and indicated that she began treating plaintiff in July 2005, and that, in her opinion, plaintiff was completely disabled as of March 2007. (T. 732). Because Dr. Alexander–Decker's assessment of functional capacities did not apply to the relevant time period, the ALJ found that Dr. Christine Alexander–Decker's opinion that plaintiff has been disabled since March 2007 was further evidence of the ALJ's conclusion that plaintiff was not disabled prior to the expiration of her date last insured. [11] (T. 948). The ALJ properly gave some weight to Dr. Alexander–Decker's opinion.

**\*12** Dr. Stratton completed a "physical capacities evaluation" dated June 24, 2008, to which the ALJ did not assign a particular weight. (T. 944–48). This report is dated over two years after the date last insured, and treatment notes dated the same day indicate that plaintiff complained of diffuse muscular tenderness, but that her grip was "4/5" and her strength in all four extremities was "4+/5 ." (T. 801–02). Clearly, Dr. Stratton's opinion did not address plaintiff's condition during the relevant time period and did not merit controlling weight.

Dr. Welch treated plaintiff from August 2, 1991, to May 11, 1995. [12] (T. 403–16). Dr. Todd R. Jorgenson, who also works in Dr. Welch's office, saw plaintiff on February 16, 2001. [13] (T. 425–26). Another doctor in Dr. Welch's office, Dr. Michelle Antiles, saw plaintiff on May 2, 2001 (T. 421–24), and again on October 12, 2006, when she filled out a "Medical Source Statement of Ability to Do Work–Related Activities (Physical)." [14] (T. 417–20). Plaintiff argues that the 2006 report should be given controlling weight. (Pl.'s Br. 17). However, the report is dated well after the relevant period and gives no explanation for its conclusions other than a list of diagnoses: "fibromyalgia, [left] shoulder surgery/tendonitis, [right] index finger trigger finger, diabetic peripheral neuropathy, [bilateral carpal tunnel syndrome] and cubital tunnel." (T. 418). The ALJ was correct in not assigning Dr. Welch's prior records or the October 12, 2006 report controlling weight.

Chiropractor Sydney R. Hochman reported that he treated plaintiff from September 1994 through October 2007, but the only record included is a letter dated October 3, 2007, indicating his conclusion that plaintiff was totally disabled as of January 2001. (T. 429). Dr. Hochman also completed a "Physical Capacities Evaluation" dated October 10, 2007, a fill-in-the-blank form. (T. 430–31). The ALJ found that Dr. Hochman, as a chiropractor, is not an acceptable medical source under the regulations, and thus not a treating source. 20 C.F.R. §§ 404.1513, 404.1502. Therefore, his opinion was not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). In addition, because Dr. Hochman did not indicate how frequently he treated plaintiff, when he last saw plaintiff, and whether the conclusions on the October 10, 2007 form were based on the relevant period, the ALJ appropriately

considered Dr. Hochman's opinion, but did not grant it controlling weight. As discussed above, substantial evidence exists in the record that supports the ALJ's conclusion that plaintiff was capable of a limited range of light work.

**B. Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' " *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (quoting *Gallardo v. Apfel,* No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan,* No. 96–CV–1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

**\*13** First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

The ALJ noted that plaintiff cares for her grandson three hours per day for five days a week, totaling 15 to 20 hours per week, which plaintiff testified she had been doing for two years prior to the October 21, 2008 hearing. (T. 945; *see* T. 912). However, plaintiff also testified that she had stopped working at her custodial job due to her pain. (T. 892–94). Plaintiff also testified that her diabetes caused her to quit her job in 1999 (T. 894), but she had been diagnosed with diabetes in 1980, and thus all her time working as a custodian was as a Type I diabetic. (T. 894).

The ALJ noted that while plaintiff saw a physician a few times for mental health treatment prior to 1999 (T. 945; *see also* T. 901–02, 913), and received a few therapy sessions at different times from the Warrensburg Health Center, Glens Falls Behavioral Health, and the Caleo Center (T. 945; *see also* T. 913–14), she has never been psychiatrically hospitalized (T. 945; *see also* T. 913), and was not on any medication for depression at the time of the October 21, 2008 hearing. (T. 901). Plaintiff testified that she quit drinking alcohol in April 2006, but drank an average of five to six beers per day before then. (T. 914). The ALJ also noted that plaintiff testified she never had legal problems or work problems as a result of her alcohol abuse. (T. 945; *see also* T. 914–15).

It is clear that plaintiff suffers from pain, but as the evidence discussed above indicates, her pain does not preclude plaintiff from performing a limited range of light work. She has continually provided care for her grandson, and while she cannot do everything at home, she is capable of doing many household chores and taking care of herself. (T. 263, 266, 874–75). Thus, the ALJ's finding that plaintiff's statements as to the intensity, persistence, and limiting effects of her pain and mental impairments are not completely credible is supported by substantial evidence.

**C. Vocational Expert**

**\*14** Because the ALJ found the plaintiff was unable to perform her previous work, the ALJ proceeded to Step 5 of the Commissioner's sequential analysis. Step 5 requires the ALJ to determine whether the plaintiff's impairments prevent her from

adjusting to a type of work different from what she has done in the past. 20 C.F.R. § 404.1520(a)(v). The burden of proof at this step shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982), 20 C.F.R. § 404.1560(c)(2). The ALJ may, under the appropriate circumstances, rely on the "Medical Vocational Guidelines," contained in 20 C.F.R. Part 404, Subpt. P, App. 2, known as "The Grids." *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y.1996) (footnotes omitted). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by her exertional impairments, the ALJ may be required to consult a vocational expert (VE). *Bapp v. Bowen,* 802 F.2d 601, 606 (2d Cir.1986). In this case, the ALJ utilized a VE.

If the ALJ does use a VE, he must present the VE with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue,* 358 F. App'x 274, 276 (2d Cir.2009). Where the hypothetical is based on an ALJ's RFC analysis which is supported by substantial facts, the hypothetical is proper. *See id.* at 276–277. The ALJ is not required to pose a hypothetical that includes non-severe impairments. *See Dumas v. Schweiker,* 712 F.2d 1545, 1554 n. 4 (2d Cir.1983). A plaintiff will be found not disabled if the ALJ determines the plaintiff can perform work that exists in the national economy regardless of whether work exists in the immediate area in which plaintiff lives, a specific job vacancy exists for plaintiff, or plaintiff would be hired if she applied. 20 C.F.R. §§ 404.1566(a)(1)-(a)(3).

In the section discussing the Medical Vocational Guidelines, the ALJ found that plaintiff's additional limitations prevented her from performing a full range of light work. (T. 950). Thus, the ALJ consulted a VE to testify whether jobs existed in the national economy for an individual with the plaintiff's age, education, work experience, and residual functional capacity. (T. 950). The VE testified that plaintiff would have been able to perform the requirements of representative occupations such as collator operator with 185 such jobs in the region and 48,496 such jobs in the national economy; photocopy machine operator with 97 such jobs in the region and 22,418 such jobs in the national economy; and laundry sorter with 327 such jobs existing in the region and 131,274 such jobs in the national economy. [15] (T. 926–27).

**\*15** The ALJ then added the restrictions that plaintiff could only occasionally reach in all directions and could not perform a job requiring constant fingering. (T. 928). The VE testified that plaintiff would still have been able to perform the requirements of representative occupations such as "investigator dealer accounts," with 160 such jobs in the region and 36,000 such jobs in the national economy; and "surveillance system monitor," with 88 such jobs in the region and 11,964 in the national economy. (T. 929–30).

As discussed above, the ALJ's RFC determination was supported by substantial evidence, and thus, the hypothetical the ALJ posed to the vocational expert was proper, based on the ALJ's RFC assessment. The ALJ properly applied the correct legal standards, and his findings were supported by substantial evidence from the record.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4352410

Gill v. Astrue, Not Reported in F.Supp.2d (2011)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 130 of 153
2011 WL 4352410

## Footnotes

1    Plaintiff failed to number the pages in her Memorandum of Law (Dkt.16). For ease of reference, the court will cite to pages as assigned by the Case Management/Electronic Case File (CM/ECF) system.

2    The previous ALJ decision dated July 26, 2004, found that plaintiff was not disabled based on the same impairments. Because plaintiff failed to appeal that decision, the ALJ was precluded from considering plaintiff's disability status prior to July 27, 2004. 20 C.F.R. § 404.957(c)(1). *See also Britton v. Astrue,* No. 5:06–CV–639, 2011 WL 2267587, at *13 (N.D.N.Y. June 7, 2011) (discussing administrative *res judicata* ); *Malave v. Sullivan,* 777 F.Supp. 247, 251 (S.D.N.Y.1991) (same); *Amato v. Bowen,* 739 F.Supp. 108, 111 (E.D.N.Y.1990) (same).

3    Additional relevant details from the medical evidence are discussed below in connection with the court's analysis of the issues in dispute.

4    The VE testified that this job is similar to an inventory clerk. (T. 929).

5    The ALJ did not consider a treating source opinion from Dr. Robert Lapp Evans, from late 2004. (T. 309–10). On review, the Appeals Council stated that the ALJ should have considered the treating doctor's medical opinion. However, the Appeals Council evaluated Dr. Evans' opinion and concluded that it merited little weight because it was unsupported. (T. 9)

6    The ALJ's decision incorrectly stated that Dr. Gara and PT Krueger indicated that plaintiff reported "being very active at home." (T. 948). The substance of Dr. Gara and PT Krueger's report indicates that plaintiff reported pain, and avoided activities she thought would increase or cause pain. The court notes that other records indicate plaintiff's level of activity at home. (T. 263, 266, 874–75).

7    A breathing problem that is aggravated by plaintiff's own conduct is not disabling. *See Mongeur v. Heckler,* 722 F.2d 1033, 1039 (2d Cir.1983).

8    The GAF is a scale that indicates the clinician's "judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text revision 2000) (DSM–IV–TR). The GAF scale ranges from 0 to 100; GAF scores from 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning. A GAF of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. A GAF of 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM–IV–TR at 34.

9    A GAF of 31–40 indicates some impairment in reality testing or communication (speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM–IV–TR at 34.

10   Plaintiff does not mention Dr. Poster's report dated February 9, 2010. Because the report is dated years after the date last insured, and Dr. Poster gives no other explanation for his conclusions other than "patient has diabetic neuropathy [and] peripheral vascular disease," it is entitled to little weight.

11   As to Dr. Alexander Decker's opinion that plaintiff was disabled, the ALJ is entitled to reject conclusions of disability made by other sources because it is the province of the Commissioner to make the determination of whether an individual is "totally disabled." 20 C.F.R. §§ 404.1527(e), 416.27(e); *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)). This is true

even if the individual stating his or her opinion of "total disability" is a medical doctor. *Id.; See also Michels v. Astrue,* 297 F. App'x 74, 76 (2d Cir.2008).

12    Plaintiff argues that Dr. Welch's opinion should be given controlling weight. (Pl.'s Br. 17). However, it appears from the medical records that the last time Dr. Welch saw plaintiff was in May 1995, almost ten years before the relevant period of July 24, 2004—December 31, 2005. (T. 403–16).

13    The record indicates that Dr. Jorgenson saw plaintiff once, three years before the relevant period. (T. 425–26).

14    It appears from the record that Dr. Antiles saw plaintiff twice: once in May 2001 for a Social Security evaluation and one other time, five years later, when she completed the October 12, 2006 "Medical Source Statement of Ability to Do Work–Related Activities (Physical)." (T. 417–24). Plaintiff attributes the October 12, 2006 form to Dr. Welch, but defendant correctly points out that Dr. Antiles actually completed the form, as the same signature is on the October 12, 2006 form and the May 2001 letter signed by Dr. Antiles. (*See* T. 420, 424).

15    The numbers above are taken from the ALJ's decision. (T. 950). They do not match the numbers originally stated by the VE. The numbers were recalculated by taking 88.4% of the actual numbers provided by the VE to obtain the appropriate number for the relevant time period, as explained by the VE later in his testimony. (T. 930–31). The VE gave the ALJ figures related to the time of the hearing, as he had not had time to calculate the numbers relating to the relevant time period. (T. 930). The VE instructed the ALJ that the numbers for the relevant time period could be calculated by taking 88.4% of the current figures given in his testimony. (T. 931). The ALJ then used these recalculated figures in his decision. (T. 950).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4352719
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lynne GILL, Plaintiff,

v.

Michael J. ASTRUE, Defendant.

No. 1:10–CV–985 (MAD/ATB).
|
Sept. 15, 2011.

**Attorneys and Law Firms**

Office of Stephen J. Mastaitis, Jr., Stephen J. Mastaitis, Jr., Saratoga of Counsel, Springs, NY, for Plaintiff.

Social Security Administration, Office of the General Counsel, Suzanne M. Haynes, Esq., Thomas C. Gray, Esq., Special Assistant U.S. Attorney, of Counsel, New York, NY, for Defendant.

*ORDER*

MAE A. D'AGOSTINO, District Judge.

 **\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on the 29th day of August 2011. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

**ORDERED** that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The Commissioner is granted judgment on the pleadings and Plaintiff's motion for judgment on the pleadings is denied.

3. The Clerk is directed to close the case and enter judgment accordingly.

4. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4352719

End of Document                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 133 of 153

2015 WL 4251163
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rebecca Jane KIMBALL, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:14–CV–0698 (LEK/ATB).
|
Signed July 13, 2015.

**Attorneys and Law Firms**

Steven R. Dolson, Esq., for Plaintiff.

Peter W. Jewett, Special Asst. U.S., for Defendant.

*ORDER*

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a Report–Recommendation filed on June 16, 2015, by the Honorable Andrew T. Baxter, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 15 ("Report–Recommendation"). Plaintiff Rebecca Kimball ("Plaintiff") timely filed objections. Dkt. Nos. 16 ("Objections"); 16–1 ("Memorandum").

Within fourteen days after a party has been served with a copy of a magistrate judge's reportrecommendation, the party "may serve and file specific written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). If a party objects to a reportrecommendation, "the Court subjects that portion of the report-recommendation to a *de novo* review." *Williams v. Roberts,* No. 11–CV–0029, 2012 WL 760777, at \*3 (N.D .N.Y. Mar. 7, 2012) (citing FED. R. CIV. P. 72(b)(2) and 28 U.S.C. § 636(b)(1)(C)); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court should review that aspect of a report-recommendation for clear error. *Barnes v. Prack,* No. 11–CV–0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); *Farid v. Bouey,* 554 F.Supp.2d301, 306–07 & n.2 (N.D.N.Y.2008); see also *Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

Plaintiff objects to the Report–Recommendation's finding that the Administrative Law Judge's decision is supported by substantial evidence. Mem. at 2–3. However, Plaintiff's Objection is a mere reiteration of the arguments made in Plaintiff's appeal before Judge Baxter. *Compare id., with* Dkt. No. 12 ("Brief"). Accordingly, the Court has reviewed the entirety of the ReportRecommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 15) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice;** and it is further

**ORDERED,** that the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. *PROCEDURAL HISTORY*

 **\*2** On August 24, 2011, plaintiff filed applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging disability beginning June 27, 2009. (Administrative Transcript ("T") at 10, 185). The applications were denied initially on February 10, 2012. (T. 60–69). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on December 11, 2012. (T. 24–59). On January 29, 2013, ALJ Gregory M. Hamel found plaintiff was not disabled. (T. 7–23). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 18, 2014. (T. 1–4).

## II. *GENERALLY APPLICABLE LAW*

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers

such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

**\*3** In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue,* 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r,* 683 F.3d 443, 448 (2d Cir.2012); 42 U.S.C. § 405(g)). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Talavera v. Astrue,* 697 F3d 145, 151 (2d Cir.2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "—even more so than the 'clearly erroneous standard.' " *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart,* 343 F.Supp.2d 218, 224 (S.D.N.Y.2004); *Fuller v. Astrue,* No. 09–CV–6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. *FACTS*

Plaintiff is a 42 year old woman who lives with her two children, ages 13 and 8, and her boyfriend.[1] (T. 29, 32). Plaintiff has a general equivalency degree. (T. 29). Plaintiff's last employment was as an assembler at a facility that manufactured foggers and other insecticide sprayers. (T. 30). This assembly work varied from small items that required the use of tweezers to larger products that were assembled by hand. (T. 51). Plaintiff testified that none of the products being assembled weighed more than twenty pounds. (*Id.*). Plaintiff stated that she left this job in February 2008 due to complications from diabetes, which caused her to repeatedly miss work. (T. 30, 273). She has not worked since that time.[2] (T. 209).

In addition to her diabetes treatment, plaintiff was treated and was prescribed medication for a number of physical impairments, including high cholesterol, high blood pressure, fibromyalgia, back pain, and neuropathy. (T. 429). During the ALJ hearing, plaintiff testified to numbness in her hands, feet and legs, and pain which made it difficult to walk, stand, grip, and lift. (T. 33–34). At the time of the hearing, plaintiff had a history of medication non-compliance, and had quit prescribed physical therapy after three sessions because she felt it did not make her any better. (T. 16, 309, 311, 489).

**\*4** Plaintiff was also diagnosed with unspecified paranoid schizophrenia and schizoaffective disorder[3], and she had been taking Zoloft, an anti-depressant, for three months prior to the hearing. (T. 39, 442, 478–485). She testified that she had been hearing voices, and that she was going to be referred to a psychiatrist. (T. 46, 485). At the time of the hearing, plaintiff had never had any psychiatric hospitalization or counseling. (T. 46–48, 483).

Plaintiff testified that she could generally care for herself—sometimes with pain—and that she provided care for her children, including housekeeping, meal preparation, laundry and shopping. (T. 35). Plaintiff's sister often came over to help. (*Id.*). Plaintiff was able to drive, but testified that she only did so about twice a week due to frequent numbness in her hands, which made it difficult to control the car. (T. 37–38). She generally socialized with her family, including weekly outings with her mother, and chatted with neighborhood children from her front porch. (T. 36.41).

Further details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV. *THE ALJ'S DECISION*

The ALJ determined that plaintiff met her insured status through September 30, 2010, and that plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 27, 2009. The ALJ found that plaintiff had the following severe impairments at step two of the sequential evaluation: diabetes mellitus with neuropathy; fibromyalgia; hypertension; hyperlipidemia; and mental disorders diagnosed as schizoaffective disorder and paranoid schizophrenia. (T. 12). At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of any listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P., including Listing 12.04. (T. 13–14).

The ALJ found at step four of the analysis that plaintiff had the RFC to perform light work, except that plaintiff could only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. (T. 14). The ALJ found that plaintiff could not climb ladders and similar devices. (*Id.*) Plaintiff was able to frequently, but not constantly, do tasks requiring handling, reaching, and fingering. The ALJ determined that plaintiff could do routine and repetitive tasks only, and that she could not do tasks requiring more than occasional public contact and interaction. (*Id.*).

In making the RFC determination, the ALJ stated that he considered all of the plaintiff's symptoms, and considered the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. 404.1529 and 416.929" and Social Security Rulings ("SSRs") 96–4p and 96–7p. (*Id.*). Finally, the ALJ stated that he considered opinion evidence pursuant to 20 C.F.R. §§ 404.1527 and 416.929 and SSRs 96–2p, 96–5p, 96–6p, and 06–3p. (*Id.*). In doing so, the ALJ assigned significant weight to the opinions of consultative medical examiner Dr. Kalyani Ganesh, and consultative psychiatric examiner, Michael Alexander, Ph .D. (T. 17).

**\*5** Dr. Ganesh opined that plaintiff had no gross physical limitation in sitting, standing, walking, or use of the upper extremities. (T. 17, 432). Dr. Ganesh found that plaintiff's movements were "very brisk," and that she could do a full squat, had a normal stance, and exhibited full strength in the upper and lower extremities. (T. 17, 431–32). Dr. Ganesh noted plaintiff's wide range of daily activities, and described plaintiff's effort during the examination as "poor." (T. 431).

Dr. Alexander conducted a psychiatric exam of plaintiff and opined that she could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and learn new tasks. (T. 17, 441). He concluded that plaintiff may have difficulty performing some complex tasks independently due to her medical conditions, rather than her mental conditions. Dr. Alexander also concluded that plaintiff could make appropriate decisions, relate adequately to others, and appropriately deal with stress, and that plaintiff's mental impairments were not significant enough to interfere with her daily functioning. (*Id.*).

The ALJ also considered the opinion of the state psychiatric consultant, Dr. D. Mangold, who concluded that plaintiff appeared to be mentally capable of performing "simple competitive work" and described plaintiff's limitations as "not significant" or "moderate." (T. 17, 443–474). The ALJ assigned this opinion significant weight because it was consistent with the record as a whole. (T. 17).

After considering the evidence and plaintiff's testimony, the ALJ found that plaintiff was not fully credible with respect to the intensity, persistence, and limiting effects of her symptoms. (T. 15). In making the credibility determination, the ALJ considered the plaintiff's testimony in addition to the medical evidence. (T. 15–18).

At step four, the ALJ also determined that plaintiff's RFC would prevent her from performing her past relevant work. (T. 18). At step five, the ALJ relied upon the testimony of a vocational expert to conclude that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and determined that plaintiff was not disabled, based upon her age, education, and prior work experience. (T. 19).

## V. *ISSUES IN CONTENTION*

Plaintiff raises the following argument:

> 1. The ALJ failed to assess all severe impairments and include the true limiting effect of those impairments in the RFC determination, resulting in an RFC evaluation that is not supported by substantial evidence. (Pl.'s Br. at 3–5) (Dkt. No. 12).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. (Def.'s Br. at 3–7) (Dkt. No. 14). For the following reasons, this court agrees with the defendant and will recommend dismissing the complaint.

## *DISCUSSION*

## IV. *SEVERE IMPAIRMENT*

### A. Legal Standard

**\*6** The claimant bears the burden of presenting evidence establishing severity at step two of the disability analysis. *Briggs v. Astrue,* No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at \*3 (N.D.N.Y. Mar. 4, 2011) (Rep't.-Rec.), *adopted,* 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

The regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue,* No. 12–CV–6291, 2013 WL 5474210, at \*10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue,* No. 6:03–CV–521, 2008 WL 833968, at \*2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of " 'not severe' ... if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting SSR 85–28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment...." SSR 85–28, 1985 WL 56856, at *3. The Second Circuit has held that the step two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at step three through step five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue,* No. 5:10–CV–537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.,* No. 7:10–CV1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon,* 54 F.3d at 1031.

### B. Application

**\*7** The ALJ found that plaintiff had four severe physical impairments: diabetes mellitus with neuropathy; fibromyalgia; hypertension; and hyperlipidemia. (T. 12). The ALJ also found two severe mental impairments: schizoaffective disorder and paranoid schizophrenia. (*Id.*). Plaintiff argues that the ALJ erred by not finding that spondylolysis of the lumbar spine[4] and right rotator cuff tendonitis, each mentioned in plaintiff's medical records, also constituted severe impairments. (Pl.'s Br. at 3–5).

In support of this argument, plaintiff cites to March 27, 2009 medical imaging results which depicted spondylolysis and osteoarthritic changes in the lumbar spine. (T. 333). Plaintiff also cites treatment notes that include a diagnosis of right rotator cuff tendonitis, and described a decreased range of motion in plaintiff's right shoulder. (T. 294). Plaintiff also relies upon a surface EMG study that showed her right upper trapezius musculature "exhibited hyperactive muscle contraction rate." (T. 280). Plaintiff did not provide a Medical Source Statement from a treating physician. (T. 17).

In his decision, the ALJ acknowledged the diagnoses of right rotator cuff tendonitis and back pain. In addition, as will be discussed below, the ALJ analyzed the same medical imaging and treatment notes now relied upon by plaintiff, along with subsequent musculoskeletal examinations and Dr. Ganesh's consultative physical examination as part of his RFC assessment. (T. 16). Because the ALJ considered the impairments as part of his RFC analysis and did not deny plaintiff's claim at Step 2 of the sequential analysis, this court finds that any error by the ALJ in not finding plaintiff's spondylolysis and right rotator cuff tendonitis to be severe was harmless.

### VII. *RFC*

#### A. Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue,* No. 3:11–CV–1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (citing *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone,* 70 F.Supp.2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d

2015 WL 4251163

Cir.1984); *LaPorta v. Bowen,* 737 F.Supp. at 183; *Sullivan v. Secretary of HHS,* 666 F.Supp. 456, 460 (W.D.N.Y.1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and nonmedical evidence. *Trail v. Astrue,* No. 5:09–CV–l 120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96–8p, 1996 WL 374184, at *7).

### B. Application

**\*8** The ALJ found that plaintiff could perform light work except that plaintiff could only occasionally climb stairs, balance, stoop, kneel, crouch and crawl; could not climb ladders and similar devices; and could frequently do tasks requiring handling, reaching, and fingering. (T. 14). The ALJ also concluded that plaintiff was limited to routine and repetitive tasks only, and that she could not do tasks requiring more than occasional public contact and interaction. (*Id.*). Plaintiff argues that, in making this finding, the ALJ failed to properly weigh the medical evidence associated with plaintiff's diagnosed spondylolysis and right rotator cuff tendonitis. (Pl.'s Br. at 4–5). This court does not agree.

Plaintiff cites medical imaging results, plaintiff's documented complaints of lower back pain and associated numbness and tingling in her legs, and a September 15, 2009 positive straight leg raise test[5] as proof of the limitations imposed by plaintiff's spondylolysis. (Pl.'s Br. at 4). However, the ALJ considered each of these issues in his RFC assessment. While not specifically referencing spondylolysis, the ALJ spent a significant portion of his decision discussing patient's back pain, numbness and alleged mobility impairments. (T. 16–18). For example, the ALJ noted the September 2009 positive straight leg raise, but found that subsequent musculoskeletal examinations were "largely normal." (T. 16, 364, 370–71, 398, 480, 484, 486–91). The ALJ cited the diagnoses of chronic body pains, fibromyalgia, osteoarthritis, and peripheral neuropathy, and reviewed medical imaging which showed "only minimal osteoarthritis changes." (T. 16, 333, 348). During the hearing, the ALJ questioned plaintiff extensively about her back pain and neuropathy, and the impact those impairments have on her daily life. (T. 33–42). Plaintiff testified that her pain did not preclude her from performing a variety of daily activities, and that her pain medications helped with her symptoms. (T. 16).

The ALJ also relied upon the relevant medical opinion evidence, particularly the consultative physical exam. Dr. Ganesh found some limited range of motion in the lumbar spine, but noted that plaintiff showed poor effort during the exam. (T. 431–433). Dr. Ganesh's report also concluded that plaintiff had normal range of motion in all other joints, moved briskly, had a normal stance, and performed a full squat. (T. 16, 431).

This court concludes that the ALJ's RFC determination as it relates to spondylolysis is supported by substantial evidence. The only spondylolysis reference in the medical records described the condition as "minimal," and plaintiff offered no evidence that the condition increased in severity.[6] (T. 333). Subsequent physical exams focus most on plaintiff's fibromyalgia and diabetes, with limited references to back pain. (T. 298–302, 304–10, 478–85).

Similarly, the ALJ's assessment of plaintiff's right rotator cuff tendonitis was supported by substantial evidence. (T. 16–18). Plaintiff argues that the decreased range of motion and pain associated with this impairment caused a more restrictive limitation on plaintiff's ability to reach than set forth in the RFC, but cites no medical evidence to support this conclusion. (Pl.'s Br. at 5). In December 2009, plaintiff was diagnosed with right rotator cuff tendonitis by her treating physician, Dr. Morrell, but he found only a "slight decrease in internal rotation." (T. 294–95). Plaintiff cites a January 2010 progress note showing "hyperactive muscle contraction rate" in the "right upper trapezius musculature", but the same note describes plaintiff as having only "moderate muscle tension" at the start of physical therapy and that her left shoulder had more pain and tension than her right. (T. 280). Plaintiff's treating physicians and medical professionals attributed other instances of shoulder pain to fibromyalgia, not tendonitis. (T. 273, 487).

**\*9** The ALJ considered plaintiff's hearing testimony regarding her physical capabilities, including her shoulder and reaching ability. (T. 15–16, 42–45). He also considered the consultative exam of Dr. Ganesh, which found no gross physical limitations in plaintiff's upper extremities. (T. 432).

Kimball v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2015)

2015 WL 4251163

At best, plaintiff's complaint is premised upon a disagreement over how the ALJ resolved arguably conflicting evidence about plaintiff's back and shoulder problems. In the absence of a Medical Source Statement or other comprehensive opinion by a treating physician, the ALJ chose to rely upon the medical evidence which showed these impairments were less than severe, and the consultative examination which concluded that these impairments did not impose significant limitations on plaintiff's ability to perform light work. (T. 16). As stated above, it is the province of the ALJ to resolve conflicts in the evidence. *Galiotti v. Astrue,* 266 F. App'x 66, 67 (2d Cir.2008). In addition, the report of a consultative examiner may serve as substantial evidence upon which the ALJ may base his decision. *Herb v. Colvin,* No. 14–CV–156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin,* No. 13–CV–543A, 2014 WL 3866452, at *7 (W.D.N .Y. Aug. 6, 2014) (Rep't–Rec.)); *Simmons v. Comm'r of Soc. Sec.,* No. 13–CV–5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur,* 722 F.2d at 1039). Thus, the ALJ's determination that plaintiff can perform light work is supported by substantial evidence.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shah be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed June 16, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4251163

---

**Footnotes**

1    At the time of the hearing in December of 2012, plaintiff was 40, and her children were 11 and 6. (T. 32).

2    Plaintiff had a prior application for benefits denied by an ALJ. The onset date of June 29, 2009 in this proceeding corresponds to the day after the date of the previous ALJ decision. (T. 30–31, 203).

3    Schizoaffective disorder is a condition in which a person experiences a combination of schizophrenia symptoms and mood disorder symptoms, http://ww w.mayoclinic.org/diseases-conditions/schizoaffective-disorder/ basics/definition/ con–20029221

4    Spondylolysis is a defect in the connection between vertebrae that can lead to small stress fractures that can cause vertebrae to slip out of place, a condition called spondylolisthesis. http:// my.clevelandclinic.or g/health/ diseases_conditions/hic_your_back_and_neck/ hic_Spondylolysis

5    Positive straight leg raise results are indicative of a herniated disc. http://www.w ebmd.com/back-pain/medical-history-and-physical-exam-for -a-hemiated-disc.

6    The March 27, 2009 imaging report states that "[t]here is minimal Grade I spondylolisthesis at the L5–S1 level. There is bilateral spondylolysis at the same level. Minor spurring is seen anteriorly which is most severe at the L3–L4 level. No other significant abnormalities seen." (T. 333).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7223338

2016 WL 7223338

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Jamal WARREN, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

3:15-CV-1185 (GTS/WBC)

|

Signed 11/18/2016

**Attorneys and Law Firms**

LACHMAN & GORTON, 1500 East Main St., P.O. Box 89, OF COUNSEL: PETER A. GORTON, ESQ., Endicott, NY 13761-0089, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL–REGION II, 26 Federal Plaza–Room 3904, OF COUNSEL: TOMASINA DIGRIGOLI, ESQ., New York, NY 10278, Counsel for Defendant.

## REPORT and RECOMMENDATION

William B. Mitchell, Carter U.S. Magistrate Judge

 **\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 13.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Jamal Warren ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 10, 11.) For the reasons set forth below, it is recommended that Plaintiff's motion be denied and Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on August 26, 1993. (T. 207.) He completed high school with an individual education program ("IEP") diploma. (T. 324.) Generally, Plaintiff's alleged disability consists of mental illness, learning disability, right leg injury, poor vision, and speech impairment. (T. 233.) His alleged disability onset date is November 20, 2003. (T. 92.) He has no past relevant work.

### B. Procedural History

On January 7, 2013, Plaintiff applied for child's insurance benefits under Title II, and Supplemental Security Income ("SSI") under Title XVI, of the Social Security Act. (T. 92, 200.) Plaintiff's applications were initially denied, after which he timely requested a hearing before an Administrative Law Judge ("the ALJ"). On October 23, 2014, Plaintiff appeared before the ALJ, John P. Ramos. (T. 32-61.) On December 12, 2014, ALJ Ramos issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 8-31.) On September 14, 2015, the Appeals Council ("AC") denied Plaintiff's request for review,

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 143 of 153

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7223338

rendering the ALJ's decision the final decision of the Commissioner. (T. 1-4.) Thereafter, Plaintiff timely sought judicial review in this Court.

## C. The ALJ's Decision

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 13-26.) First, the ALJ found that Plaintiff had not yet attained age 22 as of April 1, 2012 and Plaintiff had not engaged in substantial gainful activity since April 1, 2012. (T. 13.) Second, the ALJ found that Plaintiff had the severe impairments of intellectual disability and Blount's disease status pose bilateral osteotomy. (T. 14.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 15-18.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of sedentary work. (T. 18.) [1] Specifically, the ALJ found that Plaintiff could lift and/or carry ten pounds occasionally, stand and/or walk for two hours in an eight-hour day and sit for six hours in an eight-hour day. (*Id.*) The ALJ determined that Plaintiff could understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact with others to the extent necessary to carry out simple tasks, handle reasonable levels of simple work-related stress in that he could make decisions directly related to the performance of simple work and handle usual work place changes and interactions associated with simple work. (*Id.*) Fifth, the ALJ determined that Plaintiff had no past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 24-25.)

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

**\*2** Plaintiff makes essentially three arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues the ALJ failed to account for Plaintiff's cognitive impairments in his RFC determination. (Dkt. No. 10 at 6-12 [Pl.'s Mem. of Law].) Second, Plaintiff argues that the ALJ failed to find that Plaintiff's condition met Listing 12.05C. (*Id.* at 12-16.) Third, and lastly, Plaintiff argues that the ALJ failed to consult with a vocational expert ("VE"). (*Id.* at 16-18.)

### B. Defendant's Arguments

In response, Defendant makes three arguments. First, Defendant argues that the ALJ properly considered and assessed Plaintiff's cognitive limitations. (Dkt. No. 11 at 6-10 [Def.'s Mem. of Law].) Second, Defendant argues that the ALJ properly found that Plaintiff's mental impairments did not meet section 12.05C of the Listings. (*Id.* at 11-12.) Third, and lastly, Defendant argues that the ALJ properly found that Plaintiff was not disabled as step five of the sequential evaluation process. (*Id.* at 13-15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 144 of 153

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7223338

Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

### IV. ANALYSIS

For ease of analysis, Plaintiff's arguments will be addressed out of order and in a consolidated manner.

### A. The ALJ's Step Three Determination

If an ALJ determines that a plaintiff has a severe mental or physical impairment at step two of the disability evaluation procedure, the ALJ must then determine whether the impairment meets the criteria of any impairment listed in Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii)(d), 416.920(a)(4)(iii)(d). The impairments listed in Appendix 1 are considered severe enough to prevent a plaintiff from doing any gainful activity. *Id.* at §§ 404.1525(a), 416.925(a). If a plaintiff's impairment, or combination of impairments, matches one listed in Appendix 1, and satisfies the duration requirement in 20 C.F.R. §§ 404.1509, 416.909, then the ALJ should generally find the plaintiff disabled without considering the plaintiff's age, education, and work experience. *Id.* at §§ 404.1520(d), 416.920(d).

To match an impairment listed in Appendix 1, a plaintiff's impairment "must meet all of the specified medical criteria" of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (citing 20 C.F.R. § 404 Subpt. P, App. 1). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* An impairment may also be "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria of any

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7223338

listed impairment." 20 C.F.R. § 404.1526(a). Although an ALJ may award benefits at step three, a plaintiff who fails to prove her impairment matches or equals one listed in Appendix 1 is not denied benefits, but rather, the ALJ must proceed to step four. *See id.* at §§ 404.1520(e), 416920(e).

At step three the ALJ determined that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of a Listing. (T. 15.) The ALJ determined that Plaintiff's mental impairment did not meet the criteria of Listing 12.05C. (*Id.*) The ALJ also reviewed the criteria of Listing 12.05D. (T. 16-17.) Listing 12.05 addresses intellectual disability; and claimants are per se disabled if the requirements of paragraphs A, B, C, or D are met. *see* 20 C.F.R. §§ 404.1525(a), 416.925(a).

Listing 12.05 requires, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.05. The requirements of paragraph C are met if the plaintiff has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Ultimately, the ALJ determined that Plaintiff did not meet Listing 12.05C because he did not have significant deficits in adaptive functioning. (T. 16.)

 **\*4** Plaintiff argues that the ALJ erred in his step three determination because Plaintiff has significantly subaverage general intellectual functioning and Plaintiff has deficits in adaptive functioning. (Dkt. No. 10 at 12-16 [Pl.'s Mem. of Law].)

The record contained numerous intellectual testing, including IQ testing. In 1999, Plaintiff completed the Slossom Full Range IQ test, the Kaufman Brief Intelligence test, and the Stanford Binet Intelligence Scale—Fourth Edition ("SB-IV"). (T. 337.) The Slossom test indicated a verbal score of 82 (low average), an abstract score of 70 (borderline), a quantitative score of 90 (average), a memory score of 76 (borderline), a performance score of 74 (borderline), and a full range score of 77 (borderline). (T. 337.) The Kaufman test indicated a vocabulary score of 82 (low average), a matrices score of 94 (average) and a composite score of 87 (low average). (*Id.*) The Stanford test indicated a verbal reasoning score of 80 (low average), abstract/visual reasoning score of 68 (extremely low), a quantitative reasoning score of 72 (borderline), a short term memory score of 84 (low average), and a partial test composite of 71 (borderline). (*Id.*)

In 2002, Plaintiff again completed intelligence testing. He completed the Wechsler Intelligence Scale for Children—Third Edition (WISC-III) and received a performance IQ score of 62 (extremely low). (T. 337.) He completed a Wechsler Individual Achievement Test—Second Edition (WIAT-II). (T. 338.) The WIAT-II indicated a word reading score of 66 (extremely low), a pseudo word decoding score of 66 (extremely low), a reading comprehension score of 62 (extremely low), a numerical operations score of 81 (low average), a math reasoning score of 62 (extremely low), a spelling score of 79 (borderline), and a written expression score of 72 (borderline). (*Id.*)

In 2005, Plaintiff completed more intelligence testing. He completed the Wechsler Abbreviated Scale of Intelligence (WASI), which indicated a full IQ of 58 (extremely low). (T. 338.) He completed the Kaufman Test of Educational Achievement—Brief (KTEA) and received a score of 63 (extremely low) in reading, a score of 49 (extremely low) in math, and a score of 63 (extremely low) in spelling. (*Id.*) Plaintiff was given the Adaptive Behavior Assessment System—Second Education (ABAS-II). Results of the ASAB-II, indicated a conceptual composite score of 96 (average), practical composite score of 105 (average), social composite score of 119 (high average), and a global adaptive composite score of 105 (average). (*Id.*)

In April of 2011, at age 17 years and 9 months, Plaintiff was administered the Wechsler Adult Intelligence Scale—Fourth Edition (WAIS-IV). (T. 336, 339.) The WAIS-IV results indicated a verbal comprehension score of 68 (extremely low), perceptual reasoning score of 58 (extremely low), a working memory score of 74 (borderline), a processing speed score of 79 (borderline), and a full scale IQ score of 63 (extremely low). (T. 339.) Notations indicated that Plaintiff was functioning at a similar cognitive level "as before." (T. 340.) Notations also indicated that Plaintiff's WAIS-IV scores signified that he had "great difficulty in reasoning using verbal information... and in doing more visual-spatial, hand-on tasks." (*Id.*) Plaintiff was also administered

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7223338

the Woodcock Johnson Tests of Achievement—Third Edition and scored "extremely low" in all areas indicating "significant weakness in all of the academic areas." (T. 341.) Plaintiff scored "extremely low" in all areas of the Adaptive Behavior Assessment System—Second Edition (ABAS-II). (T. 342.)

 **\*5** Although Plaintiff's IQ scores fall within the requirements of Listing 12.05C, the ALJ determined that Plaintiff did not meet the Listing because he did not have "significant deficits in adaptive functioning." (T. 16.) Adaptive functioning refers to an individual's "[ ]ability to cope with the challenges of ordinary everyday life." *Talavera v. Astrue,* 697 F.3d 145, 153 (2d Cir. 2012) (quoting *Novy v. Astrue,* 497 F.3d 708, 710 (7th Cir. 2007)). Accordingly, courts have held that if a plaintiff is able to satisfactorily navigate activities such as "liv[ing] on [one's] own," "tak[ing] care of ... children ... without help ... sufficiently well that they have not been adjudged neglected," "pay[ing] bills," and "avoid[ing] eviction," the plaintiff does not suffer from deficits in adaptive functioning. *Talavera,* 697 F.3d at 153. This District has previously looked to factors such as living on one's own, independently caring for children, cooking, paying bills, communication abilities, and daily living skills as indications of deficits in adaptive functioning. *Stephens v. Colvin*, No. 3:15-CV-00622, 2016 WL 4094885, at \*6 (N.D.N.Y. Aug. 2, 2016) (citing *Barton v. Astrue*, No. 3:08–CV–0810, 2009 WL 5067526, at \*7 (N.D.N.Y. Dec. 16, 2009)).

In making his determination, the ALJ relied on the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V") for guidance. (T. 16.) The DSM-V divides adaptive functioning into three domains: conceptual, social, and practical. (T. 16.) The ALJ took into consideration Plaintiff's test scores from 2008 in which he scored in the average range for conceptual, practical, and social adaptive behavior, and test scores from 2011 in which he received extremely low scores for conceptual, practical, and social adaptive behavior. (T. 16, *referring to* T. 338, 342.) The ALJ appears to question the accuracy of the 2011 scores, noting that Plaintiff was anticipating his redetermination and that Plaintiff's teacher commented that he was able to accomplish academic, community and social skills, but needed to be motivated to do so. (T. 16.) The ALJ also noted that educational records indicated Plaintiff could do simple math problems involving money and he was very social. (*Id.*) The ALJ took into consideration Plaintiff's activities of daily living, such as his ability to cook, clean, do laundry, shop, and care for his own personal hygiene. (*Id.*) Finally, the ALJ noted that Plaintiff was able to work as a cab driver. (*Id.*)

Plaintiff specifically argues that the ALJ erred in his conclusion that Plaintiff has a high school education, because Plaintiff did not receive a regular education diploma, but instead an IEP diploma. (Dkt. No. 10 at 13-14 [Pl.'s Mem. of Law].) The ALJ noted at step five, not step three, that Plaintiff's education level was "at least high school." (T. 24); *see* 20 C.F.R. §§ 404.1564, 416.964. The ALJ did not discuss Plaintiff's type or level of education, outside of testing, at step three of his determination. (T. 15-18.) Elsewhere in his determination the ALJ noted that although Plaintiff was eligible for special education and classified as a child with an intellectual disability that did not necessarily mean that he was disabled under the adult rules of disability. (T. 21.)

To be sure, attendance in special education classes, and an education pursuant to an IEP, have been construed as factors indicative of deficits in adaptive functioning. *Lyons v. Colvin*, No. 7:13-CV-00614, 2014 WL 4826789, at \*9 (N.D.N.Y. Sept. 29, 2014). Here, although Plaintiff received an IEP diploma, the ALJ relied on other significant evidence in the record in making his determination that Plaintiff did not have deficits in adaptive functioning. As noted by the ALJ, Plaintiff was able to do simple problem solving involving money, he was social, he was able to perform activities of daily living independently, and he was able to drive. (T. 16.)

Indeed, in his Function Report, Plaintiff indicated that he was able to shop for food, pay bills, count change, and play games. (T. 243.) Plaintiff informed the consultative examiner that he cooks, cleans, does laundry, shops once a month, showers and dresses himself daily, and listens to the radio and plays sports. (T. 365.)[2] He indicated that he could and could not handle a savings account, but that his ability to handle money has not changed due to his impairments. (T. 243.) Although Plaintiff indicated that he could not follow spoken or written instruction (T. 246), school records indicated that he was capable of being focused and could do simple problem solving involving money, could read and work with graphs, and could use a calculator with ease. (T. 344-345.)

**\*6** Although Plaintiff did not work at the level of substantial gainful employment, he was employed after high school and reported that he ceased working due to conditions other than his intellectual impairment. Plaintiff testified that he ceased working as a cab driver because of the "drunks and idiots," he ceased working at a restaurant because he could not understand his boss's heavy accent, and he ceased working as a cart returner because he had surgery on his leg. (T. 39, 54.) He further testified that he has a driver's license, but does not drive because he does not own a car. (T. 42.) Therefore, despite Plaintiff's enrollment in an IEP program, substantial evidence in the record supported the ALJ's determination that Plaintiff did not have deficits in adaptive functioning. *See Perry v. Astrue,* No. 3:11-CV-1122, 2013 WL 474849, at \*3 (N.D.N.Y. Feb. 6, 2013) (ALJ properly determined Plaintiff with an IEP diploma did not have deficits of adaptive functioning were the evidence indicated she could perform activities of daily living and the basic mental demands of unskilled work).

Plaintiff cites to evidence in the record which he maintains provides substantial evidence to support a finding of deficits in adaptive functioning. (Dkt. No. 10 at 15-16 [Pl.'s Mem. of Law].) However under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record. *See Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); *see also Wojciechowski v. Colvin,* 967 F.Supp.2d 602, 605 (N.D.N.Y. 2013) (Commissioner's findings must be sustained if supported by substantial evidence even if substantial evidence supported the plaintiff's position); *see also Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (reviewing courts must afford the Commissioner's determination considerable deference and cannot substitute own judgment even if it might justifiably have reached a different result upon a *de novo* review).

Therefore, substantial evidence supported the ALJ's step three determination that Plaintiff did not meet Listing 12.05C because he did not have the requisite deficits in adaptive functioning and it is recommended that the ALJ's step three determination be upheld.

## B. The ALJ's RFC Determination

Plaintiff's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In assessing Plaintiff's RFC, the ALJ must consider "all of the relevant medical and other evidence." *Id.* at §§ 404.1545(a)(3)-(4), 416.945(a)(3)-(4). An RFC determination must account for limitations imposed by both severe and non-severe impairments. *See Id.* at §§ 404.1545(a)(2), 416.945(a)(2). An ALJ's RFC determination must be supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g). If it is, that determination is conclusive and must be affirmed upon judicial review. *See id.; Perez v. Chater,* 77 F.3d 41, 46 (2d Cir. 1996).

Plaintiff argues that in formulating his RFC determination the ALJ erred because he failed to account for specific limitation imposed by consultative examiner, Sara Long, Ph.D. and the ALJ improperly assessed Plaintiff's cognitive functioning. (Dkt No. 10 at 6-12 [Pl.'s Mem. of Law].) Plaintiff does not argue that the ALJ erred in his physical RFC assessment.

On April 2, 2013, Dr. Long performed a psychiatric evaluation. (T. 380-383.) During her examination she observed that Plaintiff was cooperative with good social skills. (T. 381.) Dr. Long noted that Plaintiff was neat and well-groomed with appropriate eye contact. (*Id.*) On examination, Plaintiff occasionally stuttered and had to repeat himself; otherwise, his speech was clear with adequate expressive and receptive language. (T. 381.) Dr. Long observed that Plaintiff's thought processes were coherent, goal directed, with no indication of sensory or thought disorder. (*Id.*) During examination, Plaintiff displayed a full range of appropriate affect in speech and thought content. (*Id.*) Dr. Long noted that Plaintiff could not subtract three from 20, but could subtract three from 10. (*Id.*) Dr. Long noted that Plaintiff repeated three objects immediately and after five minutes; he repeated digits forward to four digits and backward to two. (*Id.*)

**\*7** Plaintiff reported that he was able to take care of his own grooming, he did "some" cooking, cleaning, and laundry. (T. 382.) He further reported that he socialized and family relationships were good. (*Id.*)

Regarding Plaintiff's cognitive functioning, Dr. Long stated that Plaintiff appeared to be functioning on a borderline to extremely low intellectual level (T. 382); however, his cognitive factors were not fully evaluated and prognosis might be re-evaluated after vocational counseling (T. 383).

In a medical source statement Dr. Long opined that Plaintiff was able to "follow and understand simple directions and instructions and to perform simple tasks independently." (T. 382.) She further opined that Plaintiff could maintain attention and concentration and was able to maintain a regular schedule. (*Id.*) Dr. Long stated that Plaintiff was able to relate adequately with others and was capable of adequate stress management. (*Id.*) She opined that Plaintiff appeared to have moderate to marked limitations in his ability to learn new tasks, perform complex tasks, and make appropriate decisions. (*Id.*)

Plaintiff argues that the ALJ erred in formulating his RFC determination because he afforded "great weight" to Dr. Long's opinion; however, he omitted her opinion that Plaintiff had moderate to marked limitations in his ability to learn new tasks and make appropriate decisions, which would preclude all work. (Dkt. No. 10 at 6-7 [Pl.'s Mem. of Law].) Here, the ALJ's mental RFC determination was supported by substantial evidence in the record.

In formulating his RFC, the ALJ afforded Dr. Long's opinion "great weight." (T. 23.) Plaintiff maintains that the ALJ erred in failing to not only account for all of Dr. Long's opinion, but also for failing to explain how his RFC was consistent with Dr. Long's opinion. (Dkt. No. 10 at 6-7 [Pl.'s Mem. of Law].) First, An ALJ does not have to strictly adhere to the entirety of one medical source's opinion. *See Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."), *see also Zongos v. Colvin*, No. 12-CV-1007, 2014 WL 788791, at *9 (N.D.N.Y. Feb. 25, 2014) (finding that it was within the ALJ's discretion to afford weight to a portion of a treating physician's opinion but not to another portion). Second, it is "not require[d] that ALJ have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981) (rejecting the proposition that the hearing officer must explicitly reconcile "every shred" of conflicting testimony). "In our review, we defer to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

Despite her opinion that Plaintiff had moderate to marked limitations in his ability to learn new tasks and make work-related decisions, Dr. Long opined Plaintiff retained the ability to understand and follow simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule. (T. 382.) *See Kifayeh v. Colvin*, 99 F. Supp. 3d 369, 378 (E.D.N.Y. 2015) (although consultative examiner opined that plaintiff could not learn new tasks, the doctor ultimately opined that plaintiff could perform simple tasks and make appropriate decisions and plaintiff reported he was able to self-groom and go to mosque which supported ALJ's mental RFC determination that plaintiff could perform simple, routine work); *see Patterson v. Colvin*, No. 14-CV-6224, 2015 WL 5036934, at *11 (W.D.N.Y. Aug. 26, 2015) ("Similarly, although [consultative examiner] stated that [Plaintiff's] ability to learn new tasks may be negatively affected by her reading difficulties, [the consultative examiner] also determined that, despite those limitations, [Plaintiff] retained the ability to understand and follow simple directions, perform simple tasks, maintain attention and concentration, maintain a schedule, make appropriate decisions, relate adequately with others, and adequately deal with stress."). Therefore, Dr. Long ultimately opined that Plaintiff could perform simple routine work despite his limitations. In addition, other medical evidence and testimony in the record supported the ALJ's mental RFC determination.

**\*8** Other evidence in the record supported the ALJ's determination that Plaintiff could essentially perform simple, routine, unskilled work and specifically that Plaintiff was capable of learning new tasks. (T. 18.) In formulating Plaintiff's mental RFC the ALJ relied primarily on the opinion of Dr. Long; however, he also relied on the opinion of the non-examining State agency medical consultant, Edward Kamin, Ph.D. (T. 24.)

2016 WL 7223338

Dr. Kamin reviewed Plaintiff's record, including Dr. Long's examination. (T. 62-91.) Dr. Kamin opined that Plaintiff was not significantly limited in his ability to: carry out very short and simple instructions; preform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (T. 67-69.) Dr. Kamin's opinion supported the ALJ's determination that Plaintiff could perform the basic mental demands of unskilled work.

It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e), 416.912(b)(6), 416.913(c), 416.927(e); *Baszto v. Astrue,* 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").

The ALJ's mental RFC determination was further supported by school records and Plaintiff's testimony. The ALJ noted that statements from Plaintiff's teachers suggested that Plaintiff was able to work in some capacity, but may lack motivation. (T. 21.) Plaintiff's teacher reported that he was not always eager to do work, but he was cooperative and would do what he knew was expected of him. (T. 345.) His teacher stated that in the "right setting" Plaintiff could be successful. (*Id.*) The ALJ also noted that Plaintiff was able to obtain a taxi license, do simple math involving money, prepare food, shop in stores, pay bills, count change, and drive. (T. 21.) Therefore, evidence provided by Plaintiff's teachers and Plaintiff's own testimony of his activities support the ALJ's mental RFC determination and further indicate that Plaintiff was capable of learning new tasks.

Plaintiff then contends that Dr. Long's conclusion, that Plaintiff had moderate to marked limitations, was too vague to support an RFC determination. (Dkt. No. 10 at 8 [Pl.'s Mem. of Law].) Plaintiff first admonishes the ALJ for failure to include specific limitations and then argues those limitations would not constitute substantial evidence even if the ALJ had included them. For the reasons discussed herein, the ALJ's mental RFC was supported by substantial evidence, namely, the medical opinions of Drs. Long and Kamin, statements by Plaintiff's teachers, and Plaintiff's own testimony.

Plaintiff next argues that the ALJ failed to properly account for Plaintiff's cognitive limitations in his RFC determination. (Dkt. No. 10 at 9-12 [Pl.'s Mem. of Law].) In support of his argument, Plaintiff specifically argues the ALJ improperly substituted his judgment for medical opinion by calling into question the veracity of Plaintiff's testing results and the ALJ failed to include testing limitations in his RFC determination. (*Id.* at 11-12.)

**\*9** First, the ALJ did not improperly substitute his own lay opinion. To be sure, an ALJ is "not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015). Here, although the ALJ noted that Plaintiff's testing scores "varied significantly, calling into question the veracity of these test results" the ALJ nonetheless determined that Plaintiff suffered from an intellectual impairment and assessed that impairment throughout his determination based, not only on testing results, but on medical opinion evidence and Plaintiff's testimony.

It is well within an ALJ's discretion to weigh the validity of multiple testing results. Here, the ALJ concluded that although Plaintiff has an intellectual disability, "his performance on standardized tests have varied significantly, calling into question the veracity of these test results." (T. 20.) An ALJ may reject an IQ score as invalid when it is inconsistent with the record. *See Burnette v. Colvin,* 564 Fed.Appx. 605, 608 (2d Cir. 2014) (ALJ properly exercised his discretion in affording little weight to an IQ score which was inconsistent with the record); *see Baszto v. Atrue,* 700 F.Supp.2d 242, 248 (N.D.N.Y. 2010) (collecting cases). The ALJ took into consideration Plaintiff's tests scores at steps three and four of his determination. In formulating his RFC, the ALJ determined that based on the record as a whole, including Plaintiff's test scores, medical evidence, and testimony, that Plaintiff retained the mental RFC to perform unskilled work. (T. 20-21, 23-24.)

Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)
Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 150 of 153
2016 WL 7223338

Second, Plaintiff essentially asks the Court to reweigh the evidence before the ALJ. Plaintiff provided a summary of various test results which he contends the ALJ failed to properly take into account. (Dkt. No. 10 at 11-12 [Pl.'s Mem. of Law].) When applying the substantial evidence test to a finding that a plaintiff was not disabled, the Court "will not reweigh the evidence presented at the administrative hearing, ... nor will it determine whether [the applicant] actually was disabled. [Rather,] [a]bsent an error of law by the Secretary, [a] court must affirm her decision if there is substantial evidence [in the record] to support it." *Lefford v. McCall,* 916 F. Supp. 150, 155 (N.D.N.Y. 1996) (citing *White v. Shalala,* 823 F.Supp. 621, 623 (N.D. Ind 1993)). Because substantial evidence supported the ALJ's mental RFC determination, for the reasons stated herein, it is recommended that the RFC determination be upheld.

### C. The ALJ's Step Five Determination

Plaintiff argues that the ALJ erred in his step five determination because he failed to call on the services of a VE. (Dkt. No. 10 at 16-18 [Pl.'s Mem. of Law].)

At step five in the sequential evaluation, the ALJ was required to perform a two part process to first assess Plaintiff's job qualifications by considering his physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). The second part of this process is generally satisfied by referring to the applicable rule of the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid"). *See Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir. 1986).

The Second Circuit has explained that the ALJ may not solely rely on the Grids if a non-exertional limitation "has any more than a 'negligible' impact on a claimant's ability to perform the full range of work." *Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue,* 595 F.3d 402, 411 (2d Cir. 2010)). A non-exertional impairment is non-negligible "when it ... so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala,* 595 F.3d at 411. Whether VE testimony is required must be determined on a "case-by-case basis." *Bapp* 802 F.2d at 605-606. Further, "the mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." *Id.* at 603.

**\*10**  Here, the ALJ cited to SSR 85-15, which provides that the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (T. 25.) The ALJ's mental RFC determination is consistent with the demands of unskilled work. Therefore, the ALJ did not err in reliance on the Grids in his step five determination because Plaintiff's mental impairments did not prevent him from performing the basic demands of unskilled work. It is therefore recommended that the ALJ's step five determination be upheld.

**ACCORDINGLY**, based on the findings above, it is
**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 7223338

**Warren v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)**
2016 WL 7223338

---

### Footnotes

1    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket
     files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of
     walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required
     occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

2    Plaintiff informed another consultative examiner that he does not do laundry, because his fiancé does it. (T. 385.)

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00506-AJB-ML    Document 24    Filed 05/05/25    Page 152 of 153
Warren v. Colvin, Not Reported in Fed. Supp. (2016)
2016 WL 7238947

2016 WL 7238947
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jamal WARREN, Plaintiff,

v.

Carolyn W. COLVIN Commissioner of Social Security, Defendant.

3:15-CV-1185 (GTS/WBC)
|
Signed 12/13/2016

**Attorneys and Law Firms**

LACHMAN & GORTON, P.O. Box 89, 1500 East Main Street, OF COUNSEL: PETER A. GORTON, ESQ., Endicott, NY 13761-0089, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL—REGION II, 26 Federal Plaza, Room 3904, OF COUNSEL: TOMASINA DIGRIGOLI, ESQ., New York, NY 10278, Counsel for Defendant.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this Social Security action filed by Jamal Warren ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is the Report and Recommendation of United States Magistrate Judge William B. Mitchell Carter, recommending that Plaintiff's motion for judgment on the pleadings be denied, and that Defendant's motion for judgment on the pleadings be granted. (Dkt. No. 14.) Objections to the Report and Recommendation have not been filed, and the time in which to do so has expired. (*See generally*, Docket Sheet.)

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's Report and Recommendation, but they must be "specific written objections," and must be submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *accord,* 28 U.S.C. § 636(b)(1)(C). When no objection is made to a report and recommendation, the Court subjects that report and recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After carefully reviewing the relevant papers herein, including Magistrate Judge Carter's thorough Report and Recommendation, the Court can find no clear error in the Report and Recommendation. Magistrate Judge Carter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 14.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Carter's Report and Recommendation (Dkt. No. 14) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the Commissioner's determination is **AFFIRMED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7238947

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.